## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JANE DOES I, II, III and FRIENDS OF FARMWORKERS, INC. D/B/A JUSTICE AT WORK IN ITS CAPACITY AS EMPLOYEE REPRESENTATIVE,<br><br>Plaintiffs,<br><br>EUGENE SCALIA, IN HIS OFFICIAL CAPACITY AS UNITED STATES SECRETARY OF LABOR; OCCUPATIONAL SAFETY AND HEALTH ADMINISTRATION, UNITED STATES notice DEPARTMENT OF LABOR,<br><br>Defendants. | Case No.: 3:20-cv-01260<br>Judge Mannion |

## POST-HEARING BRIEF AND RESPONSE TO MOTION TO DISMISS

# **TABLE OF CONTENTS**

A. Plaintiffs Assert a Viable Claim Under 29 U.S.C. § 662(d)................................2

B. Defendants' Failure to Act Under § 662 Is Arbitrary and Capricious ................7

   1. *There is "Imminent Danger" at the Plant under the OSH Act* ......................7

   2. *OSHA's Failure to Address the Imminent Danger Is Arbitrary and Capricious*...............................................................................................13

      a. OSHA's Conclusion that Conditions at the Plant Do Not Constitute an Imminent Danger Is Based on Reasons That Conflict with the Law and Available Evidence....................................................................14

      b. OSHA's Investigation of Maid-Rite's Conditions Has Been Conducted in an Arbitrary and Capricious Manner .................................19

C. Plaintiffs' Requested Remedies Include but Are Not Limited to an Order Requiring OSHA to Seek Relief for Maid-Rite's Workers Under 29 U.S.C. § 662(a) .............................................................................................25

# TABLE OF AUTHORITIES

## CASES

*CBS Corp v. FCC*, 663 F.3d 122 (3d Cir. 2011) ...............................................15, 21

*Cuyahoga Valley Ry. Co. v. United Transp. Union*, 474 U.S. 3 (1985)...................5

*Edison Electric Institute v. EPA*, 391 F.3d 1267 (D.C. Cir. 2004).........................16

*Int'l Union v. Chao*, 361 F.3d 249 (3d Cir. 2004).....................................................13

*Marshall v. Daniel Const. Co.*, 563 F.2d 707 (5th Cir. 1977)...................................6

*Marshall v. Whirlpool Corp.*, 593 F.2d 715 (6th Cir. 1979) .....................................6

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983).............................................................................................13, 16

*Nat'l Cotton Council of Am v. Donovan*, 452 U.S. 490 (1981)...............................18

*Pub. Citizen Health Research Grp. v. Auchter*, 702 F.2d 1150 (D.C. Cir. 1983) ........................................................................................................................13

*Ramaprakash v. FAA*, 346 F.3d 1121 (D.C. Cir. 2003) .........................................15

*Rural Cmty. Workers All. v. Smithfield Foods, Inc.*, No. 5:20-CV-06063-DGK, 2020 WL 2145350 (W.D. Mo. May 5, 2020) ..................................................4

*Scott v. Sysco Food Serv. of Metro N.Y., L.L.C.*, No. CIV.A. 07-3656(SRC), 2007 WL 3170121 (D.N.J. Oct. 26, 2007) ................................................................4

*United Food & Commercial Workers Union, Local No. 663 v. United States Dep't of Agric.*, No. 19-CV-2660 (JNE/TNL), 2020 WL 2603501 (D. Minn. Apr. 1, 2020) ..........................................................................................................18

*Whirlpool Corp. v. Marshall*, 445 U.S. 1 (1980).........................................3, 5, 8, 17

## STATUTES, RULES, REGULATIONS

29 C.F.R. § 1903.6 ................................................................................ 22-24

29 U.S.C. § 651, *et seq*. ............................................................................ 1

29 U.S.C. § 654 ................................................................................. 22

29 U.S.C. § 657 .............................................................................. 20, 22

29 U.S.C. § 658 ................................................................................. 12

29 U.S.C. § 659 ................................................................................. 12

29 U.S.C. § 661 ................................................................................. 12

29 U.S.C. § 662 .......................................................................... *passim*

## MISCELLANEOUS

Dep't of Labor Br., *In re AFL-CIO*, No. 20-1158 (D.C. Cir. May 29, 2020) ......... 15

Imminent Danger Situations, OSHA Field Op Man. Sec I, Ch. 11 (DOL) .............. 8

Petition To Permit Waivers of Maximum Line Speeds for Young Chicken
Establishments Operating Under the New Poultry Inspection System;
Criteria for Consideration of Waiver Requests for Young Chicken
Establishments To Operate at Line Speeds of Up to 175 Birds per Minute,
83 Fed. Reg. 49,048 (Sept. 28, 2018) ................................................. 18

Grant, Michael, Basler, Colin, et al. *Strategies to reduce COVID-19
transmission at the Smithfield Foods Sioux Falls Pork Plant*, April 22, 2020,
*available at* https://covid.sd.gov/docs/smithfield_recs.pdf ("Sioux Falls Epi
Aid") ........................................................................................ 9, 16

Jessica Lussenhop, *Coronavirus at Smithfield pork plant: The untold story of
America's biggest outbreak*, BBC, Apr. 17, 2020, *available at*
https://www.bbc.com/news/world-us-canada-52311877 ........................................ 9

Steinberg J, Kennedy ED, Basler C, et al. *COVID-19 Outbreak Among Employees at a Meat Processing Facility — South Dakota*, March–April 2020. MMWR Morb Mortal Wkly Rep 2020;69:1015–1019. DOI: http://dx.doi.org/10.15585/mmwr.mm6931a2 ..................................................10, 15

Executive Order on Delegating Authority Under the DPA with Respect to Food Supply Chain Resources During the National Emergency Caused by the Outbreak of COVID-19 (April 28, 2020) ..........................................................19

Meat and Poultry Processing Workers and Employers, Interim Guidance from CDC and the Occupational Safety and Health Administration (OSHA), available at https://www.cdc.gov/coronavirus/2019-ncov/community/organizations/meat-poultry-processing-workers-employers.html ("OSHA Meatpacking Guidance") .....................................8, 14, 16

Updated Interim Enforcement Response Plan for Coronavirus 2019 (COVID-19), May 19, 2020, *available at* https://www.osha.gov/memos/2020-05-19/updated-interim-enforcement-response-plan-coronavirus-disease-2019-covid-19 ("May 19 Guidance") .............21

U.S. GOV'T ACCOUNTABILITY OFFICE, WORKPLACE SAFETY & HEALTH: SAFETY IN THE MEAT & POULTRY INDUS., WHILE IMPROVING COULD BE FURTHER STRENGTHENED 32, January 2005, *available at* https://www.gao.gov/assets/250/245042.pdf.............................19

Pursuant to the Court's August 4, 2020 Order (ECF No. 40), Plaintiffs submit this post-hearing brief establishing that the Court can hear their 29 U.S.C. § 662(d) claim and that Defendants have violated § 662 by arbitrarily and capriciously "fail[ing] to seek relief," 29 U.S.C.§ 662(d), from an imminent danger for workers at the Maid-Rite Plant in Dunmore, PA (the "Plant").

Conditions at the Plant have remained largely unchanged since workers filed complaints about Maid-Rite's practices in April and Plaintiffs filed their imminent danger complaint in May. Most importantly, Maid-Rite has made no efforts during the pandemic to reorganize its production lines so workers can properly socially distance during their long and grueling shifts. (Jane Doe II Decl. ¶¶ 13-21 (Ex. B); Mechanic Decl.[1] ¶¶ 9-13 (Ex. C).) Because OSHA ignored relevant evidence and the Agency's own guidance, and conducted its investigation in a manner that conflicted with the Occupational Safety and Health Act ("OSH Act"), 29 U.S.C. § 651, *et seq.*, OSHA's determination that there is no imminent danger is arbitrary and capricious.

Plaintiffs request an order from this Court requiring OSHA either to seek an imminent danger injunction under 29 U.S.C. § 662(a) or to conduct a prompt onsite inspection—this time without providing advance notice to Maid-Rite—to

---

[1] The declaration attached here as Exhibit C from an anonymous worker who is not a plaintiff in this case is referred to as the "Mechanic Declaration," because that worker is employed as a mechanic within the Plant.

determine whether an imminent danger exists at the Plant. If OSHA continues to determine that no such imminent danger exists, Plaintiffs request that the agency provide a report for the Court justifying that determination based on the evidence, the OSH Act, and relevant regulations and guidance.

## A. **Plaintiffs Assert a Viable Claim Under 29 U.S.C. § 662(d).**

Plaintiffs' allegations fall squarely within the jurisdiction provided by 29 U.S.C. § 662(d). Section 662(a) establishes the Secretary of Labor can:

> petition [the courts] … to restrain any conditions or practices in any place of employment which are such that a danger exists that could be reasonably expected to cause death or serious physical harm imminently or before the imminence of such danger can be eliminated through enforcement procedures.

Section 662(d) provides that if the Secretary fails to use that authority, employees:

> might bring an action against the Secretary in the United States district court for the district in which the imminent danger is alleged to exist … for a writ of mandamus to compel the Secretary to seek such an order and for such further relief as may be appropriate.

For employees to obtain that relief, they must show "the Secretary arbitrarily or capriciously fails to seek relief under this section." *Id.* § 662(d).

Plaintiffs meet these requirements. Plaintiffs submitted a complaint to OSHA explaining that Jane Doe workers at the Maid-Rite plant believed they faced an imminent danger (ECF No. 2-3). These conditions persist at the Plant. (Jane Doe II Decl. ¶¶ 13-21.) The OSHA official who reviewed that complaint

understood the workers alleged an imminent danger. (Tr. 136:12-14.) [2] Nonetheless, OSHA determined, *before conducting an in-person inspection*, that "the conditions listed in the complaint did not give rise to an imminent danger." (*Id.* at 141:1-4.) Even after an inspection confirmed the complaint's allegations regarding the lack of social distancing on the line, OSHA still concluded no imminent danger existed. For the reasons set forth below, those determinations were arbitrary and capricious at the time, and remain so today. Plainly, allowing workers to be exposed to an imminent risk of contracting COVID-19 can "be reasonably expected to cause death or serious physical harm" imminently. 29 U.S.C. § 662(a). Yet OSHA has failed to act. That failure makes this Court's intervention pursuant to § 662(d) appropriate and necessary.[3]

The Supreme Court recognized § 662(d) empowers employees "to bring an action to compel the Secretary to seek injunctive relief if he believes the Secretary has wrongfully declined to do so." *Whirlpool Corp. v. Marshall*, 445 U.S. 1, 10 (1980). And a federal district court recently held workers could not pursue common law remedies against their employer for exposing them to COVID-19

---

[2] Because this brief relies on several aspects of the July 31, 2020 hearing, Plaintiffs attach the complete transcript of that hearing to this brief as Exhibit A.

[3] Plaintiffs submit a declaration with this brief establishing the Jane Doe workers continue to be employed at Maid-Rite and to face the imminent dangers there. Therefore, to the extent OSHA contends or the Court concludes Plaintiffs must establish they were "current employees" at the time they filed suit, rather than at the time of their OSHA complaint (*see* Tr. 7:4-10), Plaintiffs have done so.

*because* they could employ § 662(d) to compel OSHA to act. *Rural Cmty. Workers All. v. Smithfield Foods, Inc.*, No. 5:20-CV-06063-DGK, 2020 WL 2145350, at *8 (W.D. Mo. May 5, 2020) ("[I]f OSHA fails to act quickly [regarding unsafe conditions due to COVID-19, workers] may receive emergency relief through OSHA's statutory framework [under § 662(d).]"). A court in this Circuit has held similarly. *Scott v. Sysco Food Serv. of Metro N.Y., L.L.C.*, No. CIV.A. 07-3656(SRC), 2007 WL 3170121, at *5 (D.N.J. Oct. 26, 2007) (Section 662(d) should be used when OSHA wrongly "dismisse[s]" a complaint.). Consistent with these cases and considering OSHA's refusal to act while Maid-Rite's workers are exposed to COVID-19, Plaintiffs have properly invoked § 662(d).

OSHA's alternative reading of § 662(d) is atextual. OSHA argues that because § 662(c) requires an inspector to "inform the affect[ed] employees and employers of an imminent danger found during an inspection and that he is recommending that relief be sought," the Secretary can only seek an order under § 662(a) after receiving such a recommendation from an inspector, and an employee or her representative can only invoke § 662(d) if the Secretary fails to heed such a recommendation. (ECF No. 24, at 3.) Yet neither § 662(a) nor § 662(d) contain any language suggesting that those provisions are triggered only where an inspector determines there is imminent danger.

Seemingly recognizing the inherent flaws in its argument that a subordinate

4

employee can cabin the Secretary's authority to protect workers from imminent dangers, OSHA pivoted at the hearing. It stated that it did not actually mean the inspector alone had the authority to trigger the Secretary's authority. Rather, according to OSHA, the inspector's recommendation would come after consultation with "the area director, [and] the regional administrator," who would collectively determine whether the Secretary should act. (Tr. 28:15-21.) But the statute nowhere mentions those other officials, and OSHA cannot explain why Congress would limit the authority of a politically accountable official based on recommendations received from his subordinates.

Moreover, conditioning § 662(d) actions on whether an inspector issues a recommendation that an imminent danger exists would fail to provide workers "full protection in most situations" consistent with the purpose of § 662. *Whirlpool Corp.*, 445 U.S. at 10. It would mean that if, as here, an OSHA official fails to recognize the severity of a risk, workers would have *no* mechanism to protect themselves. Workers have no right to contest OSHA's failure to issue a citation in OSHA's administrative processes. *Cuyahoga Valley Ry. Co. v. United Transp. Union*, 474 U.S. 3, 7-8 (1985) ("[T]he Secretary's decision to withdraw a citation against an employer under the Act is not reviewable."). And as OSHA conceded, aside from § 662(d), there is not "any formal appeal process" for workers if OSHA decides workplace conditions do not constitute an imminent danger. (Tr. 88:25-

5

89:7.) Rather, as OSHA acknowledged, "this process," meaning the process spelled out under § 662(d), is how employees are meant to hold OSHA accountable for failing to protect them from imminent dangers. (*Id.*) If the Court accepts OSHA's argument that an inspector's recommendation is a prerequisite to an action under § 662(d), workers will be left with no recourse if OSHA officials were to make a mistake in that initial determination or even if they were *ordered* not to find an imminent danger in the workplace at issue.

The only two cases OSHA cites to support its interpretation do not address the scope of § 662(d). Those cases both concern whether OSHA could promulgate a rule permitting employees to refuse to work due to unsafe conditions. *Marshall v. Whirlpool Corp.*, 593 F.2d 715, 720 (6th Cir. 1979); *Marshall v. Daniel Const. Co.*, 563 F.2d 707, 710 (5th Cir. 1977). Moreover, *Daniel Construction*, in reviewing the legislative history of § 662, explained Congress' primary concern was to *reduce* the power of inspectors and ensure "only the courts had the authority to enjoin an employer's business operations." 563 F.2d at 713, 715. Plaintiffs' interpretation, not OSHA's, accomplishes these ends. Plaintiffs' argument recognizes courts' gatekeeping role, whereas OSHA's would empower inspectors to determine, based on their views alone, whether the injunction mechanism spelled out in § 662 applies to any particular workplace danger.

Finally, § 662(d) itself resolves OSHA's argument that if this case proceeds,

the floodgates will open to a spate of similar suits. Workers can only bring a § 662(d) claim if they face an imminent danger, have notified OSHA, and plausibly allege that OSHA has "arbitrarily or capriciously" failed to act under § 662. In other words, there are many obstacles to bringing a case under § 662(d).[4] This case, however, presents the extraordinary situation that Congress contemplated in enacting that provision. The conditions presented by COVID-19 and the Plant are atypically dangerous, and OSHA's position that those conditions could *never* create an imminent danger is arbitrary and capricious. These circumstances require the Court's intervention, and § 662(d) permits it.

### B. Defendants' Failure to Act Under § 662 Is Arbitrary and Capricious.

To succeed under § 662(d), Plaintiffs must show: (1) the conditions at Maid-Rite present an "imminent danger" to workers, and (2) OSHA's failure to "seek relief" under § 662 is arbitrary and capricious. Plaintiffs have done so.

*1.  There is "Imminent Danger" at the Plant under the OSH Act.*

An "imminent danger" is one that can "cause death or serious physical harm immediately or before the imminence of such danger can be eliminated through [OSHA's] enforcement procedures." 29 U.S.C. § 662(a). Serious harms are those that could cause "[a] substantial reduction in physical or mental efficiency or health, even though the resulting harm may not manifest itself immediately."

---

[4] As Defendants state, "no Court has *ever*" granted such relief. (ECF No. 24, at 4.)

Imminent Danger Situations, OSHA Field Op Man. Sec I, Ch. 11 (DOL); *see also Whirlpool,* 445 U.S. at 8-10. For example, in OSHA's words, an imminent danger arises from a trench without sufficient "shoring," where there is a "history of collapses," and "it's raining." (Tr. 142:22-143:1.)

In this case, Maid-Rite's ongoing refusal to allow workers to socially distance along production lines constitutes an imminent danger, especially coupled with other conditions at the Plant. Workers at the Plant must stand for around eight hours a day on Maid-Rite's lines working elbow-to-elbow with the workers next to them, and just a few feet away from the workers across from them. (Jane Doe II Decl. ¶¶ 13-21; Mechanic Decl. ¶¶ 9-13.) OSHA does not substantively contest this fact, stating that during its pre-announced inspection—in anticipation of which Maid-Rite moved workers to create the false impression it allows even two feet of distancing, (Jane Doe II Decl. ¶¶ 6-8, 12)—workers were "2 to 3 feet apart," unless the station was "naturally" set up to permit distancing. (Tr. 191:8-12.)

OSHA's and the CDC's COVID-19 guidance for meat-processing plants, however, emphasizes the critical importance of distancing workers along production lines. This guidance from April[5] notes that the forced close proximity

---

[5] *See* Meat and Poultry Processing Workers and Employers, Interim Guidance from CDC and the Occupational Safety and Health Administration (OSHA), available at https://www.cdc.gov/coronavirus/2019-ncov/community/organizations/meat-poultry-processing-workers-employers.html ("OSHA Meatpacking Guidance").

of meatpacking workers "may contribute substantially to their potential exposures," and recommends that employers like Maid-Rite "modify[] the alignment of workstations, including along processing lines, if feasible, so that workers are at least six feet apart in all directions (e.g., side-to-side and when facing one another)." (Compl. ¶ 73, ECF No. 1.) This is exactly what OSHA appears to concede Maid-Rite has *not* done.

In April, as part of reviewing an outbreak at another meat-processing plant, the CDC explained that "keeping space between individuals (social distancing) is one of the best strategies to avoid being exposed to the virus and slowing its spread."[6] "Changes in production practices (e.g., line speed reductions) may be necessary in order to maintain appropriate distancing among employees." *Id.* at 7. The CDC noted that the plant at issue had been conducting temperature screenings, mandating that workers wear facemasks, and had installed plexiglass barriers between workers along production lines, but that those measures were insufficient, absent social distancing along production lines and other changes. *See id.* at 2-3.

A study of that same plant published by the CDC just last week explained

---

[6] Grant, Michael, Basler, Colin, et al. *Strategies to reduce COVID-19 transmission at the Smithfield Foods Sioux Falls Pork Plant*, April 22, 2020, *available at* https://covid.sd.gov/docs/smithfield_recs.pdf ("Sioux Falls Epi Aid"). *See also* Jessica Lussenhop, *Coronavirus at Smithfield pork plant: The untold story of America's biggest outbreak*, BBC, Apr. 17, 2020, *available at* https://www.bbc.com/news/world-us-canada-52311877.

that the "highest attack rates" of COVID-19 occurred where "employees tended to work <6 feet (2 meters) from one another on the production line."[7] Therefore, the researchers concluded, we must "prioritize implementation of control measures consistent with published guidelines" and in particular combine "engineering (e.g., modification of workstations to separate workers) and administrative (e.g., promoting social distancing when possible) controls." *Id.*

Dr. Melissa Perry, an epidemiologist who has studied meat-processing plants, emphasizes that spacing meatpacking workers more than six feet apart on the production line is the most important control measure a meatpacking employer can adopt to mitigate spread of a respiratory virus like COVID-19. (Perry Decl. ¶ 11, Ex. D.) Other measures that fall lower in the "hierarchy of controls," such as instituting temperature checks and performing regular cleaning, are necessary but not sufficient to controlling the virus's spread. (Perry Decl. ¶¶ 15-18.) Dr. Perry opines that if OSHA's observations from its pre-announced inspection are accurate and workers are two to three feet apart for eight hour shifts, there is an extremely high risk that the virus would spread quickly at the Plant because of the lack of social distancing and regardless of any other safety measures. (Perry Decl. ¶ 12.)

---

[7] Steinberg J, Kennedy ED, Basler C, et al., *COVID-19 Outbreak Among Employees at a Meat Processing Facility — South Dakota*, March–April 2020. MMWR Morb Mortal Wkly Rep 2020;69:1015–1019. DOI: http://dx.doi.org/10.15585/mmwr.mm6931a2.

The risks are even higher where, as the worker declarants have stated here, workers are forced to work elbow-to-elbow. *Id.* She explains that "once the virus is present in a facility that fails to follow the highest-priority recommendations in the Meatpacking Guidance," including guidance with respect to social distancing on production lines, "it is [her] opinion that spread among workers at such a workplace [is] inevitable." (*Id.* ¶ 20.)

The risk of spread is not speculative. These same or similar conditions have already caused the spread of the virus among a substantial percentage of the Plant's workforce. (Compl. ¶¶ 80-81, ECF No. 1.) The virus is surging around the country and in Lackawanna County in particular (*id.*, ¶ 102), and Maid-Rite has a practice of rotating workers from other facilities through the Dunmore Plant (*id.*, ¶ 4), a practice that also conflicts with OSHA's Meatpacking Guidance recommending that plants "cohort" workers to minimize the number of exposures. (*Id.* ¶ 79.)

The imminent danger created by the lack of distancing is exacerbated by Maid-Rite's several other flagrant breaches of OSHA's Meatpacking Guidance, including: the failure to place any form of barricade between workers (Compl.¶ 74; Jane Doe II Decl. ¶ 15); the failure to provide workers with masks that Maid-Rite can ensure comply with OSHA's Guidance (Compl. ¶¶ 71, 83; Jane Doe II Decl. ¶ 17; Mechanic Decl. ¶ 9); the failure to provide workers with additional breaks to wash or sanitize their hands, meaning that workers at Maid-Rite may have to wait

hours after coughing or sneezing to cleanse themselves (Compl. ¶¶ 77, 89-92; Jane Doe II Decl. ¶ 18); and Maid-Rite's continued payment of weekend bonuses to workers who do not miss a day of work during the week, incentivizing workers to attend work even when they are sick, (Compl. ¶¶ 94-96; Jane Doe II Decl. ¶ 18).

Finally, the "imminence of [these] danger[s] can[not] be eliminated through" the citation procedures spelled out elsewhere in the OSH Act, 29 U.S.C. § 662(a). Notably, OSHA has up to six months to issue a citation and proposed penalty. 29 U.S.C. § 658(c). An employer can also contest the citation and penalty before the Occupational Safety and Health Review Commission, which stays the effect of the citation. 29 U.S.C. § 661, 659(c). (*See also* Compl. ¶ 104; Tr. 25:3-25:9.) Delays in the administrative process are regrettably expected in the normal course. But Congress created § 662 to afford the agency a direct path to court in emergency situations. And Congress created § 662(d) to give workers a mechanism for holding OSHA accountable when OSHA refuses to act.

Maid-Rite has created a "trench without sufficient shoring" by its serious breaches of the most important safety guidelines for meat-processing plants. That trench has a history of collapses (prior outbreaks), and it is now raining (resurgent spread and Maid-Rite rotating new workers through the facility). (Tr. 142:22-143:1.) The trench could collapse any day. Plaintiffs do not have time to wait.

*2. OSHA's Failure to Address the Imminent Danger Is Arbitrary and Capricious.*

An agency's action is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Moreover, in this case, the arbitrary and capricious analysis is informed by the fact that "human lives are at stake[, and] the very purpose of [OSHA's] governing Act is to protect those lives." *Pub. Citizen Health Research Grp. v. Auchter*, 702 F.2d 1150, 1157-58 (D.C. Cir. 1983). Agency decisions "that might be altogether reasonable in the sphere of economic regulation are less tolerable when human lives are at stake." *Int'l Union v. Chao*, 361 F.3d 249, 255 (3d Cir. 2004) (internal quotation marks omitted).

OSHA's decision to refuse to act to protect Maid-Rite workers from the imminent danger they face is arbitrary and capricious. Its inaction stems from its conclusion that conditions at the plant do not present an imminent danger. (Def.'s Br. at 15, ECF No. 24.) That conclusion is wrong and relies upon (1) considerations inconsistent with the evidence before the agency, which depart from agency guidance and practices without explanation, and which conflict with statute

13

and regulations; and (2) an investigation that flouts statute and regulation.

> ### (a) OSHA's Conclusion that Conditions at the Plant Do Not Constitute an Imminent Danger Is Based on Reasons That Conflict with the Law and Available Evidence.

OSHA has proffered two principal considerations supporting its repeated determination that there is no imminent danger at the Maid-Rite facility: first, that the failure to socially distance workers along production lines can never, on its own, constitute an imminent danger, and second, that workplace hazards cannot pose an imminent danger absent recent hospitalizations or deaths caused by the employer's violations. Those reasons are inadequate, inconsistent with the evidence, and conflict with agency guidance.

**First,** OSHA's determination that "there was nothing in [Plaintiffs' May 19] complaint that led [OSHA] to believe that there was an imminent danger situation at Maid-Rite" was rooted principally in OSHA's conclusion that meat-processing companies do not create an imminent danger by failing to allow workers to socially distance along production lines. (Tr. 174:11-25.)

That conclusion is arbitrary and capricious. OSHA's Meatpacking Guidance explains the critical importance of social distancing along production lines, listing it as the first recommendation under the heading of "Engineering Controls," which sit at the pinnacle of the "Hierarchy of Controls" in to which that guidance document is organized.  *See* OSHA Meatpacking Guidance, note 5, *supra*. And the

CDC's Sioux Falls studies reinforce that other controls are likely to be ineffective in protecting meatpacking workers forced to work for hours every day, indoors, immediately next to each other along production lines. Steinberg, *supra*, note 7. While this guidance is not self-enforcing, OSHA has represented to the D.C. Circuit that guidance like the Meatpacking Guidance helps to define employers' general duty to their workers under the OSH Act. Dep't of Labor Br. at 27, *In re AFL-CIO*, No. 20-1158 (D.C. Cir. May 29, 2020). The agency cannot so blatantly depart from the Guidance without providing a reasoned explanation. *CBS Corp. v. FCC*, 663 F.3d 122, 126 (3d Cir. 2011) (citing *Ramaprakash v. FAA*, 346 F.3d 1121, 1124 (D.C. Cir. 2003) (agency must "provide a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored")). OSHA has provided no such explanation here.

OSHA's conclusion is also inconsistent with available facts and evidence. Consistent with OSHA's and the CDC's analysis, experts state failure to socially distance meatpacking workers along production lines is *the* critical workplace hazard driving transmission of the virus within plants. *See* (Perry Decl. ¶¶ 11-12.)

OSHA's Area Director testified it was his policy that the lack of social distancing alone could never be an imminent danger. (Tr. 174:21-25.) But even if OSHA attempts to rely on the fact that Maid-Rite has followed a few secondary and tertiary suggestions in the OSHA Meatpacking Guidance while flouting the

most important recommendation regarding spacing, that too would be arbitrary and capricious. The OSHA Meatpacking Guidance and the Sioux Falls EPI Aid prioritize social distancing along production lines *over* other controls like facemasks or temperature checks. *See* OSHA Meatpacking Guidance (placing social distancing highest in "hierarchy of controls"). Moreover, OSHA's suggestion that a few mitigation steps lower down on the "hierarchy of controls" would resolve any imminent danger at the plant ignores Maid-Rite's several other violations of OSHA's Meatpacking Guidance. Thus, without additional explanation, the determination that these steps would on their own resolve an imminent danger is arbitrary and capricious. *Edison Electric Institute v. EPA*, 391 F.3d 1267, 1269 & n.3 (D.C. Cir. 2004) (agency must account for a departure from its nonbinding guidance).

**Second**, if the agency believes recent hospitalizations or deaths are a prerequisite for an imminent danger, that too is inconsistent with the OSH Act and arbitrary and capricious. *See Motor Vehicle Mfrs. Ass'n of U.S.*, 463 U.S. at 43. OSHA suggests Plaintiffs cannot *plead* the existence of an imminent danger without alleging recent hospitalizations. (Def.'s Br. at 30, ECF No. 24.) Similarly, OSHA explained the Compliance Safety and Health Officer investigating Maid-Rite determined there was no imminent danger "not because COVID is not serious, but because there was no indication that employees at the plant were suffering

serious harm *at that point*." (Tr. 36:1-3.) (emphasis added).[8] OSHA went on to explain conditions at Maid-Rite do not constitute an imminent danger because "the Plaintiffs have provided no indication that anyone at the plant has been hospitalized since May 19, that anyone has died since May 19." (*Id.* at 36:4-6.)

Insofar as this is OSHA's rationale for declining to find the Plant presents an imminent danger to workers, it is inconsistent with the plain language of the OSH Act. The statute provides an imminent danger exists where conditions are "reasonably expected to cause" death or serious physical harm. 29 U.S.C. § 662(a). The statute is concerned with future, not past, harms, and seeks to prevent them before they occur. *See Whirlpool Corp.*, 445 U.S. at 12. By the time a worker exhibited symptoms of COVID-19, the serious harm would be done. But, the OSH Act and § 662 "do[] not wait for an employee to die or become injured." *Id.* at 12.

**Finally**, there are no alternative justifications present in the record for OSHA's conclusion that conditions at the plant do not constitute an imminent danger. For example, although not claiming that this consideration was relevant to its imminent danger determination, OSHA suggested that social distancing along production lines at the Maid-Rite facility may not be feasible. (Tr. 59:24-60:1.)

---

[8] To be sure, OSHA stated that it does not only "care about people who are hospitalized and dead," (Tr. 36:7-10). But it suggested OSHA's standard enforcement procedures are adequate for people who cannot show present injury or harm.

But OSHA has not made a finding that such a change would not be feasible, and testimony from workers indicates that spacing workers along production lines is perfectly feasible when Maid-Rite slows production. (Jane Doe II Decl. ¶¶ 7-8.) Expert testimony reinforces that meat-processing plants can space workers if they slow lines or space meat further apart along production lines. (Compl. ¶ 84, ECF No. 1.); *Nat'l Cotton Council of Am v. Donovan*, 452 U.S. 490, 508 (1981) ("The plain meaning of the word 'feasible' is . . . 'capable of being done.'").

OSHA's Area Director additionally suggested that, in evaluating whether a failure to socially distance workers along production lines constitutes an imminent danger, the agency had to consider "USDA type regulations that would also govern activities over those conveyer lines." (Tr. 177:3-5.) If the Area Director is referring to regulations about line speeds, the United States Department of Agriculture has set *maximum* line speeds for meat and poultry producers,[9] but those rules do not prevent other agencies for setting slower line speeds in the interests of workplace

---

[9] *See, e.g.*, *United Food & Commercial Workers Union, Local No. 663 v. United States Dep't of Agric.,* No. 19-CV-2660 (JNE/TNL), 2020 WL 2603501, at *3 (D. Minn. Apr. 1, 2020) (lawsuit regarding lifting of maximum line speeds for pork producers); Petition To Permit Waivers of Maximum Line Speeds for Young Chicken Establishments Operating Under the New Poultry Inspection System; Criteria for Consideration of Waiver Requests for Young Chicken Establishments To Operate at Line Speeds of Up to 175 Birds per Minute, 83 Fed. Reg. 49,048 (Sept. 28, 2018) (discussing waivers from maximum line speed requirements for meatpacking workers).

safety.[10] If the Area Director is referring to President Trump's executive order with respect to meatpacking, there is nothing in that order requiring plants to operate production lines at pre-pandemic speeds and certainly nothing to prevent OSHA from ordering changes that require slower line speeds to protect against the spread of COVID-19.[11] In fact, the executive order emphasizes the importance of enforcing workplace safety protections at meat-processing plants to ensure that those plants remain open. *Id.*

In sum, OSHA's conclusion that spacing on production lines cannot constitute an imminent danger and, therefore, that Maid-Rite's failure to space workers is not an imminent danger is arbitrary and capricious because it ignores the OSH Act, OSHA's own guidance, and all available evidence.

(b) OSHA's Investigation of Maid-Rite's Conditions Has Been Conducted in an Arbitrary and Capricious Manner.

OSHA also conducted its investigation of the Plant in an arbitrary and capricious manner, further undermining its conclusion that conditions at that plant do not necessitate prompt action under § 662.

---

[10] U.S. GOV'T ACCOUNTABILITY OFFICE, WORKPLACE SAFETY & HEALTH: SAFETY IN THE MEAT & POULTRY INDUS., WHILE IMPROVING COULD BE FURTHER STRENGTHENED 32, January 2005, *available at* https://www.gao.gov/assets/250/245042.pdf.

[11] Executive Order on Delegating Authority Under the DPA with Respect to Food Supply Chain Resources During the National Emergency Caused by the Outbreak of COVID-19 (April 28, 2020).

*First,* OSHA acted arbitrarily and capriciously when it refused to treat Plaintiffs' May complaint as a formal complaint that would require a prompt inspection. The OSH Act provides:

> [E]mployees or representative of employees who believe that a violation of a safety or health standard exists that threatens physical harm, or that an imminent danger exists, may request an inspection by giving notice to the Secretary or his authorized representative of such violation or danger. Any such notice shall be reduced to writing, shall set forth with reasonable particularity the grounds for the notice, and shall be signed by the employees or representative of employees . . . If upon receipt of such notification the Secretary determines there are reasonable grounds to believe that such violation or danger exists, he shall make a special inspection in accordance with the provisions of this section as soon as practicable. . . . If the Secretary determines there are no reasonable grounds to believe that a violation or danger exists he shall notify the employees or representative of the employees in writing of such determination.

29 U.S.C. § 657(f).

Here, there is no dispute that Plaintiffs' May complaint alleges a violation and imminent danger, is reduced to writing, sets forth with particularity the workplace hazards at the Maid-Rite facility, and is signed by an employee representative, Justice at Work. (Tr. 136:24-137:9). Based on the statute's text, OSHA should have conducted an inspection of the facility "as soon as practicable." 29 U.S.C. § 657(f). Instead, OSHA initiated an informal inquiry by emailing the allegations to Maid-Rite and requesting a response. (Tr. 154:11-14.) It took these steps even though this complaint followed several others it had already received about the Plant's COVID response. (Tr. 140:21-141:4.)

20

The basis for refusing to treat the May complaint as a formal complaint was, according to the Assistant Area Director, that OSHA now treats all complaints involving "medium risk facilit[ies]," including meatpacking plants, as non-formal complaints "if there aren't any outlying issues" rendering the conditions in the workplace "an imminent danger." (Tr. 139:7-13).

That is inconsistent with the relevant guidance for OSHA's enforcement officials at the time and therefore arbitrary and capricious. *CBS*, 663 F.3d at 126 (agency must provide reasons for substantial deviation from policies or practices). OSHA's May 19 guidance explains that not all complaints regarding medium-risk facilities will result in inspections, depending on the discretion of the Area Director, but that guidance also instructs the agency to forgo inspections only where "non-formal procedures can sufficiently address the alleged hazards."[12] In this case, there is no indication that OSHA determined that non-formal procedures could address the hazard. Indeed, OSHA received a response it found unsatisfactory with respect to social distancing, although it still took six weeks after the filing of the May complaint for OSHA to conduct an onsite inspection. (Tr. 157:14-19.)

---

[12] Updated Interim Enforcement Response Plan for Coronavirus 2019 (COVID-19), May 19, 2020, *available at* https://www.osha.gov/memos/2020-05-19/updated-interim-enforcement-response-plan-coronavirus-disease-2019-covid-19 ("May 19 Guidance").

Even if OSHA's conduct was consistent with its May 19 Guidance, its actions were inconsistent with 29 U.S.C. § 657(f), and therefore arbitrary and capricious. The statute specifies that an inspection must be conducted promptly unless there are "no reasonable grounds to determine that a violation or danger exists." 29 U.S.C. § 657(f). The face of Plaintiffs' complaint makes clear that there was ample reason to believe an imminent danger or at least a *violation* existed. The complaint alleges several violations of the Meatpacking Guidance that OSHA has stated helps define the contours of employers' general duty to their workers. 29 U.S.C. § 654(a)(1). OSHA has offered no argument to the contrary.

***Second***, when OSHA did conduct an onsite inspection, it did so in an arbitrary and capricious manner. OSHA's regulations provide that OSHA may give employers advance notice of inspections only in rare circumstances. 29 C.F.R. § 1903.6. Such circumstances include "in cases of apparent imminent danger, to enable the employer to abate the danger as quickly as possible," *id* at § 1903.6(a)(1), "where the inspection can most effectively be conducted after regular business hours or where special preparations are necessary for an inspection," *id.* at § 1903.6(a)(2), "where necessary to assure the presence of representatives of the employer and employees or the appropriate personnel needed to aid in the inspection," *id.* at § 1903.6(a)(3), and "in other circumstances where the Area Director determines that the giving of advance notice would enhance the

probability of an effective and thorough inspection," *id.* at § 1903.6(a)(4).

Advance notice of onsite inspection is so anathema to OSHA—at least when the agency is functioning consistent with statute and regulation—that the Department of Labor's Regional Solicitor stated it was "inappropriate" for Plaintiffs' counsel to argue advance notice may have occurred here. (Tr. 63:7-11.)

The official who inspected the Plant testified after this admonition, however, that she in fact informed Maid-Rite of the July inspection the day before the inspection. (*Id.* at 189:9-15.) She acknowledged that this was not OSHA's typical practice, but that she provided such advance notice at the direction of her superiors. (*Id.* at 197:17-14, 198:1-4.) When asked why they directed her to provide advance notice, she explained, "OSHA has a right to protect their employees also." (*Id.* at 198:11-12.)

The advance notice mattered. Workers report that in anticipation of the inspection, Maid-Rite made changes to hide the extent of its unsafe working conditions, spacing workers further along production lines. (Jane Doe II Decl. ¶¶ 5, 7-9.) After the inspection, workers were once again forced to work immediately next to each other, sometimes touching. (Jane Doe II Decl. ¶ 12.)

OSHA may have a right to protect its inspectors, but the Agency has not explained why that would justify such a deviation from OSHA's regulations, especially where OSHA had already concluded that conditions at the Plant did not

constitute an imminent danger to workers who showed up at the Plant every day. The purpose of advance notice for an onsite inspection was not to abate an imminent danger as quickly as possible, 29 C.F.R. § 1903.6(a)(1)—after all, OSHA conducted the inspection six weeks after Plaintiffs' imminent complaint. And the inspection was not conducted outside of business hours, *id.* at § 1903.6(a)(2). OSHA also cannot argue that the advance notice "enhance[d] the probability of an effective and thorough inspection," *id.* at § 1903.6(a)(4). The workers' accounts reveal otherwise. *See* (Jane Doe II Decl. ¶¶ 5, 7-9.)

OSHA may argue notice was "necessary to assure the presence of representatives of the employer and employees or the appropriate personnel needed to aid in the inspection," 29 C.F.R. § 1903.6(a)(3). But it has offered no basis to support this claim. If conditions at the plant did not constitute an imminent danger, then there should have been no need for an employer representative to be available to ensure the OSHA inspector was protected from any immediate threat to her.

The investigation and inspection of the Plant baselessly failed to comply with OSHA's rules. Those errors infected the ultimate determination here, preventing OSHA from obtaining accurate, timely information regarding Maid-Rite's practices and rendering OSHA's conclusion arbitrary and capricious.

C. **Plaintiffs' Requested Remedies Include but Are Not Limited to an Order Requiring OSHA to Seek Relief for Maid-Rite's Workers Under 29 U.S.C. § 662(a).**

Section 662(d) permits the Court to order the Secretary of Labor "to seek . . . an [imminent danger] order and for such further relief as may be appropriate." Plaintiffs' principal request is and has always been for an order directing the Secretary of Labor to act promptly to protect workers at the Maid-Rite Plant pursuant to his authority under § 662(a).

Considering the testimony elicited at the July 31 hearing, Plaintiffs now also request that OSHA be ordered to perform another onsite inspection of the facility, this time unannounced. Plaintiffs acknowledge that an onsite inspection has occurred, but for the reasons explained above, that inspection was conducted in an arbitrary and capricious manner relying on arbitrary and capricious policies— including that the lack of social distancing can never create an imminent danger. A second inspection may aid in curing the ongoing violation. If, however, OSHA again determines conditions at the Maid-Rite plant do not constitute an imminent danger, it must provide reasons for its determination so Plaintiffs can determine whether to exercise their rights under § 662(d).

Respectfully submitted this 14th day of August 2020.

s/ David H. Seligman

David H. Seligman, CO Bar No. 49394
Juno Turner, NY Bar No. 4491890*

25

Brianne Power, CO Bar No. 53730
1410 High St., Suite 300
Denver, CO 80218
Telephone.: 720-239-2606
david@towardsjustice.org
juno@towardsjustice.org
brianne@towardsjustice.org
**TOWARDS JUSTICE**

David Muraskin, D.C. Bar No. 1012451
Karla Gilbride, D.C. Bar No. 1005586
**PUBLIC JUSTICE, P.C.**
1620 L Street NW, Suite 630
Washington, DC 20036
Telephone: (202) 797-8600
Fax: (202) 232-7203
kgilbride@publicjustice.net
dmuraskin@publicjustice.net

Adrienne H. Spiegel, CA Bar No. 330482
475 14th Street, Suite 610
Oakland, CA 94612
Telephone: (510) 622-8207
aspiegel@publicjustice.net

*Attorneys for Friends of Farmworkers, Inc.,
d/b/a Justice at Work*

**FRIENDS OF FARMWORKERS, INC.,
D/B/A JUSTICE AT WORK**
Lerae Kroon, PA Bar No. 325464
Nina Menniti, PA Bar No. 326828
Samuel Datlof, PA Bar No. 324716
990 Spring Garden St, Suite 300
Philadelphia, PA 19123
Telephone: (215) 733-0878
Fax: (215) 733-0878
lkroon@justiceatworklegalaid.org
nmenniti@justiceatworklegalaid.org
sdatlof@justiceatworklegalaid.org

26

*Attorneys for Jane Does I, II, and III*

**NICHOLS KASTER, PLLP**
Matthew H. Morgan, MN Bar No. 304657
Anna P. Prakash, MN Bar No. 0351362*
4600 IDS Center
80 S. Eighth Street
Minneapolis, Minnesota 55402
Telephone: (612) 256-3200
Fax: (612) 338-4878
morgan@nka.com
aprakash@nka.com

*Attorneys for Friends of Farmworkers, Inc.,
d/b/a Justice at Work*
* application for admission *pro hac vice*
forthcoming

27

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I caused this brief to be filed be filed in ECF, which caused a copy to be served on counsel for all parties.

s/ David H. Seligman
David H. Seligman, CO Bar No. 49394
1410 High St., Suite 300
Denver, CO 80218
Telephone: 720-239-2606
david@towardsjustice.org
juno@towardsjustice.org
brianne@towardsjustice.org
**TOWARDS JUSTICE**