# EXHIBIT A

1

1     IN THE UNITED STATES DISTRICT COURT
      FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
2

3
   JANE DOES I,II,III, et al,    )
4                                )
            Plaintiffs           )
5                                )
         vs                      )      3:20-CV-01260
6                                )
   EUGENE SCALIA, in his         )
7  capacity as United States     )
   Secretary of Labor, et al,    )
8                                )
            Defendants           )
9  _____  )

10          TRANSCRIPT OF PROCEEDINGS - ORAL ARGUMENT/HEARING
            BEFORE THE HONORABLE MALACHY E. MANNION
11                   FRIDAY, JULY 31, 2020
                   SCRANTON, PENNSYLVANIA
12 FOR THE PLAINTIFFS:
        LERAE KROON, ESQ.
13      SAMUEL H. DATLOF, ESQ.
        DAVID H. SELIGMAN, ESQ.
14      DAVID S. MURASKIN, ESQ.
        MATTHEW MORGAN, ESQ.
15      Justice at Work
        5907 Penn Avenue
16      Suite 320
        Pittsburgh, Pennsylvania  15206
17
   FOR THE DEFENDANTS:
18      OSCAR L. HAMPTON, III, ESQ.
        RICHARD T. BUCHANAN, ESQ.
19      U.S. Department of Labor
        Suite 630 East
20      The Curtis Center
        170 South Independence Mall West
21      Philadelphia, Pennsylvania  19106

22 Proceedings recorded by machine shorthand, transcript produced
   by computer-aided transcription.
23 _____

24          SUZANNE A HALKO, RMR, CRR
            CERTIFIED REALTIME REPORTER
25           235 N. WASHINGTON AVENUE
            SCRANTON, PENNSYLVANIA 18503

2

1                          WITNESS INDEX

2    FOR DEFENDANTS:          DIRECT    CROSS    REDIRECT

3    Alia Al-Khatib            99       107       116
     Susan Giguere            119       135       165
4    Mark Stelmack            166       170        --

5
     FOR PLAINTIFFS
6
     Shannon Warner           181       200        --
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  This is the matter of Jane Doe 1, 2, and 3

2    against OSHA, et al, Department of Labor.  The Docket Number in

3    the case is 3:CV-20-1260.  We have a hearing scheduled today

4    related to a motion or a petition filed by the Plaintiffs

5    related to a request for mandamus under 662(d) of Title 29.

6    Counsel for the Plaintiffs that are present in the courtroom,

7    would you just please state your name for us?

8               MS. KROON:  Lerae Kroon of Justice at Work.

9               MR. DATLOF:  Sam Datlof of Justice at Work.

10              THE COURT:  The individuals from OSHA, the

11   individuals that are in the courtroom with us?

12              MR. HAMPTON:  Your Honor, would you prefer me to

13   stand?

14              THE COURT:  No.  You can sit and relax and wiggle

15   your feet or drink your water, whatever you want to do.  You

16   don't have to stand.

17              MR. HAMPTON:  I'm Oscar Hampton from the U.S.

18   Department of Labor in Philadelphia, and I'm representing the

19   Secretary, Eugene Scalia today.

20              MR. BUCHANAN:  I'm Richard Buchanan.  I'm the Deputy

21   Regional Solicitor in Philadelphia, and I also represent the

22   Department of Labor.

23              THE COURT:  And then the individuals that we have

24   remotely who may at some point participate in some manner in

25   the case, if you would identify yourselves for the record?

1          MR. SELIGMAN:  This is David Seligman.  I'm

2  representing Justice at Work.

3          THE COURT:  David, could you give me your full name

4  again first?

5          MR. SELIGMAN:  I will say with respect to the audio,

6  it's a little hard to hear folks at counsel table.  I'm not

7  sure there's anything that you can do about that.  I just

8  wanted to flag it.

9          THE COURT:  I appreciate that.  Counsel was speaking

10  a little low.  We will ask you to pull the microphone in

11  between you.  It's a boom mic that should pick up from

12  everybody, but we're also going to request in light of the

13  remote that everybody speak louder than you normally would in

14  the courtroom if we were just -- it's actually if you pull that

15  towards the middle of you, and everyone should speak loudly,

16  even though we would normally speak at a more gentile tone, so

17  to speak.

18          MR. MURASKIN:  Good morning.  David Muraskin from

19  Public Justice.

20          THE COURT:  Okay.  So Mr. Muraskin and Mr. Seligman,

21  I have you.  Who else do we have?

22          MS. GILBRIDE:  Karla Gilbride, Your Honor, also

23  representing Justice at Work.

24          THE COURT:  And then finally?

25          MR. MORGAN:  Matthew Morgan, Your Honor, good

1  morning, with Nichols Kaster on behalf of Justice at Work as

2  well.

3         THE COURT:  I want to begin with the question of

4  anonymity.  It appears that the parties have no disagreement

5  concerning the use of anonymity, is that correct?

6         MR. HAMPTON:  That is depending on the witnesses,

7  that is correct, but we would like to bring up before we get

8  started, Your Honor, we want to establish the issue of

9  standing.

10        THE COURT:  I want to talk to you about that, because

11  I'd like to know -- tell me your good faith basis --

12        MR. HAMPTON:  Well, good faith --

13        THE COURT:  Let me finish.  I want to know your good

14  faith basis.  Normally under 12(b)6, we take the allegations in

15  the complaint as true, but in the complaint it indicates that

16  all three individuals by declaration have indicated they were

17  employed there.  662(d) specifically allows employees to bring

18  the action.

19        So my question to you is a simple one, tell me your

20  good faith basis to believe that that is not a true statement

21  and that there is not standing -- they are not employees for

22  purposes of 662(d).

23        MR. HAMPTON:  Well, 662(d) requires they be current

24  employees, not just an employee, and I believe --

25        THE COURT:  Is the word current in there?  I don't

1  remember seeing the word current.  You may not be -- but I

2  don't remember seeing the word current in 662(d).

3          MR. HAMPTON:  Well, it doesn't say that, but --

4          THE COURT:  It says any employee.

5          Now, I understand you're extrapolating, but it does

6  not say the word current employee, but assuming that that is a

7  difference without a distinction or a difference with a

8  distinction, let me know at the time the complaint was made,

9  your good faith basis to believe that anyone was not an

10  employee.

11          MR. HAMPTON:  Well, I don't think -- well, I don't

12  want to disagree with the Court right off the bat.

13          THE COURT:  You can disagree with me right off the

14  bat.  That doesn't bother me.  My point is a simple one:  I

15  don't want to spend time and waste time on superfluous matters

16  that have no basis in fact.  That is one thing I don't want to

17  do.  I want to get down to the meat and potatoes.  This is not

18  a -- I don't know what, but I want to make sure.

19          I don't see any basis -- any basis whatsoever for you

20  to challenge standing in this particular case based upon the

21  allegations, and in addition to that, OSHA itself and the

22  Department of Labor have standards and regulations allowing for

23  anonymity with respect to an employer under the circumstances

24  of not wanting to have retaliation by an employer to an

25  employee.

1          So I go back to my original question:  Tell me your

2  good faith basis to believe that Jane Does 1, 2, and 3, were

3  not employed at the time that they had made that complaint.

4          MR. HAMPTON:  Well, first, there's, again, a

5  requirement because the condition precedent is that the

6  Plaintiffs haves to establish that an employee might be

7  injured.

8          It is not -- I can't think of a circumstance where an

9  employee might not be injured if they are not actually a

10  current employee on the day that the complaint was filed.

11          THE COURT:  And I said, so tell me your good faith

12  basis that they were not employed on the date the complaint was

13  filed.

14          MR. HAMPTON:  I would suggest, Your Honor -- and I

15  will make sure I preserve the record that that is not our

16  burden.  All we're asking is for the Plaintiffs to come forward

17  with information that we don't necessarily need to see -- they

18  can present it to the Court -- that actually establishes that

19  the employees upon whose behalf they are bringing the case are

20  actual employees.  They're bringing the case as a

21  representative of the employees.  They have not --

22          THE COURT:  Which, by the way, they are allowed to

23  under 662(d) as well, correct?

24          MR. HAMPTON:  I agree, Your Honor.

25          Conflating the informant's privilege and the way OSHA

1  protects employees in connection with their enforcement

2  activity is a completely different animal, and in that

3  instance, it is the Secretary who has the privilege, not the

4  individual employee, and that is for enforcement purposes.

5          There is no threat of retaliation here by OSHA

6  against these employees.  We're not their employers.

7          This is an extraordinary situation.  The Plaintiffs

8  have brought this action to get the Secretary of Labor to do

9  something that is discretionary not ministerial.  They are

10  trying to replace our judgment with theirs.

11          THE COURT:  You're well down the road, and I don't

12  want to go down the road.  I want to talk about in your

13  response, you indicate that you agree and consent to them

14  proceeding with pseudonyms.  That is in your response.  Then

15  you say, but we think there is a problem with standing.

16          So my question to you is, tell me what the good faith

17  basis is that there is a problem in standing.  Tell me the fact

18  that you have aside from -- do you think in every case, that

19  every single civil case that's filed that a plaintiff or a

20  defendant could just say, you know, we're not sure that even

21  though they said they were injured, or they were this or they

22  were that, we don't know that they have standing, Judge.  We

23  want you to do something, even though we can't articulate a

24  good faith basis to tell you we believe that information is

25  incorrect or that information is not proper.

1          MR. HAMPTON:  First, the declarations were signed in

2   June, not in and around the time the petition was filed.  So

3   that itself establishes that the employee may not still be an

4   employee of Maid-Rite.  So that is a factual issue right there.

5          Until last night or a day ago, we did not get any

6   declarations that appeared to have been executed on or after

7   the date that they filed the complaint.  We have two

8   declarations.  One is dated that the employee might still be

9   employed by Maid-Rite.  The other clearly indicated that --

10          THE COURT:  It might be.  The declarations that I

11   read indicated that they were still employed and had been

12   employed for 10 years.  Did you get different declarations?

13          MR. HAMPTON:  No, I did not, but that doesn't mean

14   that the Secretary shouldn't be entitled in this extraordinary

15   situation to have a verification that the employee is today,

16   this hearing, when this Court has convened to make a decision,

17   an employee of the company, especially if they are not going to

18   bring themselves into court and testify.

19          I don't think that is unreasonable, because in the

20   50-year history of the Occupational Safety and Health Act, no

21   representative or employees has brought this kind of action.

22          THE COURT:  Again, you keep wanting to go down the

23   road as to the merits of the action, and that is not what I

24   want right now.

25          My only focus is -- I will ask you one last time.  I

1  would like to know, yes or no, if you have a good faith basis

2  to suggest that their declarations are untrue, and that the

3  matter that is in the complaint, that in 12(b)(6) we normally

4  must consider as true, a good faith basis to believe it is not

5  true, not it could be, might be, would be, should be, I don't

6  know.  I want to know the good faith basis that you believe is

7  untrue.

8           MR. HAMPTON:  I need some clarification.  Is this a

9  hearing about the dismissal of a complaint?  Because

10  12(b)(6) --

11          THE COURT:  This is a hearing about whether or not

12  the Court imposes a mandamus on the Secretary of Labor.  That's

13  what it is.

14          MR. HAMPTON:  Then I would suggest to the Court

15  respectfully that that is a different standard.

16          THE COURT:  Let me go back.  I'm going to ask you one

17  last time.  I want -- I'm not interested in what else you are

18  saying right now.  What I'm interested in is that I want to

19  know what your good faith basis is to believe that the

20  allegations that they are employed or were employed at that

21  time are untrue.  Answer that question and only that question.

22          MR. HAMPTON:  The only factual basis that we have is

23  that the declarations were signed nearly a full month before

24  this action was brought, and the two declarations was one that

25  appears to indicate that the employee is in fact employed with

1  the company now was after the complaint was filed.

2          THE COURT:  Okay.  To the extent that you're

3  challenging standing, it is denied.  I don't believe you have a

4  good faith basis and I don't believe you answered the question

5  directly either, no matter how many times I asked it.  So

6  pseudonyms will be allowed for purposes of continuing with the

7  complaint.

8          Now, that is not to say that pseudonyms may be -- is

9  the equivalent of the identification of the individuals being

10 made or not made to OSHA during the course of this proceeding

11 or at some point in the future, but for public purposes of this

12 complaint being filed and on the docket of the court, the

13 pseudonyms will be allowed.

14         The next area that I want to talk about in this case,

15 there appears to be what I would consider to be factual issues

16 that have been raised on each side that are diametrically

17 opposed to each other.  Among those include whether an

18 inspection was actually done or not done.

19         This complaint was filed on July 28th, and it alleges

20 in that complaint -- I'm sorry -- the complaint was filed on

21 July 22nd, and it indicates in that complaint, for example,

22 that no inspections had been done.  It appears that OSHA

23 indicates that they had done, in fact, an in-person inspection

24 at a time that would be, I believe, prior -- I think it was

25 July 9th -- prior to the filing of the complaint.  So we have a

1   lot of facts.

2          We have OSHA having requested documentation from

3   Maid-Rite for which it was indicated that masks were being

4   distributed, that washing of sanitation stations were present

5   in the facility, appropriate social distancing in break areas,

6   staggered breaks, and the Plaintiffs indicate in their filing

7   that virtually none of that is correct or true.

8          So one thing I am going to want to talk a little bit

9   about, so we're clear, are which of those factual discrepancies

10  are correct, or if some of them are not correct, what is the

11  correct statement.

12          I'm also interested and concerned, the Plaintiffs

13  have submitted a declaration from an attorney in their office

14  who indicates that OSHA had responded with some statement to

15  the effect of, we don't consider any COVID-19 matters to be

16  emergency matters.  That's a statement I want to discuss, and

17  the reason I want to discuss it is when I look at 662(d), it is

18  concerning to me as to whether or not such a statement,

19  assuming that a statement like that was made and is the

20  official position of OSHA, whether such a statement in making

21  that would be arbitrary and capricious to make a determination

22  in advance that there are no conditions in anything related to

23  the COVID-19 that could require an immediate evaluation.

24          In addition to that, I want to talk about the section

25  itself 662 and how it is that one interprets Subsection D, and

1   whether Subsection D needs to be interpreted as a whole in that

2   section, which would seem to indicate that absent the Secretary

3   refusing a recommendation under 662(C) from the OSHA inspector,

4   that the Court may not have jurisdiction in the circumstance to

5   be able to entertain a mandamus order.

6          The things that concern me about that are obviously

7   that if that's not the case, then are employers and

8   employees -- are employees free to completely bypass OSHA by

9   saying, oh, it is going to take too much time, and so as a

10  result of that, it is an emergency and we're going to use

11  662(d), because we don't need to worry about whether the

12  Secretary has in fact made or not made a recommendation that

13  was requested by one of the OSHA inspectors.

14         The language of 662(d) is, frankly, very concerning

15  to me as to when it is and what is the procedure and process by

16  which the Court's jurisdiction would be imposed in a case like

17  this.

18         It seems to me, in all honesty, that one would have

19  to read 662 in its entirety, which seems to be a progression of

20  activities from Section A to D, and not be able to just skip to

21  D and avoid everything else because it doesn't fit your needs.

22  If it does, it appears that an employee could put the Court in

23  the position each time of acting on behalf of the agency OSHA

24  and take it out of the realm of OSHA where, in a case like

25  this, the Court all of a sudden is making a decision as to

1   whether or not the circumstances are an immediate danger to

2   someone's death and/or their health, when the expertise in this

3   area is specifically and normally reserved for the agency that

4   does this as part of their daily activities.  They are some of

5   the important issues that I am concerned with.

6          While I'm not saying we will exclude testimony from

7   witnesses, I'm most interested in the legal arguments around

8   the question of mandamus, the Court's jurisdiction to impose

9   the mandamus, the procedures by which OSHA has allegedly

10  violated their own procedures, whether or not it requires a

11  recommendation by an OSHA inspector to the Secretary to

12  effectively be mandamus or require the Secretary to almost

13  overrule the Secretary in a failure to follow up on a

14  recommendation, a positive recommendation by an inspector.

15         I'm also concerned about the pendency of an

16  investigation.  Why is it that the Court should be able to

17  decide in the midst of an investigation that it should be

18  involved in some way in the case, as opposed to allowing the

19  investigation that clearly in this case is ongoing by

20  declaration of the parties to be completed by those that are

21  responsible under the law for that?

22         They are the things that I'm most interested in.  I

23  say that to you because my general practice is I like to get to

24  the meat of the matter and fluff is not that important to me.

25  I'm not here for fluff.  I'm here for let's get to the

 1  specifics.

 2          I know that the Plaintiffs had submitted a requested

 3  process by which we would do this hearing.  With all due

 4  respect, if you wish to -- I won't call it an opening

 5  statement, but if you want to spend a minute or two to tell me

 6  what it is you expect to do, you're welcome to do that, but,

 7  again, I want to get to the legal arguments and facts that make

 8  a difference in the case, as opposed to -- without due respect

 9  to either side -- posturing.  I want to get to the meat of it.

10          So Ms. Kroon or Mr. Datlof, I don't know if you want

11  to say something to begin with before we go further.

12          MS. KROON:  I believe Attorney Seligman would like to

13  say some words to begin.

14          THE COURT:  Mr. Seligman, again, you heard my, more

15  or less, admonitions.  I'm not a jury.  I'm not interested in

16  an opening statement in the sense that, you know, you are going

17  to persuade me by my heart or emotions.

18          I'm more interested in, tell me what the facts are

19  that you believe will show that you have -- that the Court has

20  the authority and the right under 662(d) to make a

21  determination that a mandamus is appropriate.

22          MR. SELIGMAN:  Absolutely, Your Honor.  I think

23  before I walk through the factual disputes, my colleague, David

24  Muraskin from Public Justice, is going to speak to the reading

25  of 662(d) and the Court's authority to issue a mandamus order.

1          THE COURT:  All right.  Mr. Muraskin, it appears that

2    we're going to break this down.  Go ahead.

3          MR. MURASKIN:  Thank you, Your Honor.

4          Yes.  So I guess I want to be clear about both the

5    practical consideration and the legal consideration here.

6          As a practical matter, no one in this court today is

7    asking you for any notice without any order -- excuse me --

8    without OSHA being given an opportunity to act.  As you are

9    aware, there has been a complaint filed.  We had tried to get

10   OSHA to talk --

11         THE COURT:  Mr. Muraskin, I don't know if you can

12   move your speaker, your microphone, your laptop closer to you,

13   but as you move back and forth, you are fading in and out.

14         MR. MURASKIN:  Is that better, Your Honor?

15         THE COURT:  Yes, that's better.

16         MR. MURASKIN:  So I was saying as a practical matter,

17   no one here today is asking you to order OSHA to do something

18   without OSHA being given an opportunity to act.

19         We have filed a complaint with OSHA, and it is OSHA's

20   delay in acting on that complaint that we are suggesting allows

21   you to issue a mandamus.

22         I will point you to the Rural Community Workers

23   Alliance case from the Western District of Missouri that was

24   just issued a few months ago that explicitly says that's how

25   662 should be read, that when OSHA fails to act quickly, you

1  are allowed to use 662 to act.

2       I would suggest to you that is the most logical

3  reading of the statute, that the power given under 662 is for a

4  worker to hold OSHA accountable for its failure to act and your

5  right to action against the Secretary.

6       What they are seeking to do -- I should say also that

7  the Secretary's power is very clearly laid out in Section A.

8       Int neither D nor A condition and then actual

9  inspection or recommendation as a prerequisite towards those

10 authorities being used.  So you can start at the top or end at

11 the bottom and no one refers -- none of the provisions refer to

12 the necessity of an inspection.

13      What they are asking you to do is to empower a line

14 worker, a person who is subordinate, and in this case has been

15 on the job for, I think, 16 months, to entirely determine

16 whether the Secretary can use their power or whether workers

17 can exercise their rights under 662(d).

18      What they are saying is that if that person who has

19 been on the job for 16 months fails to make a recommendation to

20 the Secretary, neither the Secretary can act, nor can a worker

21 ever bring their suit, and that seems to me to be inconsistent

22 with the plain text of A and D, which makes no reference to

23 that precondition.

24      What C is, is literally what it says it to be, the

25 title references that it's a notification provision.  It's

1  meant to give the employer and the worker an opportunity to

2  know when that recommendation is made.  It is not meant to

3  create prerequisite.

4          Indeed, Your Honor, to speak to your concern, were

5  OSHA to declare that no COVID infection could be imminent

6  danger, under the Government's reading of the statute that very

7  well would prevent both the Secretary from acting and it would

8  prevent the worker from ever bringing suit, because in that

9  circumstance, OSHA would have directed its employee inspector

10 to never find imminent danger, and under the Government's

11 reading, that would stop anyone from acting, be it the

12 Secretary or be it a worker, and that is exactly the problem

13 with the reading.

14          What we believe needs to happen here is that OSHA

15 needs to be given an opportunity to act, and if it does not

16 act, then a worker can go in and argue that it's arbitrary and

17 capricious.  That could be because OSHA did not act in a timely

18 manner.  It could be that OSHA did not act in -- if OSHA

19 overruled its inspector, or it could be any other number of

20 circumstances.  That is the right for you under 662(d).

21          That is the reading provided in 662(d) in Rural

22 Community Workers Alliance, in Scott v. Sysco Foods, which I

23 don't know whether you have our briefs in front of you, Your

24 Honor, from last night, but Rural Community Workers Alliance is

25 2020 Westlaw 2145350; Scott v. Sysco Foods, 2007 Westlaw

1  3170121, which says that a worker can use 662(d) if an action

2  was dismissed by OSHA, which necessarily means that there was

3  not inspection and a recommendation for an imminent danger

4  action.

5           Then if you go to Marshall v. Klug, 1979 Westlaw

6  23050, it says that 662(d) allows the Court to determine

7  whether a dangerous condition exists, expressly empowering the

8  Court to make the determination that Your Honor was concerned

9  about and --

10          THE COURT:  Let me hold you on that for a second,

11  because when I read Marshall, you are reading one section of

12  Marshall, and there is another section of Marshall where the

13  Court seems to specifically discuss the fact that employees are

14  entitled to petition the Federal District Court for a writ of

15  mandamus against the Secretary if he arbitrarily or

16  capriciously fails to seek injunctive relief requested by the

17  OSHA inspector are the words at Page 717 of Marshall in the

18  Fifth's Circuit opinion, which seems to kind of lead to C in

19  terms of the Secretary not following the recommendation of the

20  OSHA inspector, right?

21          MR. MURASKIN:  So just to be clear, Your Honor, I was

22  citing a different Marshall case.  My Marshall case was from

23  the District of North Dakota, because Marshall was the

24  Secretary of Labor, his or her name -- I believe it's a him --

25  appears very often, but to address the Fifth Circuit case, so

1   that Fifth Circuit case certainly has that language.  It was

2   not attempting to interpret all the contours of 662(d).

3          What the Government has done is cite both Fifth and

4   Sixth Circuit cases about the right to refuse work, where an

5   analogy was made to the 662 language, and what they were trying

6   do is say that the rights given in 662 -- in the Sixth Circuit

7   case, they said they do equate to a right to refuse work, and

8   the Fifth Circuit case said it doesn't.  It's trying to draw an

9   analogy.  It's not trying to deter in the contours of 662.

10          I actually believe though, Your Honor, if you look at

11   the legislative history detailed there, they explain to you

12   what the concerns were that motivated 662 and those favor

13   Plaintiffs.

14          So what they first detail is that the original

15   proposal was for the Secretary to be able to issue an

16   administrative order to stop work, and what they wanted to do

17   is prevent empowering the agency to have that direct power.

18   They wanted to involve the courts in this determination.

19          If you look down further in the legislative history,

20   which is detailed in both of those cases, what it says is

21   congress is specifically concerned with pressure being brought

22   to bear on inspectors to make certain recommendations and they

23   are seeking to avoid that pressure from being used and

24   leveraged against OSHA.

25          What the Government is proposing is the exact --

1          THE COURT:  Let me hold you for a second.  You're

2   right it was a different issue that the Fifth Circuit was

3   ultimately deciding in deciding OSHA didn't have the authority

4   in that particular case with respect to allowing what they

5   assumed was workers to be able to stop their work if they

6   disagreed with the OSHA inspector, but just what you said there

7   is interesting, and that is that the legislative history, as

8   you read it, and honestly as I read it, is indicative of the

9   fact that at the time that this was being passed, the concern

10  was that an individual OSHA inspector -- not the Secretary of

11  Labor -- an individual OSHA inspector could be somehow, because

12  maybe they are in the district or the location, that they could

13  be -- I don't want to say bribed, but they could be influenced

14  in a manner that would cause them, depending on who the

15  employer was, to make a certain recommendation.  So the focus

16  there was on the inspector, not the Secretary of Labor.

17          The statute focuses on really a determination made by

18  the Secretary of Labor, not the inspector in the case.  I do

19  understand that congress then was concerned because of an

20  individual inspector and location and being influenced that

21  there be collaboration with the employee and somehow to make

22  sure that all of the facts are coming to the Secretary of

23  Labor.

24          But there is a difference between the legislative

25  history related to what an individual inspector would be

1 involved with that was a concern and whether the Secretary of

2 Labor at a higher level, who either adopted or didn't adopt,

3 and the section itself 662(C) doesn't speak -- it speaks to the

4 decision really of the Secretary of Labor, and that's my

5 concern, but go ahead.

6          MR. MURASKIN:  I agree with you about the facts that

7 you are laying out.  I disagree with you about the conclusion

8 that you are drawing from, and maybe this is because we're

9 understanding the Government's argument differently, but what I

10 understand the Government's argument to be is that if the

11 inspector does not make the recommendation that there is an

12 imminent danger, then the Court both lacks jurisdiction and we

13 cannot state a claim.

14          In other words, what the Government's view is, is

15 that a subordinate employee -- here it's someone who has been

16 on the job a bare minimum of time -- can make this

17 determination and that that determines all of the powers under

18 the Act.

19          In other words, in their view both the Secretary

20 could not act if no recommendation was made and we cannot bring

21 the suit because no recommendation was made, and that is their

22 jurisdictional argument, that we can't come into court because

23 their inspector on her own chose not to make that

24 recommendation, and if that is their argument, that is totally

25 inconsistent with the legislative history that is seeking to

1   take the inspector's decision-making out of it because of the

2   fears of pressure.

3            THE COURT:  Well, can't you actually, if the local

4   inspector makes a determination that there is no case and

5   recommends such to the Secretary of Labor, and the Secretary of

6   Labor adopts that and there is no case, it's closed, don't you

7   have a right after the administrative process is complete to

8   appeal to the circuit?

9            MR. MURASKIN:  We don't have a right -- Your Honor,

10  there is a difference here, I think, between OSHA's citation

11  process that you are describing and the imminent danger

12  process.

13           What we are trying to do is get protection quickly.

14           THE COURT:  I understand that, but you made it sound

15  as if the local inspector says, no, it's all over with, and the

16  truth is that it's not.  There is an administrative process

17  that is exactly in place to make sure that one can continue on

18  if you disagree with the result in the administrative process.

19           My concern here is, are we skipping the

20  administrative process?  I understand that there are

21  circumstances that that can occur where Section 662(d)

22  specifically allows for that to occur, but it sounds to me like

23  you are basically saying, anytime I disagree, hey, they took

24  two weeks, I think they should have taken a week, I will file a

25  mandamus with the Court, or I don't like the result, and there

1   is an administrative process, but, heck, why do I want to go

2   through that?  I will just go to the Court and claim there's an

3   immediate danger that they are not taking into consideration.

4           My concern is your argument broadens 662(d) immensely

5   on what would be, could be, might be, should be, and that's a

6   concern, and while I'm not downplaying in any way -- I

7   completely appreciate the danger of COVID-19.  As I said, I'm

8   going to speak very directly to OSHA about whether or not there

9   is some policy or statement that they have held that no

10  COVID-19 cases can fit within that circumstance.  That may be

11  very well an arbitrary and capricious determination or decision

12  with not looking at the individual characteristics, but I'm

13  also concerned that you're sweeping with a very broad brush

14  here.

15          It appears to be you are asking me to make a

16  determination that effectively makes anyone at any time have

17  the ability to avoid the administrative process which is in

18  place and jump to the Court and say, we say it's an immediate

19  danger; therefore, the Court now has jurisdiction to make the

20  decisions the agency would make.

21          MR. MURASKIN:  While I appreciate your concern, Your

22  Honor, what I will say is no one has ever used this statute

23  before, so the notion of a floodgate concern, I think, is a

24  little bit suspect.

25          What we have is a very unique circumstance in which

1  workers are in fact facing dangers that OSHA cannot remedy

2  through its actual processes.

3       The OSHA process that you are describing takes six

4  months approximately for a citation to issue, and we are

5  prepared to present testimony that particularly in cases such

6  as this that six months is likely to occur.

7       The employer then gets another 15 working days to

8  appeal that, and then they can go through an administrative

9  process themselves that can take up to 18 years to resolve.

10      THE COURT:  Well, I mean, let's not talk about 18

11  years.  I know you put in your documentation it can take a

12  decade to do.  It seems to me again that's kind of grasping the

13  outside absolute, you know, maximum example that could ever be

14  made and, in all honesty, that gives you a credibility

15  argument.  I don't think that's an argument in these

16  circumstances that holds really any water that it's going to

17  take 18 years for them to decide whether or not COVID-19 in

18  this circumstance.

19      So why don't we try to focus on the reality and

20  practicality and not some sort of theoretical cartoon

21  basically.  Go ahead.

22      MR. MURASKIN:  Your Honor, I reject that this is a

23  theoretical cartoon.  The 18 years might be the outside

24  extreme, but actually the independent agency's Article 1 Court

25  needs to hear this.  It only has three members.  It often --

1 and, again, we're prepared to present testimony on this

2 today-- it often only has two members because there's a

3 political machination.  If those two members don't agree, it

4 can't issue a decision, and during that appeals process, an

5 employer has no obligation to comply with OSHA's mandates.

6        So when you are talking about the normal process, you

7 are talking about up to a six-month citation process, up to a

8 15-day appeal window, and then an appeals process that can take

9 however long you want to fill in.  I will tell you our witness

10 is prepared to testify it regularly takes years.

11        So what 662(d) is about is recognizing that that

12 administrative process cannot protect workers, that workers do

13 have a right to come into court, and that is a precondition for

14 us to show.  That is part of our burden and part of the

15 reasons.  It's not an expansive right.  We have to show that

16 OSHA's administrative process cannot protect these workers from

17 this risk.  We don't only need to show that, we need to show

18 that OSHA was being arbitrary and capricious.

19        To use again, Your Honor, your own example, if OSHA

20 were to declare COVID-19 could never be an imminent danger, it

21 sounds like Your Honor would agree, and certainly I believe

22 that would be arbitrary and capricious.  Under OSHA's view,

23 that declaration could only ever be challenged through this

24 drawn-out administrative process and not under 662(d), because

25 under the Government's view, once they have directed their line

1  workers not to make a recommendation, that keeps us from

2  getting jurisdiction, because if there is no recommendation,

3  the Secretary has no power to act.  They substituted an

4  individual who is subordinate to the Secretary to make a

5  political judgment and to use that to limit a political

6  appointee's power.  That does not really seem like a logical

7  way to read 662(d), particularly given the legislative history.

8           THE COURT:  Mr. Muraskin, thank you for your comment.

9  Let me move to the Department of Labor and see with respect to

10  the issue that we have talked about, the statute itself, if you

11  want to respond to that at this time.

12           MR. HAMPTON:  Well, Your Honor, I agree with the

13  Court.  Marshall versus Daniel Construction Company gives the

14  Court direction.  The employees are entitled to petition the

15  Federal District Court for writ of mandamus.

16           MR. MURASKIN:  Your Honor, I'm sorry.  I cannot hear.

17           THE COURT:  You need to speak up.  Speak as loud as

18  you can.  You need to speak louder.

19           MR. HAMPTON:  Your Honor, for those that are

20  listening on my side, that would be the first time that anyone

21  has ever instructed me to talk louder.

22           I think the Court is right, Your Honor, that Marshall

23  versus Daniel Construction provides for a persuasive path where

24  employees are entitled to a petition in the Federal District

25  Court for a writ of mandamus on the Secretary, if and only if

1   the Secretary or a delegated representative acts arbitrarily

2   and capriciously.

3        If I may, we're giving -- I want to make sure the

4   Court understands the administrative process.  Occupational

5   Safety and Health Compliance Officers make recommendations.

6   They do not issue citations.  Those are issued by the area

7   director.

8        Any imminent danger decision, whether yea or nay by

9   compliance officers, would not only be reviewed by the

10  assistant area director, the area director, the RA and me, the

11  regional solicitor, in that situation if it was serious, it

12  would be a situation, particularly in an imminent danger

13  situation, that we would bring as an organization the full

14  discretionary and prosecutorial powers we have and our good

15  judgment to make that determination.  So the notion that the

16  compliance officer on it's own would make a such a decision is

17  just not true.  OSHA, the area director, the regional

18  administrator, would make that decision based on a

19  recommendation to it by a compliance officer.

20       I do believe that Section D does require that

21  recommendation, and that is because the compliance officer is

22  the one, unlike the Justice at Work folks, who have actually

23  been to the worksite, has the experience to evaluate it,

24  understands the regs that apply and the general duty clause

25  that might apply, understands what the requirements of

1   protecting, because we're forgetting the employer has

2   protections here, too.

3          OSHA doesn't just get to say, employer, you have

4   violated the Act.  OSHA has to make a determination based on

5   its good judgment that in the context of the gathering of facts

6   that there is a good faith reason to believe whether or not

7   there's a violation.

8          The burdens with regard to those violations change,

9   whether it's a 5(a)(1) violation or there is an actual

10  regulation or standard that guides the employer on the manner

11  of conduct that he should follow in protecting the employees at

12  his worksite.  So the CSHO isn't some cowboy out there making

13  some decision on their own.

14         In this particular -- well, I won't talk about this

15  particular case.  We believe that there has to be such a

16  recommendation.  There was no recommendation in this instance.

17  There has been an on-site inspection.  OSHA has started

18  proceedings in connection with this matter.  I think the Court

19  is right, it is inappropriate for the Court at this point to

20  interfere with that process.

21         I also think it is interesting for the Plaintiffs to

22  indicate the imminency of the situation, when, on May 19th,

23  they knew about the, quote, imminent danger -- and let me be

24  clear about something up front both for the Secretary's

25  benefit, the Solicitor of Labor, and mine.  I have been

1   committed to protecting employees for over 30 years.  I was

2   actually the OSHA counsel in Kansas City before I became the

3   regional solicitor.  I take my job extraordinarily serious.  On

4   some level the notion that in this instance that employees of

5   OSHA are dismissive of the threat presented by COVID-19 is just

6   silly.

7           Now, is it a difficult situation?  Yes, it is.  We

8   have been all over the map with regard to CDC guidelines.  It

9   is a new situation.  OSHA is adapting and we have put in place

10  policies and procedures for these types of inspections that

11  meet the standards of protecting employees.  So, I guess, just

12  so that it's out there, Your Honor.

13          THE COURT:  Let me ask you, what happens when -- I

14  understand -- so your argument concerning OSHA is doing their

15  investigation, they should be given time to do their

16  investigation, they're taking it seriously.  I get your side

17  position on that.

18          Does there come a point in time -- the argument by

19  Mr. Muraskin that, you know, it could take 18 years, I don't

20  think it has any real credibility, but the bottom line is that

21  assuming that it seems to me unchallengeable with 150,000

22  Americans dead by COVID-19 that COVID-19 itself isn't a game

23  changer in some way.  Now, that being said -- in many ways --

24  that being said, I appreciate the fact that if I'm in some

25  superstore someplace and my complaint is that my other

1  employees, I need to have them work two aisles away from me,

2  that may not be an emergent circumstance or situation.  It

3  might be something that needs to be looked at, the complaint

4  needs to be taken care of.

5          But in a circumstance like Maid-Rite where people are

6  working with our food supply; No. 1, and No. 2, that the

7  arguments are made that the social distancing is possible, but

8  not being taken care of -- and I'm concerned about and we will

9  talk later about competing statistics.  The response, I

10  believe, from Maid-Rite was of 400 employees that about 10

11  percent had been at some point infected, that would be roughly

12  40 employees.

13          The allegation by the Plaintiffs, which admittedly

14  comes from what appears to be a completely unscientific

15  evaluation, a guesstimate by one of the complainants indicates

16  that 50 percent or half of the people have in fact been

17  infected at one point or another, where I think the employer

18  says that since May 14th, there has been one.

19          But my concern here is this:  I am very concerned, in

20  all honesty, with the allegation that a statement was made that

21  OSHA does not consider COVID-19 cases as being emergencies, and

22  that sounded to be, as I said, whatever that statement is,

23  whether it is a statement by one person, a misreading of a

24  statement, I'm very interested whether that is the policy of

25  OSHA in any way, shape, or form, because that would concern me

1   that that would be an arbitrary and capricious act on their

2   part to -- without the individual circumstances of the

3   difference, for example, between a meatpacking plant where our

4   public supply of food is coming from, and we know from at least

5   press reports that meatpacking plants in this country and pork

6   packing plants have had very significant problems that affected

7   at one point in time the potential food supply of the country,

8   that that circumstance would be the same as perhaps, as I said,

9   the superstore that a complaint comes in and someone says,

10  well, I've got to be within two aisles of somebody else that

11  works at the store.  Maybe that isn't an emergency, maybe

12  another one is.

13          So all of that boils down to, does there come a point

14  in time if there is not an appropriate resolution of an

15  investigation that it does become an abuse or an arbitrary or

16  capricious act by OSHA not to in fact make a decision in a case

17  that involves 150,000 dead Americans?

18          MR. HAMPTON:  There is lot to unpack there, and I'm

19  going to try.  Again, this is a difficult situation for me to

20  be in, because usually I'm on the other side advocating for

21  employees.

22          I want to make it clear -- I'm going to do this a

23  couple of times -- the Secretary and the Solicitor of Labor and

24  I are committed -- and the head of the Occupational Safety and

25  Health Administration -- are committed to protecting employees.

1          I have to say to the Court that 152,000 deaths is a
2 terrible tragedy for our nation, but OSHA is only responsible
3 for what occurs at individual work sites, and there is a
4 temporal component of 13(d).  It is not just that the
5 Plaintiffs can't replace OSHA judgments with their own.  They
6 have to establish that there is an imminence of serious bodily
7 harm or death.

8          Factually I will start off -- and to some degree I
9 understand that this might not be something the Court wants to
10 hear -- on May 19th, the Plaintiffs were aware of this danger
11 and did not act until July 27th.  So even if we take the
12 actions of the Plaintiffs who allowed 75 days or so to lapse in
13 between the time that they claim they got notice --

14          THE COURT:  So would you like me to mandamus them to
15 file that complaint earlier?

16          MR. HAMPTON:  Well, I mean, that is part of the
17 problem here, Your Honor, because the Plaintiffs are attempting
18 to become OSHA, and in a situation that first is difficult for
19 everyone, that almost every single arm of Government all over
20 the United States as in local, state, and federal levels are
21 struggling with, OSHA has put in place guidelines that come
22 nowhere near of indicating that a COVID-19 exposure is anything
23 less than any other type of serious exposure that might occur
24 at a worksite that OSHA is charged to protect, and it is just
25 not true.

1          In response to -- in fact, I want to stick with the

2    legal, but there are factual components that are important.

3    OSHA did an informal request for information when they

4    initially got the complaint.  In response to that, we got

5    documents --

6          THE COURT:  It was in June, June 2nd?

7          MR. HAMPTON:  I believe it was in early April, that's

8    the initial complaint.

9          THE COURT:  You are talking about not the complaint

10   made by the Plaintiffs in this case, but the original

11   complaint?

12         MR. HAMPTON:  The original complaint.  We did what we

13   call an informal investigation.  We do those all the time.  We

14   seek information from the employer.  The employer provided that

15   information and, frankly, gave us information that was not

16   disputed.

17         THE COURT:  And your response to them was to ask the

18   employer to take certain actions, right?

19         MR. HAMPTON:  That is correct.

20         We got another complaint from employees and the

21   employees representative here, and as a result of that, we did

22   an on-site inspection, and we were continuing an investigation.

23         So it's just not factually correct for the Plaintiffs

24   to characterize the actions of OSHA as anything other than in

25   accord with actions that we take all the time when we identify

1  a situation, whether it is an imminent danger situation or not,

2  that might impact the safety of employees.

3      We have not completed that investigation, quite

4  frankly, and I think the Court is absolutely correct that we

5  should allowed to be able to finish that process for no other

6  reason that the Plaintiffs didn't think it was important enough

7  to take action for 75 days.

8      One thing I do want to respond to is most OSHA cases

9  are settled.  The vast majority of OSHA cases are settled at

10  the informal stage.  When they come to my office, the vast

11  majority of cases are settled in a very short time.  This

12  notion that every single case takes even two years is just

13  silly.

14      OSHA has an administrative apparatus that works

15  extraordinarily well.  Over the course, the Occupational Safety

16  and Health Act has been in place when nearly 15,000 died every

17  year.  That number has come down to less than 5,000.  That is

18  because of efforts of hundreds of thousands of employees over

19  the 50-year history of OSHA of doing their job and doing it

20  well.

21      The Court is correct that D requires a

22  recommendation, an administrative recommendation, not just from

23  the CSHO, but with the considered judgment of individuals in

24  leadership positions to make a determination of whether or not

25  a imminent danger situation exists.  That determination is

1 made.  It wasn't made in this instance, not because COVID is

2 not serious, but because there was no indication that employees

3 at the plant were suffering serious harm at that point.

4        The Plaintiffs have provided no indication that

5 anyone has been hospitalized since May 19th, that anyone has

6 died since May 19th.

7        Now, again, see, I have to be careful.  I mean, I

8 don't want the press to say the Secretary said that we only

9 care about people who are hospitalized and dead.  That is not

10 true.

11        We have started our process.  That process is

12 calculated to ensure that the company does exactly what they

13 are required to do in order to protect their employees, but

14 imminent danger is something that we reserve for the most

15 egregious situation.  It is certainly a situation where the

16 employees at Maid-Rite should be concerned about their safety,

17 but based upon the evidence that we have and we would present

18 in response to this, the company -- we have gotten information

19 and we haven't verified it, but I think is correct -- the

20 company has actually done every single thing that Plaintiffs

21 have asked for.

22        I would note for the Court, the relief that the

23 Plaintiffs desire is an inspection.  It is the only concrete

24 relief that they have requested, and lo and behold, we have

25 been conducting an inspection for the last 60 days.  In fact,

1  we did an on-site.

2        So it is just not true, and so they have gotten the

3  relief they are entitled to and, frankly, they want the Court

4  to take over the responsibility of the regional administrator

5  and the area director and review how the inspection was

6  conducted, and with all due respect to the Court, I'm better at

7  OSHA than you are and so is the RA.  So that is why the

8  administrative apparatus was set up.  It was set up for that

9  very reason.

10        So, in all actuality, it is moot.  We are doing what

11  they asked.  The Court does not need to look over OSHA's

12  shoulder.  We should be allowed, as the Court said before, to

13  continue the process.  It is important to the Secretary that

14  the Court properly read Section D.

15        You're right, if it read the way the Plaintiffs want

16  you to read it, then the Secretary will be in court all the

17  time, taking up its resources defending these kinds of actions,

18  when those people who are best capable of making those

19  decisions are being second guessed.

20        THE COURT:  Let me go back to you, Mr. Muraskin, for

21  a minute.  When I did originally read your complaint, putting

22  aside for a moment what is in the wherefore clause at the end,

23  which seems to be a lot of remediation that you are asking the

24  Court to do; in other words, to impose those things that you

25  say are not being present.  I originally read this complaint as

1  being a request, because you had made a formal complaint and

2  within an appropriate time period that OSHA had not performed

3  an inspection so that they could move forward with their

4  evaluation of whether or not this was an imminent danger to

5  someone's health or could result in death.

6          So let me ask you to respond to that, because it

7  appears to me that that was the original request, and then on

8  top of it was kind of the, and because they didn't, here is all

9  of the things that we think need to be changed, which I am

10 concerned is asking the Court to be the administrative agency

11 here, as opposed to directing them; one, to do the inspection

12 in the mandamus and to follow up, and they're telling us that

13 they have, in fact, done the inspection.  So tell me where that

14 leaves you in terms of your request for mandamus.

15          MR. MURASKIN:  Your Honor, I want to try to piece a

16 few things out.  Mr. Seligman is prepared to speak about the

17 facts.

18          THE COURT:  You have to move closer to the microphone

19 again, please.

20          MR. MURASKIN:  So Mr. Seligman is prepared to speak

21 about the facts, so I will turn it over to him in a moment, but

22 I do want to make clear to you that that's a question on the

23 merits, and what DLO is trying to do is run together their

24 jurisdictional argument with the merits.

25          I want to be very clear, the answer to the actual

1  question you posed, which is that if you read 662(d) as the way

2  they want you to read it, if OSHA just delayed and delayed and

3  delayed their worker ever bringing action, the answer would be

4  no.  That's what they're asking you to hold, that OSHA could

5  delay indefinitely.

6          If you would please look at Page 3 of their brief,

7  what they actually say is it must be a recommendation to the

8  Secretary to institute imminent danger proceedings before there

9  is jurisdiction.  That's Page 3 of their brief.  That's what

10 they are saying has to happen, they can delay as long as they

11 want under their view and then you don't have jurisdiction.

12 That's a problem.

13         To answer your earlier question, I actually think I

14 want to correct one factual statement before I turn it over.

15 It is incorrect to say that a worker could challenge these

16 proceedings in any other way.

17         If you were to actually go into the investigative

18 process under the Supreme Court's decision in Chattanooga

19 Valley, which is 474 US 3, OSHA has unreviewable discretion in

20 those proceedings to dismiss an action.  That's what the

21 Supreme Court has held.

22         This is a worker's only way to get into court and

23 have their voices heard, and they are trying to condition that

24 entirely on OSHA, and what they are saying is, because they're

25 actually trying to use the OSHA process, if we agree is the

1  first step towards initiating a 662 action, we've undercut.

2  They are talking out of both sides of their mouth.

3        We can use the 662 proceedings and then get into

4  court when they fail to act, and Mr. Seligman can tell you why

5  that failure to act is arbitrary and capricious.

6        THE COURT:  Okay.  Listen, I anticipate and expect

7  that both sides, as they have been doing, are trying to mix

8  facts with legal precepts in this case, and sometimes they are

9  necessary to get a reading that's in context and other times I

10  understand that both of you are making your emotional arguments

11  as to why you think you're right, and the bottom line is, I can

12  separate those.  So I'm not overly worried about either side

13  throwing in some facts, but I do just want you to focus on the

14  legal issues that are before us in a mandamus.

15        The next point from the Plaintiffs' perspective, who

16  is going to speak and what point is it that you want to

17  discuss?

18        MR. SELIGMAN:  Your Honor, this is David Seligman for

19  Plaintiffs.  I can respond to some of the factual issues that

20  came up in the course of the arguments, and then I would like

21  to provide an introduction to the evidence that we're prepared

22  to offer today.

23        THE COURT:  Okay.  Go ahead, Mr. Seligman.

24        MR. SELIGMAN:  I acknowledge that I wasn't able to

25  hear much of what my friend from OSHA argued.

1          So one point that stuck out to me was a point about

2    75 days.  I think it refers to the amount of time between the

3    filing of the imminent danger complaint and the filing of this

4    litigation.

5          Let's be perfectly clear that during that time

6    Plaintiffs made every effort, several efforts -- you will hear

7    testimony from Ms. Al-Khatib from Justice at Work about the

8    extent of those efforts to communicate with OSHA and encourage

9    OSHA to address the imminent dangers that were unfolding at the

10   plant every day and that continue to unfold at the plant every

11   day.

12         This was not an effort to bypass the process.  In

13   fact, it was an effort to encourage OSHA to act via OSHA's

14   process.  When OSHA didn't act, that is when Plaintiffs filed

15   suit under 662(d).

16         I hear the Court's concerns about the -- I imagine

17   are floodgate type concerns, that Plaintiffs will rush to court

18   anytime they disagree with OSHA's determinations respecting an

19   imminent danger complaint.  I want to emphasize that 662(d) is

20   available only in extraordinary of circumstances, but these are

21   those extraordinary circumstances, and that's for several

22   reasons.

23         First, we have multiple clear violations of OSHA's

24   own guidance inspecting the operation of meat packaging plants

25   during COVID-19.  This is not a situation where we are asking

1  you to make up standards as we go along, Your Honor.  OSHA has

2  already set out the guidance that meatpacking plants ought to

3  follow to keep workers safe.  They have multiple violations of

4  those, including most importantly -- and we don't think this is

5  something that OSHA can dispute -- the Maid-Rite plant in

6  Dunmore continues to operate by forcing workers to work elbow

7  to elbow along production lines and immediately across from

8  workers on the other side of those lines and that the Maid-Rite

9  plant continues to incentivize workers to attend work when they

10 are sick.

11        Second, we have a resurgence of the virus around the

12 country and a resurgence of the virus in particular in

13 Lackawanna County.

14        THE COURT:  Mr. Seligman, let me go back.  I want to

15 ask -- and that is a concern for me, I have to say, the

16 operation of the workers described as 2 feet apart, I think, by

17 your Plaintiffs, elbow to elbow touching, and across an area

18 that is 3 feet from somebody face to face.  So that is an area

19 that I'm going to discuss certainly with OSHA.

20        Going to the second one, incentives to work while

21 they are sick.  That one I'm a little more skeptical of your

22 analysis of that.  In other words, my understanding is that the

23 workplace has made incentives, we will pay you more if you work

24 on weekends.  Is there anything in the language or anywhere

25 that says if you are sick and you decide to come to work, we

1 will pay you extra to make sure you come even if you are sick?

2       It seems to me you are jumping the fence there a

3 little bit.  A lot of locations and businesses will pay workers

4 extra, especially in times of more need or of less workers, to

5 be able to have them work overtime, extra time, weekends.

6 There is nothing particularly unusual about that.  You seem to

7 be parlaying that into it's an incentive for them to work while

8 sick.

9       Where does that come from?  Who has said that we will

10 pay you while you are sick, or we want you to come in if you

11 are sick, and we will pay you extra to come in when you are

12 sick?

13       MR. SELIGMAN:  Your Honor, it's all argument that for

14 these workers, especially low wage meat processing workers in

15 Lackawanna County, that doesn't need to be said.

16       So there's a bonus that was offered up to the workers

17 at the plant ostensibly as a show of gratitude for their

18 working during the pandemic, but, in fact, you cannot receive

19 that bonus unless you attend work every day, so as a

20 substantial incentive to attend work while sick.  So if you

21 miss a day of work even early in the week, you can't get your

22 bonus, my understanding is, at the end of the week.  That's a

23 substantial pressure, especially for low wage workers, and

24 that's something, by the way, that OSHA recognizes.

25       The OSHA CDC guidance says explicitly that workplaces

1  should revisit sick leave policies and pay policies that

2  incentivize workers to come into work when they may be sick.

3          THE COURT:  Well, that sick leave policy is a

4  different animal.

5          So are you saying that every location around the

6  country right now because COVID-19 is there who give an

7  incentive for people to work extra time, that they are

8  violating the regulations by incentivizing people to come in

9  when they are sick?  It sounds like that's effectively your

10 argument.

11         I have to say that I'm not buying that argument just

12 because there's an incentive for people to work harder.  I know

13 an awful lot of people who work five or seven days a week

14 because it's needed for their family, and they did it before

15 COVID-19 and will probably do it after COVID-19, but the mere

16 fact that COVID-19 happens to be there, I don't think

17 automatically means that an incentive to work or get paid more

18 to work on a weekend or in an extra hour period of time

19 automatically equals trying to get you to come in while you're

20 sick.

21         Is there anything in the documentation from the

22 employer that you have seen or from your clients that indicates

23 that they're being encouraged to come in and work to get extra

24 money even if they are sick, aside from the fact that they are

25 being told if you work extra hours, you're going to get extra

1  money?

2          MR. SELIGMAN:  Your Honor, so first, just to clarify,

3  I don't think the policy is that we will pay you extra money if

4  you work extra hours.  That may be part of it, but that bonus

5  is not available to you if you miss work time at another point

6  during the week.  So you have to have perfect attendance

7  through the week, my understanding is, in order to be able to

8  access the bonus.  That's what's problematic.  So it's an

9  attendance incentive that I think is concerning, and it's

10 particular concerning during COVID-19.  Again, something OSHA

11 has spoken to.

12          Additionally, with respect to the workers'

13 understanding of what's happening currently at the plant, you

14 have before you declarations not only from the Jane Doe

15 Plaintiffs, but also from worker -- non-plaintiff workers that

16 we filed with the Court yesterday that report that the plant

17 continues to apply a fairly strict point system with harsh

18 penalties for workers that could ultimately result in

19 termination if they miss work even if they're sick, a standard

20 practice, my understanding is, in the meat processing industry,

21 and at least some workers understand that is still the case.

22          I believe Maid-Rite has suggested that's no longer

23 the case, at least to OSHA, but if that's true, at least some

24 workers perceive that is still the policy, and that's

25 concerning, of course, Your Honor, because that change in

1   policy can only be effective in discouraging workers from

2   attending work sick if workers are aware of the change in

3   policy.

4            Your Honor, returning to the imminent point, I think

5   something that is also important to emphasize about what makes

6   this case especially problematic and the imminent dangers,

7   especially acute, not only are they egregious violations of CDC

8   and OSHA guidance with respect to social distancing and time

9   for people to -- workers to wash and sanitize their hands and

10  the incentive payments we have discussed, but also that the

11  Maid-Rite plant continues to rotate workers from other

12  facilities through the plant which presents a risk of

13  introducing the virus at any point.

14           Based on what we know of the science of spread -- you

15  will hear today from Dr. Melissa Perry, an occupational

16  epidemiologist, who will testify about this -- once the virus

17  enters the plant, there is every reason to believe that it

18  would spread very quickly, much faster than OSHA's citation

19  process could possibly unfold.

20           THE COURT:  Let me ask you something related to the

21  that.  While I appreciate, again, the academic or ethereal

22  argument that a mixing of workers may cause a spread, people

23  don't live in a bubble.  This isn't the NBA.  They don't go to

24  the plant, sleep in the plant, their families are in the plant,

25  and they live in the plant.  The truth is that the reality of

1   life is that when people leave the plant and they go home, or

2   they go shopping to get whatever it is they are going to get,

3   or do recreation or meet with other friends, the idea that

4   merely that there be a mix of people, that somehow that that in

5   and of itself causes an imminent danger seems to me to be

6   academic and ethereal but not practical in the real world.

7          If you have a certain number of employees, and either

8   people are sick or on vacation or call off or quit, or you have

9   to hire somebody else, you will have inevitably a mix of

10  employees, and even the employees that are there, as I said,

11  they are not quarantined in some manner that when they leave

12  the plant after they are done working, that they aren't mixing

13  with the community in general as well.

14         So I'm not so sure -- while I understand the

15  possibilities, I'm really much more interested in the real

16  practicalities, as opposed to the ethereal academic, you know,

17  this could, should, would, maybe, might occur.  I get that, but

18  in the real world that is part of what happens in a business.

19         MR. SELIGMAN:  Yes, Your Honor.

20         So responding to that, first of all, I think in

21  speaking to practicalities, I think it's very unlikely in the

22  practical world, outside of this context, that you would be in

23  a situation where you would spend eight and a half hours elbow

24  to elbow with another person who you may not know in a work

25  setting.  This is what these workers are forced to do every day

1  here.

2          In a grocery store, you can attempt to socially

3  distance when you are walking around and you can stay 6 feet

4  apart from people.  The workers here don't have that

5  opportunity.

6          With respect to bringing new workers into the

7  facility, this is not just an academic concern.  In fact, it's

8  such an acute concern that it's something that OSHA itself has

9  recognized in its guidance.  It discusses the importance of

10  cohorting.  That's not happening here.

11         So all of this together, if there is mixing of lots

12  of people in an environment outside where people can socially

13  distance, that on its own doesn't present a concern, but the

14  mixing and rotating of new workers, the not giving workers time

15  to engage in personal hygiene, incentives for workers to attend

16  work even when they may be sick, and most importantly, the

17  absence of social dancing along production lines, and even the

18  absence of barriers along production lines to prevent workers

19  from infecting each other during the eight and a half hours

20  that they may spend processing meat next to someone and

21  directly across from someone on a production line, those

22  egregious violations, you know, along with the risk of spread,

23  it creates an imminent danger in this case.

24         With respect to OSHA's arbitrary and capricious

25  conduct here -- and I think that it is helpful that you had

1   this presentation from OSHA regarding why it declined to

2   determine in this case that an imminent danger was presented.

3            OSHA, as we think contrary to Section 8 of the Act,

4   OSHA did not provide a written explanation for not conducting

5   an immediate on-site inspection of the facility.  So we weren't

6   aware at the time we filed our complaint and immediately

7   afterwards why OSHA wasn't conducting on-site inspections,

8   aside from the statement to Ms. Al-Khatib that OSHA was not

9   taking imminent danger or formal complaints respecting

10  COVID-19.

11           But today, and in their briefing, OSHA has made clear

12  that the reason that there was no imminent danger -- there is

13  no imminent danger at Maid-Rite's facility is that Maid-Rite

14  told them there had been no COVID-19 cases in the plant since

15  May and because Maid-Rite had not reported to OSHA that anyone

16  from the plant was hospitalized or had died.  That conclusion

17  is surely arbitrary and capricious.

18           As an initial matter, there is certainly no reason we

19  should defer to a company's own report of hospitalizations, a

20  report, which in this case is actually inconsistent with worker

21  accounts that are before the Court today and declarations

22  submitted last night, and also no reason, of course, that we

23  should be focused on hospitalizations and death when there are

24  so many debilitating effects of this disease.

25           Most importantly, the Act is crystal clear -- and the

1  Supreme Court set this out nicely in Whirlpool v. Marshall, the

2  other Marshall case, a case we encourage this Court to

3  review -- the Act is crystal clear that it does not wait --

4  this is the Northern Supreme Court -- does not wait for an

5  employee to die or become injured to come into effect.  That's

6  a case specifically involving 662.

7          THE COURT:  Did it involve -- by the way, give me the

8  cite for the case, please.

9          MR. SELIGMAN:  445 U.S. 1.

10         THE COURT:  And you said that clearly.  I don't think

11  there is any dispute here that OSHA doesn't have to or never

12  should wait for an employee to die, but you said that was a 662

13  case.  Was it a 662(d) case?

14         MR. SELIGMAN:  No, Your Honor.  That is a case about

15  the right of employees to refuse to work when confronting

16  imminent dangers.

17         What is helpful about that case, Your Honor, is it

18  identifies the important role that 662 plays within the

19  framework.  It recognizes that OSHA has a process for issuing

20  citations and a process for allowing employers to appeal

21  citations, a right not available to workers, but the provisions

22  of Section 13 of the Act, 29 U.S.C. 662, are there for context

23  in which workers cannot wait in which imminent dangers may

24  present themselves, and that Court is clear that workers need

25  not wait for hospitalization, they need not wait for death in

1  order for the 662 framework to kick into play.

2         So OSHA's determination in this case that there was

3  no imminent danger because of no one is currently in the

4  hospital and no one apparently, according to OSHA's account

5  based on what they have heard from employer, has died, those

6  reasons are arbitrary and capricious reasons for determining

7  that an imminent danger does not exist.

8         THE COURT:  I'm not sure that I read that their

9  answer was that there is no imminent danger because, as you put

10 it, there has been no death or hospitalizations.  It is saying

11 that there hasn't been any deaths or hospitalizations, but I

12 don't recollect them indicating that there is no imminent

13 danger because there has not yet, and assuming then there must

14 be a death or a serious injury before they would consider there

15 to be an imminent danger.

16        So I understand your argument.  I agree with some of

17 your proposition related to that.  I don't agree with your

18 verbiage that their position is someone has got to die or that

19 there has got to be a serious health condition before they can

20 consider it an immediate danger.

21        But at any rate, what else do you have, Mr. Seligman?

22 Anything else?

23        MR. SELIGMAN:  Yes, Your Honor.

24        To that point, that is how I understand the argument

25 that they are making to the Court today.

1          I did want to return to an issue that you identified

2    earlier, which was whether the -- whether there was a factual

3    dispute about whether an on-site inspection has occurred.  I'm

4    not sure that Plaintiffs are in a position to dispute that an

5    on-site inspection has occurred.  We have several concerns

6    about the on-site inspection, and we don't think that the

7    on-site inspection absolves OSHA of its responsibilities or to

8    suggest that their conduct here has not been arbitrary and

9    capricious.

10          For example, a non-worker -- a worker who is not a

11   plaintiff submitted a declaration for the Court, which was

12   filed yesterday, suggesting that OSHA may have told Maid-Rite

13   in advance about the inspection, or at least that Maid-Rite

14   knew about the inspection in advance.  If that occurred, that

15   would directly conflict with 29 CFR 1903.6, which are

16   regulations applying to OSHA's on-site inspections.

17          We also have deep concerns about how long it took for

18   OSHA to perform an on-site inspection months after the initial

19   complaint in early April, six weeks after the imminent danger

20   complaint, and all of that we consider to be in violations of

21   Section 8(f) of the Act.

22          But I'm not sure we have a dispute about whether

23   there in fact was an on-site inspection, and I also don't

24   think -- and you will hear more testimony on this today when we

25   call OSHA officials who participated in the investigation -- I

1  don't think we have a dispute about the several egregious

2  violations of OSHA and CDC guidance that are occurring

3  currently at the Maid-Rite plant.

4       THE COURT:  Well, let me go back to one of my

5  original questions, and that was that my understanding in

6  reading your original complaint was the mandamus request was

7  that OSHA do an inspection, is that correct or incorrect?  If

8  it is correct, is it correct that OSHA has done the inspection?

9       MR. SELIGMAN:  Well, we're going to, I think,

10 hopefully hear more about OSHA's inspection today, but we don't

11 at this point have a reason to doubt that some sort of on-site

12 inspection has occurred, although we have concerns about what

13 that inspection entailed.

14      THE COURT:  I understand that.  I understand that

15 you're arguing scope now of their investigation, but what my

16 question really is, is that when you first filed the complaint,

17 my reading of your mandamus was, it was to force OSHA to

18 conduct an inspection which they had not done, and it appears

19 that assuming that their information is accurate and correct,

20 on July 9th, or some period of time immediately around there,

21 that OSHA did in fact do the inspection that you were

22 requesting the Court to mandamus OSHA to do.

23      MR. SELIGMAN:  Your Honor, I believe that it was part

24 of the requested relief, but the critical relief we requested

25 was that OSHA act to abate the imminent danger.  That has not

1   occurred.

2          So Section 662(d) allows workers and their

3   representatives to seek an order from this Court compelling

4   Defendants to address the imminent danger through an imminent

5   danger order.  That is the critical piece of our requested

6   relief.

7          Now, importantly, I don't necessarily think that we

8   would need that in order for this case to resolve.  So if OSHA

9   were to ensure promptly that Maid-Rite came into compliance

10  with CDC and OSHA guidance, in particular with respect to

11  social distance, I'm not sure that OSHA would need to go to

12  court to seek relief under Section 662(a).

13          However, I do want to be clear that our requested

14  relief extends beyond merely the request for an inspection.

15          THE COURT:  Let me move back to OSHA to respond to

16  Mr. Seligman's discussion of arbitrary and capricious immediate

17  danger.

18          MR. HAMPTON:  Just one point, Your Honor, they

19  actually said the Department of Labor.  OSHA is an enforcement

20  agency within the umbrella of the Department of Labor.  I just

21  want to make that clear.  They sued the Secretary.  The

22  Secretary has responsibilities with regard to a number of

23  statutes and acts that provide for worker safety.

24          THE COURT:  We get that.  We are using OSHA and the

25  Department of labor, the Government, as synonymous terms for

1 purposes of our arguments.

2          MR. HAMPTON:   I would like to refer you to Page 47 of

3 the emergency petition, Pursuant to 29 U.S.C. 662(d)'s

4 provision for all further relief as may be required, Plaintiffs

5 additionally request an order mandating that Defendants to do

6 the following -- and that order is a request of you, Your

7 Honor -- disclose to the Plaintiffs and this Court all

8 communications to and from Maid-Rite regarding this matter,

9 which is a non-starter.  I mean, that again shows my concern is

10 that they are trying to employ OSHA's judgment with their own,

11 which is just inappropriate.  Conduct an immediate on-site

12 inspection, which was done, I believe, sometime around July

13 9th.  Engage in all other actions and proceedings necessary to

14 resolving this with all imminent dangers identified in this

15 complaint.

16          That is a conclusory statement.  They haven't

17 provided any information to the Court that there was an actual

18 imminent danger, and I think that's part of the problem here.

19 The thing that separates us from all the other instances where

20 OSHA would conduct an inspection and not take the path of

21 imminent danger is that the employees with a compliance

22 officers gives notice and goes out are in a situation where

23 their life and limb is immediately in danger.  There is a

24 temporal component to it, and that's missing here.

25          So the first thing that the Plaintiffs have to do is

1  they have to give concrete evidence, not statements by

2  employees, although those could be used to support the

3  determination, but concrete information that says there is a

4  potential -- and I agree with the Court.  It doesn't have to be

5  an injury at the time, but there is a condition present at the

6  worksite that at the time the compliance officer is there, or

7  shortly before, the employees are in imminent danger.

8          If it is true that on May 19th, or subsequent to May

9  19th, no employees at the plant, or even if there is one -- and

10  we believe our facts are that the information that we have is

11  correct -- have tested positive for COVID, reported to

12  Maid-Rite that they are suffering from symptoms, or OSHA

13  learns, and we took 15 interviews -- I mean, this is the

14  problem with many of the assertions by the Plaintiffs.  We

15  interviewed employees.  The compliance officer interviewed 15

16  employees in and around the time she did her on-site

17  inspection.

18          She asked the employees questions about the

19  conditions of work, and we will put her on as a witness, and

20  she did not get any information that would indicate that those

21  15 employees believed that they were in imminent danger.  They

22  had concerns about their work, they had concerns about masks,

23  but there was no indication that those employees, the 15 that

24  we talked to, who will remain anonymous and will be protected

25  by the informant's privilege, that sustained or supported the

1   allegations that the Plaintiffs are making.

2          There is one thing that is interesting about the

3   information we have, as opposed to the information they have.

4   Their information is dated.  Ours occurred within the last --

5   within 11 days and 11 days of when this petition was filed.

6   Most of the information, factual information that the

7   Plaintiffs rely on occurred in April and May of this year.

8   Again, not meeting factually the industry standard.

9          So even before they get to replace OSHA's judgment

10  with their own, they have to present the Court with

11  information.  Again, I'm -- let me make sure -- I'm not

12  dismissing the viral nature of COVID-19.  I have family members

13  who have been exposed to it and actually became sick.  So I

14  implore the Court to understand that the Secretary and the

15  solicitor are committed to protecting employees, as is the

16  Director of OSHA.

17         But as a factual matter, we should be allowed to do

18  what we are currently doing, and that is conducting an

19  inspection, evaluating the evidence, and completing it.

20         Your Honor has brought up another issue.  We also as

21  an enforcement agency -- and I always say to my staff

22  attorneys, the governmental footprint, enforcement footprint

23  should only be as light or as heavy necessary to gain

24  compliance.  This is not done in a vacuum.

25         Maid-Rite has rights, too, in the same way the

1 employees do.  I have an obligation to act in accord when I

2 exercise my prosecutorial discretion to make sure that I have

3 to act in a manner to protect both the employers' rights and

4 employees' rights.

5          In the same way that the Plaintiffs would like you to

6 believe that everything that they got from the employees,

7 those declarations are true, and you said to me earlier when I

8 didn't answer your question, although I thought I did, that

9 what good faith basis do we have to believe that they are not

10 telling the truth, by that same token, there is nothing about

11 the inspection that would indicate that Maid-Rite and its

12 officials are lying to us.  That is something that would come

13 out based on completing the inspection.  It would be something

14 that we would discover if it's true during the course of any

15 administrative process, but at this point, no one in OSHA has

16 any reason to believe that Maid-Rite is lying to the Secretary

17 of Labor, and in every single situation, I believe, because I

18 made a list of their allegations that they made factually -- if

19 the Court would just give me a second.

20          With regard to the CDC guidelines, the only one I

21 believe arguably that Maid-Rite has not addressed according to

22 the information that they provided to us -- again, we haven't

23 completely verified, and I don't want to represent to the Court

24 that I'm here advocating for the employer -- is that Maid-Rite

25 maintains -- and we have documents that indicate that -- that

1    they encourage social distancing, and if you look at the CDC

2    guidelines, it says where possible.

3              THE COURT:  Well, I think it's feasible, I think, are

4    the words it used, not where possible.  My understanding is

5    that the words are if feasible.

6              MR. HAMPTON:  A component of establishing a

7    violation, especially of a general duty violation, is the

8    impact and cost to the employer is one of the things we have to

9    consider and, frankly, OSHA has to prove.

10             It may not be possible, or the employer may be able

11   to defend itself with regard to the spacing of employees at

12   their work station.

13             THE COURT:  Again, I think the words are if feasible.

14   I think that is different than when possible.  Something that

15   is not possible is a whole different circumstance than whether

16   it's if feasible in terms of the determination.

17             MR. HAMPTON:  Feasible has a cost component to it,

18   Your Honor.  I'm sorry.  I was accepting your feasibility.

19   That cost component is that employer is allowed to prove that

20   taking the actions might compromise its business, and that

21   would have impact of employees being out of work.

22             Now, we haven't gotten there yet, so that is why the

23   process has to go first.  I don't know if Maid-Rite has a

24   defense or not.  I don't know if they can implement engineering

25   controls that accomplish -- feasibly accomplish having their

1  employees spaced at 6 feet.

2          What I do know is that if the Court allows OSHA to

3  complete the process, then we will be able to make that

4  argument.  I do think it is important -- and, again, the

5  declarations are all -- and I don't want to be dismissive of

6  the employees' perception of the worksite, but there are 400

7  employees out there.  We have five declarations now.  OSHA

8  talked to 15 employees out there.

9          THE COURT:  By the way, just as a side note -- I

10  don't know that I picked this up -- I know there were

11  discussions back and forth between you having an interview with

12  the actual three complainants, the Jane Does, but I can't

13  remember whether or not that was accomplished or not

14  accomplished.

15          Was it accomplished or not accomplished?

16          MR. HAMPTON:  It was not.

17          THE COURT:  It was not accomplished.

18          MR. HAMPTON:  Plaintiffs put conditions on it.

19          THE COURT:  I understand you disagreed on conditions

20  on both sides, but I just couldn't remember off the top of my

21  head whether there had in fact been an interview.  Go ahead.

22          MR. HAMPTON:  The employees are not shoulder to

23  shoulder.  Again, I have no reason to disbelieve.  I'm not

24  vouching for the information that we got from Maid-Rite, but we

25  received pictures during the investigation from Maid-Rite, and

1  this was in response to the informal investigation, that

2  indicated the distance that the employees were standing.

3           Now, they were not 6 feet apart.  I'm not going to

4  represent to the Court that some of these employees -- some

5  are, but that the employees are -- all employees are 6 feet

6  apart.  That is not true, but they are not shoulder to

7  shoulder.  If you look at the measurements on the documents,

8  they are somewhere between 3 and 3 and a half feet away when

9  they are standing on the same side of the work station, and

10 somewhere around 4 feet on the other side.

11          Does that pose a risk to the employees?  OSHA is

12 trying to find that out.  Does it impose an immediate risk of

13 serious injury and harm to the employees?  There is no

14 indication based on the evidence here -- remember, the

15 Plaintiffs' evidence is dated, except for the two declarations

16 that they provided last night -- there is no information that

17 there is an imminent danger at the Maid-Rite worksite.

18          Since we have had several people talking,

19 Mr. Buchanan would like to add comments as to what I just said.

20          THE COURT:  Go ahead.

21          MR. BUCHANAN:  I would like to address --

22          THE COURT:  You have to speak up so everybody can

23 hear you.

24          MR. BUCHANAN:  I would like to address just briefly

25 the issue of the relief that the Plaintiffs are seeking here.

1          Yes, one of them is an immediate on-site inspection,

2   which I think we agree that has occurred, but we should not

3   continue to refer to the inspection in the past.  It is

4   ongoing.

5          In 154(c), they ask the Court for an order directing

6   Defendants to engage in all other actions and proceedings

7   necessary to resolve imminent dangers identified.  I want to be

8   clear that section 13(a) says that the Secretary may petition

9   the district court for an order requiring an employer to abate

10  an imminent danger.

11         Section 13(d) says if the Secretary arbitrarily or

12  capriciously fails to seek relief under the section, that

13  relief is going to court, is going to district court, just like

14  this district court, to seek an order requiring immediate

15  abatement of conditions that the Secretary believes are

16  imminent danger.

17         We don't see that in the complaint.  They don't ask

18  that the Secretary go to court to prove that there is a

19  violation and the violation constitutes an imminent danger.

20         That Section D also says that an employee or a

21  representative of the employees can get writ of mandamus here

22  to compel to separate to seek such an order and for further

23  relief.

24         Basically, they have to be asking you to order the

25  Secretary to go into court here or somewhere else per 13(a).

1  They don't even ask for that in their complaint.

2          MR. HAMPTON:   Just a couple more comments, if I may,

3  Your Honor?

4          Again, in litigation -- this often happens in

5  litigation -- people get tied to their positions and sometimes

6  they say things that are just not appropriate.

7          Alleging that someone from OSHA gave notice to an

8  employer or employer representative of the complaints not in

9  connection with the opening conference, getting permission to

10  come on site, et cetera, is just -- they have no basis for it,

11  and it's inappropriate and it is wrong and they should stop it.

12          One of the problems here is that -- and it goes to

13  one of the answers that Mr. Seligman gave -- they want to have

14  oversight, not the Court.  They don't want you to have

15  oversight.  What Plaintiffs are really saying, Your Honor --

16  and none of whom have any OSHA experience work for the

17  Department of Labor -- they want to dictate to OSHA,

18  compromising OSHA's expertise in this instance, in how the

19  inspection should be conducted.

20          There is nothing in the law that provides for that.

21  OSHA has -- and I will give you the quote -- OSHA has broad

22  prosecutorial discretion when carrying out its enforcement

23  responsibilities under the Act.  The Occupational Safety and

24  Health Act created an administrative process to ensure that

25  those individuals who enforced the Act learned as they went and

1   got better because of the mistakes that we sometimes make.

2          So that the administrative apparatus, the additional

3   regulations that were passed, the notice and comment periods

4   that were allowed to outside employers to comment on new

5   actions that OSHA was taking to address new and novel potential

6   injuries to employees, that that would be done through the

7   expertise of a group of individuals who over time had learned

8   how it worked, and that is to respect the employee's right to

9   go to work every day and go home and the employer's right to do

10  their business in a manner that is consistent with following

11  the law.

12         The Plaintiffs in this case and others, because they

13  have done this before -- the lawyers are the same in the

14  Smithfield -- they're trying to tell OSHA what to do and OSHA

15  is not allowed to exercise their good judgment, and that is not

16  what this is about.

17         This is a straightforward case about whether or not

18  in a particular instance, a particular group of OSHA employees

19  had an opportunity to evaluate the fact with regard to a

20  particular worksite at a particular time with regard to whether

21  it posed a particular threat to a group of employees.

22         OSHA responded initially with an informal complaint

23  apparatus that accumulated information and got documents from

24  the employer that indicated they had taken steps, at least

25  arguably consistent with CDC guidelines and the OSHA

65

1  guidelines.

2         Subsequent to that, OSHA had some concerns about the

3  information that it got and actually conducted a formal

4  inspection -- started a formal inspection and conducted an

5  on-site and actually talked to witnesses.

6         We have done exactly what we should have done in

7  response to a serious situation that might be posed to

8  employees.

9         As the Court said at the beginning of this, the Court

10 should not be asked -- shouldn't be in a position of replacing

11 this judgment for OSHA, and we ask that the relief that they

12 requested, that they factually had not disputed, to allow us to

13 continue our investigation, complete it, and make a

14 determination as to whether or not the Act has been violated.

15        Finally, the guidelines -- and I'm going to be

16 careful here -- use permissive language where feasible.  When

17 OSHA enforces the law -- and it has to enforce the law

18 fairly -- COVID-19 is not just a problem in the meatpacking

19 industry, although because of the nature of the industry and

20 the requirements and the fact that it was essential, it poses a

21 unique risk that might not be others.

22        But there are employees all over America; waitresses,

23 construction workers, people in plants all over America that

24 are facing the same hazard, and OSHA, I believe, got thousands

25 of complaints.  OSHA had to come up with an administrative

1  apparatus in order to deal with those complaints.  We have

2  dealt with those complaints in accord with the law and,

3  frankly, we are doing our best to adjust and be flexible on

4  being able to utilize our resources in a fashion that maximizes

5  the safety for the nation's workers.

6          THE COURT:  I did notice by your own statistics that

7  you recorded that of 7,000 some hundred complaints, there was

8  one citation.

9          MR. HAMPTON:  There was one citation?

10          THE COURT:  I think they're your statistics that you

11  quoted.  7,300 and maybe 28 complaints and one citation.

12          MR. HAMPTON:  I think those were dealt with

13  informally.  Again, we have to find evidence of an actual

14  violation, and then a violation has to be --

15          THE COURT:  I don't know how many of those were

16  settled, but all I know is that I think that was reported in

17  the Washington Post by your undersecretary testifying before

18  the legislative counsel, but I have to admit -- and I think you

19  actually -- I could be wrong -- I think you put that statistic

20  in either one of your -- I think the affidavit of the

21  declaration you submitted.  It's my recollection it indicated

22  7,000 some hundred complaints, one citation, which I have to

23  say that statistics can be misleading, but that's a jumping out

24  statistic, I have to admit.

25          Let me ask you, what we were addressing when we were

1 speaking with Mr. Seligman was immediate danger and arbitrary

2 and capriciousness.  While you went off on some other things, I

3 want you to address the issue of arbitrary and capriciousness

4 and your understanding of that under 662(d).

5         MR. DATLOF:  Your Honor, if I may, it is still very

6 difficult for the people on the Zoom call to hear.

7         THE COURT:  It's the best we can do.  I mean, I think

8 they are speaking loud enough.  That is why I wanted everybody

9 initially to be here.  The technology is the technology.  We

10 can only do the best we can with respect to that.  That's why

11 lead counsel is physically present here and so determinations

12 or decisions or arguments that can't be made remotely, lead

13 counsel will make, and that's why you're here.

14         MR. DATLOF:  Absolutely.  Just to the extent that

15 they can put it in front of them when they are speaking for

16 extended periods of time, I think that would be helpful.

17         THE COURT:  Gentlemen, let's try to do that, please.

18         MR. HAMPTON:  Yes, Your Honor.  I'm going to move

19 close to it.  Again, it's a new experience for me for folks to

20 tell me I'm not speaking loud enough.

21         Arbitrary and capricious standard is a high standard

22 for the Plaintiffs -- a burden of proof, a high standard for

23 them to establish.  In that instance, they don't discuss their

24 judgment or that of the agency, and that's in the State Farm

25 case at 473 U.S. 2943.

1        In this instance, we have completed our judgment

2  so --

3        THE COURT:  Let me ask you that.  Let me get right to

4  the meat of the matter.  How long is it going to take OSHA to

5  complete their investigation?

6        MR. HAMPTON:  Well, my response to that -- and I hope

7  I don't incur the Court's ire -- is that until we have gathered

8  the facts necessary to make a determination as to whether or

9  not a violation has occurred.  We started the on-site -- I

10 think we started the investigation less than a month ago.  The

11 on-site occurred in just a few weeks.

12        THE COURT:  I think the investigation was opened on

13 June 2nd, wasn't it, by your documentation?

14        MR. HAMPTON:  Yes.

15        THE COURT:  And this is almost August 2nd, so that is

16 more than a month ago.

17        MR. HAMPTON:  That's not -- first of all, inspections

18 don't take this much.  That's not a lot of time to conduct an

19 inspection.  We have to --

20        THE COURT:  When you say all inspections, now you are

21 grouping things that are, you know, could be any kind of

22 miniscule concern or whatever, and I'm not interested in that.

23        I'm interested in a particular circumstance where

24 150,000 Americans are dead and there's a question of very close

25 proximity with workers, at least not clearly being socially

1 distanced to the extent that one would normally expect.

2          I understand your answer is going to be, I can't tell

3 you the answer.  I get where you're going, but here is what I

4 want to know, because I'm trying to be practical here, there

5 was a request for an in-person inspection, and that, to me, was

6 the original real request for the mandamus, while the other

7 things were matters that were included, if you find that

8 they're not doing this, then here's all the other stuff that we

9 want along with it.

10          But looking at the complaint where the allegations

11 that are in there, so you are aware of the complaint before

12 June 2nd, but on June 2nd, it officially becomes open.  You

13 interact with Maid-Rite.  They send information within about

14 five days and that's reviewed.  Ultimately there is some other

15 back and forths, including apparently some sort of

16 recommendation from you to them or direction for them to fix or

17 cure based on the April complaint matters.

18          Ultimately when you open the investigation, it is

19 after the complaint here has been filed in the sense that there

20 is an inspection that actually takes place where your inspector

21 goes out and physically, according to her, for about an hour

22 looks at the plant, takes pictures, does other things of that

23 nature, and now comes back with those things.

24          So what are the next steps in an investigative

25 process after you have spoken with 15 employees, read through

1   the complaint, visited the site to visually inspect what was

2   going on and reviewed the complaint?  What comes next in terms

3   of OSHA's analysis of that?

4           MR. HAMPTON:  At that point, the CSHO talks to her

5   supervisor who is the assistant area director.  That supervisor

6   has given information to the CSHO on how to put the file

7   together to what evidence is important and what isn't.  They

8   probably have sat down together and decided and thought about

9   what citations, if any, might issue.  Then the CSHO completes

10  putting the file together, makes a recommendation with the

11  assistance of the area -- the AAD.  In a case like this --

12          THE COURT:  That recommendation is to who?

13          MR. HAMPTON:  Well, the initial conversation will be

14  between--

15          THE COURT:  I get that, and then they make a

16  recommendation to who?

17          MR. HAMPTON:  To the area director, but during that

18  process, there is probably more in a situation like this -- and

19  I'm pretty certain that my OSHA counsel was involved in this

20  case -- they might also seek direction from the regional

21  solicitor's office and that may take a bit of time.

22          In that instance, in a serious case or an important

23  case or a case that we believe impacts our national policies

24  and procedures, the area director and the regional office would

25  work with the regional solicitor's office and get our opinion

1   about whether or not a citation should issue, whether we have

2   the evidence to support -- factual evidence to support a

3   citation and, quite frankly, whether the law supports a

4   citation in a particular instance.

5           So in that instance, there are reviews that go on,

6   and I don't think they should take more -- and I'm not going to

7   give the Court a time.  I can't do that, but this --

8           THE COURT:  You were about to do that.  You said it

9   shouldn't take more than what?  What?

10          MR. HAMPTON:  I would anticipate, particularly in

11  this instance, that OSHA would act and my office would act with

12  dispatch to complete the inspection because of the nature of

13  the case and the serious potential violations that might occur,

14  but I'm not going to promise the Court that there's going to be

15  violations, because 5(a)(1) -- and this is one of the problems.

16  There is no --

17          THE COURT:  I didn't ask you whether there would be a

18  violation or citation.  That's not my question.

19          My question was roughly how long do we anticipate or

20  expect now going forward that OSHA's investigation -- it seems

21  to me that your factual investigation ought to be well on the

22  way in light of the fact that you have done a significant

23  number of interviews, that you have made an inspection a little

24  less than a month ago, three weeks ago physically, and that you

25  have clearly been involved even at the solicitor level with

1    this case now for a period of time because of this action.

2          So all of those things make me believe that most

3    stones have been turned over one way or the other.  The result

4    is not something that I'm asking about.  That's a determination

5    that OSHA will make and there's a process.

6          My concern is really the time that likely that there

7    will be some sort of a resolution of the case one way or the

8    other, whatever that may be.  It could be a compromise, it

9    could be a direction that Maid-Rite accepts, it could be a

10   citation, it could be a violation, it could be an affirmation

11   of their policies or proffer, I don't know.

12         MR. HAMPTON:  So long as the Court understands that

13   we have gotten a significant number of complaints regarding

14   COVID exposure, and we are still doing all of the other

15   instances of people falling, being in trenches, and doing other

16   things.

17         THE COURT:  And I get that.  My concern is -- and I

18   think you are getting my concern -- the example I used before,

19   I'm sure that there are -- because of COVID, it's an unusual

20   time -- I'm sure that there are many complaints that will have

21   some COVID analysis in them, but when one looks at those

22   complaints, my example of if I worked for the superstore and my

23   complaint is that they haven't put lanes in where you go up and

24   down each aisle as some stores and some places have done, you

25   know, that may not be quite as imminent a concern as whether or

1  not I'm standing within 2 feet of somebody for an extended

2  period of time on a relatively quick moving conveyor belt, that

3  I'm 3 feet or 4 feet, as you put it, across from somebody who

4  is directly facing me so that I don't have social distancing, I

5  don't have the ability to be able to turn in a different

6  direction, and I'm moving through.

7         The point I want to make, and this obviously does

8  relate to the discretion that I'm concerned that OSHA should

9  not be deprived of, and that is the ability to do more than

10 just say it's a COVID related complaint and we got a lot of

11 those, as opposed to factually it involves in this case a food

12 supply and circumstances that seem to be concerning in terms of

13 the ability to socially distance or something as simple as

14 putting a guard across, a clear shield across -- just about

15 every hardware store in the country has done that -- to be able

16 to put it across the middle of the conveyor belt and hang it

17 from the ceiling, there's a difference.

18        Just the fact that there's a lot of COVID cases

19 doesn't mean they all have to take the same amount of time.  I

20 assume that OSHA is supposed to be using the discretion to make

21 a determination of triage, if you want to call it, with each

22 case, as to whether this is something we need to pull to the

23 front of the line or whether it is something that we get to it

24 as soon as we reasonably can, but we don't know when that is.

25        MR. HAMPTON:  If I may, Your Honor.  Isn't that what

1  happened here?  OSHA gave a response to an initial complaint,

2  an informal inquiry, and with respect to that inquiry, OSHA

3  found something that they wanted to talk to Maid-Rite a little

4  bit more about, and where that leads to kick it up to a formal

5  investigation.  That's exactly what happened here.

6          I guess -- I don't want to -- all that's true, and it

7  is true that 4.4 million people have been exposed and 152,000

8  people have died, and the Secretary certainly isn't dismissive

9  of that.  It is a serious worldwide problem that have got the

10 attention of all levels of government, but we are talking about

11 a single plant in a single instance involving a single

12 allegation, and I think it's important that we're there.

13         The Plaintiffs have to establish that there was an

14 actual risk, not -- and this Court, in connection with dealing

15 with requests by inmates to be freed pursuant to the CARES Act

16 from prison, they can't be speculative.  There has to be, in

17 this situation, a concrete establishment by the Plaintiffs that

18 there was an actual hazard, not the potential of a hazard, an

19 actual hazard, and that hazard was immediate.

20         There are no facts in the record, none.  The experts

21 did not visit the plant, did not look at the policies and

22 procedures of the company.  I'm not even sure that the expert

23 will be able to maintain she looked at pictures to establish

24 the distance that employees were actually working from each

25 other.

1           The problem with this complaint, in addition to the

2    legal problems, is that factually it's all speculation.  Every

3    single bit of it is speculation.  I'm not going to call the

4    declarants by the employees self-serving.  They are not.  I'm

5    sure the employees perceive everything they say they perceived

6    with regard to their personal experience, but that has nothing

7    to do with establishing that there was a hazard generally for

8    the 400 people there.  That is what OSHA is trying to figure

9    out.  That is what this Court should allow OSHA to complete.

10   That's what's important.

11          While we do this in the context of 152,000 dead

12   Americans, we have to make sure, because we live in a country

13   that allows due process and fair notice, that our governmental

14   action is done so in a deliberate, reasonable fashion, and

15   that's exactly what OSHA is doing right now.

16          THE COURT:  We're going to -- it's 12 noon.  We are

17   going to break for lunch and we will come back --

18          MR. SELIGMAN:  Your Honor, may I have a moment to

19   respond to some of the points raised in counsel's argument?

20          THE COURT:  Sure.  Go ahead.

21          MR. SELIGMAN:  You know, I think right off the bat,

22   you know, I want to flag that there was lots of statements made

23   about our evidence being stale or inaccurate.  I encourage the

24   Court to review the declaration submitted last night from a

25   mechanic currently at the plant with respect to current

1 conditions.

2          THE COURT:  I have read that.

3          MR. SELIGMAN:  Great, great.  Thank you, Your Honor.

4 Then, returning to some of the reasons that counsel provided

5 for OSHA's conclusions here, I absolutely agree that OSHA has

6 wide discretion.

7          Section 662 sets up guardrails for that discretion,

8 and I think based on this argument, we can see that OSHA is

9 well beyond those guardrails.

10          Some of the considerations at play here include first

11 that there are no cases at the plant currently.  Once again,

12 OSHA shouldn't wait for the virus to enter the plant in order

13 to act.  That is inconsistent with the OSH Act.

14          Secondly, I want to return to a point that counsel

15 made with respect to costs.  I find that quite concerning.  The

16 OSH Act and the guidance at issue does speak to feasibility.

17 Feasibility is very different from costs on the employer.

18          I believe that OSHA is suggesting that social

19 distancing in meat processing plants is not required by OSHA's

20 guidance where it would increase loss.

21          If that's the case, that conclusion is arbitrary and

22 capricious.  We are prepared to establish that social

23 distancing is absolutely feasible, that it may, in fact,

24 increase costs for employers, but employers will be able to

25 continue operating even with social distancing.  That's

1  precisely the kind of remedy that the OSH Act is designed to

2  prescribe, to ensure that employers internalize costs that

3  otherwise would be -- otherwise workers would be forced to bear

4  through illness, disease, and injury.

5         I believe counsel also suggested that social

6  distancing on meat processing lines is not or may not be an

7  imminent danger.  That's a conclusion as well, and if that's

8  the basis for the conclusion that there is no imminent danger

9  here, that conclusion is absolutely arbitrary and capricious.

10         I'm happy to provide further argument, and after

11 lunch we can talk about some of the evidence that we're

12 prepared to submit today.

13         THE COURT:  We're going to break for lunch, and then

14 we will come back at 1:00 and we will continue.

15         I assume that we will be able to get back into the

16 same link.  Don't let your link go yet.  I assume that there is

17 no problem getting back into the same link, and then we will

18 pick it up from there.

19         I remain interested in hearing a few things.  Again,

20 my focus here is really going to be on 662(d).  My focus is on

21 the Maid-Rite plant and not a more national scope.  We are not

22 here for injunctions of national matters.  We're talking about

23 a specific plant and these activities or locations within that

24 plant that potentially fit within 662(d), which would be

25 described as arbitrary and capricious.

1          From OSHA's perspective, I do particularly want to

2  hear the allegation that the OSHA inspector had indicated that

3  we don't treat any -- the word any underlined -- COVID-19 cases

4  as immediate dangers.  That is something I want to address

5  during the course of the afternoon as to whether such a

6  statement was made, who it was made on behalf of, if it was

7  made, and the circumstances behind that as to whether that type

8  of a statement would be an arbitrary and capricious statement

9  on behalf of the agency, and then we will move on from there.

10          What I really don't want, like I said, this is not a

11  trial, it's a hearing.  I understand you may have some evidence

12  that you want to offer, and in terms of the expert evidence,

13  you know, we will see.  I'm more interested, as I said, in the

14  legal issues of immediate danger.  I understand that.  I

15  understand the medicine, I think, behind COVID-19 and its

16  spread.

17          So my real focus still remains on 662(d) and the

18  arbitrary and capricious nature of the allegations that OSHA's

19  activities are -- or the Secretary's activities are arbitrary

20  and capricious in light of the investigation that's ongoing and

21  the fact that a site visit has taken place and assurances that

22  this matter is going to move forward quickly.

23          So we will see everybody at 1:00.

24      (At this time, a luncheon recess was taken.)

25          THE COURT:  Let me focus a few questions that I have,

1  and then we will see what else needs to be offered at this

2  point in time.

3            First I would like to know from OSHA what is a formal

4  versus an informal or non-formal complaint, because you

5  described both the April and the May and this filing as being

6  some sort of none -- considered a non-formal complaint.

7            What is that?  What is the difference between that?

8            MR. HAMPTON:  If there are witnesses, they will do a

9  better job than me, because it has been a long time since I've

10 been OSHA counsel, but generally the non-formal complaint is

11 dealt with by correspondence, and that correspondence comes

12 from OSHA.  They alert -- I don't want to tell the Court

13 wrong --

14            THE COURT:  I appreciate that.

15            MR. HAMPTON:  But they send out -- they get the

16 notice of a potential violation or an employee complaint.  They

17 treat it non-formally.  They send out correspondence in an

18 effort to get the employer to respond.  Employers generally do

19 respond.  Based on the information that they receive from the

20 employer, they make a determination as to whether or not

21 further inspection activity is required.

22            In this case, that was the determination which

23 resulted into a formal inspection and there's an actual

24 on-site, and the extent of that on-site depends on the nature

25 of the violation and complaint, et cetera.

1        THE COURT:  So it has nothing to do with the document

2   that is filed or a particular way it's written or anything of

3   that nature.

4        It is really a determination by OSHA when they

5   receive the complaint, in whatever form it may be, how they are

6   going to react to that, whether it is by informally calling or

7   writing or speaking with the employer, as opposed to opening up

8   a formal investigation where they call witnesses and do a site

9   visit, things of that nature?

10        MR. HAMPTON:  I'm going to defer to witnesses, if you

11   allow those.  I don't want to misrepresent to the Court the

12   exact procedures.  I will make sure that in any document that

13   we provide to the Court that that exact procedure is spelled

14   out.

15        That's my understanding, but I'm not that in depth

16   with OSHA's procedure and the exact language and condition

17   precedents to a non-formal and a formal complaint, and I don't

18   want to misguide the Court.  So that is information that our

19   AD, or area director, would have and we would be able to advise

20   the Court of.

21        THE COURT:  Okay.  Anything that the Plaintiffs want

22   to add with respect to the question, and really this is one for

23   OSHA, what is a formal versus an informal or a non-formal or

24   other than formal complaint, I just wanted to find out.

25        MR. SELIGMAN:  Yes, Your Honor.

1          I don't think this has to be that complicated.

2  Section 8 of the Act, so that is 29 U.S.C. Section 657 spelled

3  out precisely what a formal complaint is for an imminent danger

4  complaint and what OSHA must do in response to one of the

5  complaints.

6          THE COURT:  Let me ask you -- and this is directed

7  toward OSHA as well, or the Labor or the Government or

8  whichever the Defendants in the case --

9          MR. HAMPTON:  OSHA is fine, Your Honor.

10         THE COURT:  -- with respect to a decision on imminent

11  danger, explain to me how that occurs.

12         So if somebody makes an allegation that there is an

13  imminent danger, what is the time frame within which that

14  something needs to be done, and what is it that needs to be

15  done in order to make a determination of whether it is or is

16  not an imminent danger?

17         MR. HAMPTON:  Well, an imminent danger can arise in a

18  number -- OSHA can be out at a particular worksite and make a

19  determination, having gone out there without a complaint or any

20  indication that it was an imminent danger, that it was an

21  imminent danger.

22         THE COURT:  Well, let's suppose there's a complaint

23  and the inspector is not out there and hasn't seen anything,

24  but somebody is claiming, as in this case, that there is an

25  imminent danger.  So what happens when those words -- I assume

1  that they are not the words that are used in every OSHA

2  complaint.

3         If somebody complains that there's something going

4  on, an imminent danger seems to be a term of art that relates

5  to imminent danger of death or serious medical injury or

6  physical injury, but when that is determined, what is the

7  process and the time frame that OSHA acts if there is a

8  complaint made by somebody other than the inspector concerning

9  what the person believes to be, whether rightfully or

10  wrongfully, an imminent danger?

11         What happens and how long -- when does it occur, and

12  is there a notification if there's a decision that it's not a

13  imminent danger, or we don't consider it to be an imminent

14  danger, what are the procedures and the time frame?

15         MR. HAMPTON:  Well, in that instance, the complaint

16  would be treated to where we would go out as quickly as

17  possible to conduct an investigation.  Once OSHA was on site,

18  and they made a determination that in fact an imminent danger

19  exists, then the CSHO will ask the employer to remove the

20  endangered employees from the imminent danger to abate the

21  hazard, and that's with consultation with the area director and

22  the assistant area director and oftentimes the regional

23  solicitor.

24         Most employers in that instance would voluntarily

25  abate the hazard if, in fact, it is the imminent danger.  If

1   the employer fails to or refused to abate the hazard

2   voluntarily, then at that point the CO would notify the area

3   director, who would also notify the regional director and the

4   regional solicitor.

5           At that point, if it's necessary, and the area

6   director and the area solicitor concur, then we would take

7   action and write up the employer's refusal to abate the hazard.

8           THE COURT:  That's if you find there is an imminent

9   danger?

10          MR. HAMPTON:  Correct.

11          THE COURT:  So let's suppose there's an allegation,

12  like in this case, where there is a complaint that there is an

13  imminent danger, but obviously there hasn't been any finding by

14  anybody that there is an imminent danger, how does that process

15  proceed?

16          MR. HAMPTON:  If there is not a finding of an

17  imminent danger -- let me just make sure --

18          THE COURT:  My question is, so if there's a complaint

19  made and the complaint includes that there is an imminent

20  danger, and in this case obviously the inspection occurred some

21  time after the complaint was made, and so my question is,

22  what's the process by which, when there is a complaint of

23  imminent danger, that you said they go out as soon as possible.

24  Well, it doesn't seem to be what occurred here.  It's makes it

25  sound as if they had made a determination it's not an imminent

1  danger, but what is the process in deciding that it's not an

2  imminent danger?

3          MR. HAMPTON:  That would generally be based on the

4  CSHO's expertise in evaluating hazards at that point, and if

5  they determined at that point there was an imminent danger

6  based on the information that they come across at the

7  inspection, then --

8          THE COURT:  Well, there is no inspection yet, right?

9  In our case, for example, there was no inspection when the

10  complaint was made indicating an imminent danger.  There was --

11  there may have been a request for information, but there was no

12  inspection done, correct, until July 9th?

13          MR. BUCHANAN:  No, Your Honor.  An inspection was

14  initiated on or around June 2nd, after the May 19th complaint.

15          THE COURT:  So when you use the word inspection, you

16  are not talking about a physical appearance at the location to

17  see what it is.  You are talking about opening up an

18  investigation?

19          MR. BUCHANAN:  Correct.

20          THE COURT:  So my question -- let's go back then and

21  follow that up -- what I want to know is, if somebody claims

22  there is an imminent danger, tell me what it is that you do,

23  and is there time frames either in your regulations or

24  procedures that associate themselves to an allegation of

25  imminent danger?

1          MR. BUCHANAN:  I'm going to defer.  I think that's an

2    appropriate question for OSHA, but what happened in this case,

3    I believe, was the proper procedure; that is, there was a

4    complaint filed on May 19th, received on May 20th by OSHA, an

5    acknowledgement was sent to the complainant, that would be

6    Justice at Work, and a letter was sent outlining the

7    allegations of the complaint to the employer, the employer had

8    a certain amount of time, I believe it was until --

9          THE COURT:  So that means in every case of an

10   allegation of imminent danger that step one is to write the

11   letter to the employer to ask them to respond to it, or are

12   there cases where imminent danger, the first procedure -- I

13   thought I read someplace, and perhaps I'm wrong, that within 24

14   hours or shortly thereafter that there is to be a physical site

15   visit.  So are you telling me that if there is an allegation of

16   imminent danger, the first process is, you write a letter to

17   the employer and find out what's going on?

18         MR. HAMPTON:  Not in all cases, Your Honor.  Each of

19   these are treated differently.

20         THE COURT:  That is what I want to focus on this

21   case.

22         So does that mean at some point in time somebody made

23   a determination when they received this complaint that this

24   isn't an imminent danger that requires an immediate site visit,

25   this is an allegation of immediate danger that requires a

1  letter to the employer to find out what is going on?

2        MR. HAMPTON:  OSHA has procedures for dealing with

3  this.  When the complaint came in, it wasn't just there's an

4  imminent danger.  There were factual contents to the complaint.

5  That was reviewed by the area director, a CSHO is assigned the

6  inspection by the assistant area director who is generally the

7  supervisor.  That factual content was evaluated, but then,

8  again, the witnesses could tell you exactly what happened here.

9        THE COURT:  We will ask them, but I'm trying to find

10 out the procedure that is normally used, and then we will talk

11 about what they tell us they actually did in this case.

12       MR. HAMPTON:  The procedure is that the AD and ADD

13 exercise their judgment with regard to the factual content of

14 the complaint.  If the factual content of the complaint is of

15 such information that it doesn't appear from the face of the

16 complaint, then they can put it into one or two piles.  They

17 can put it in the non-formal pile or the formal pile.

18       In this particular instance, based on the factual

19 content of the complaint, there was a determination made as the

20 agent, and probably with that of the assistant area director --

21 again, she will testify to that -- that the information

22 contained in the complaint wasn't sufficient to justify a

23 formal on site -- a formal inspection.

24       THE COURT:  Let me ask you, so in this case as an

25 example, and again going back to what your procedures are, if

1   an allegation is made of immediate or imminent danger of death

2   or serious injury, and there is a determination made that it

3   is, factually then you do what appears to be as soon as

4   possible, relatively immediate physical review of that

5   circumstance and then --

6        MR. HAMPTON:  Let me give you an example --

7        THE COURT:  Let me finish.

8        -- if it turns out it is determined it's not really

9   what appears to be in our reading an imminent danger that

10  requires us to go out, you request additional information from

11  the employer concerning the allegations that are made, is that

12  right?

13       MR. HAMPTON:  Yes, Your Honor.

14       THE COURT:  And if someone makes an allegation of an

15  imminent danger, and so you made a determination that it's not

16  really an imminent danger, are you required to notify them that

17  you have made a determination that it is not an imminent

18  danger, or are you not required to do that?

19       MR. BUCHANAN:  Your Honor, I would defer to OSHA on

20  whether they have to notify them it is not an imminent danger

21  at that time.

22       MR. HAMPTON:  If it is an imminent danger, however,

23  they do notify the employee and the employer.

24       THE COURT:  I get it, but if they decide that the

25  complaint is, in their mind, is not an imminent danger -- the

1  reason I ask that is if the OSHA office decides it is not an

2  imminent danger and the plaintiff disagrees with that, is there

3  am appellate process within OSHA where they can say to somebody

4  else, hey, we think they are wrong on this, this is really an

5  imminent danger and, if so, obviously notification is a very

6  important aspect of that, because you can't appeal something

7  until you find out what it is.

8       MR. HAMPTON:  There is correspondence back and forth

9  with the employer representative here.

10       If we go out, Your Honor, and we find that there is

11  no violation of law, the employer in that instance has rights

12  too.  So we have to be careful about the information that we

13  gathered and the disclosure of that in a pending OSHA matter.

14       Again, we have experts here who actually do this

15  every day that can tell you exactly what will happen, but it's

16  not my understanding that at some level, other than we're

17  closing your complaint, there is no explanation to the --

18       THE COURT:  I didn't even ask for an explanation.  I

19  asked for a pronouncement that, you know, we're not making a

20  finding of imminent danger, not we're not making it because

21  A,B,C,D, and E, but just so the person -- is there the

22  availability for them to be able to say, I think you made a

23  mistake here and so I need to appeal it effectively to a higher

24  person to review?

25       MR. BUCHANAN:  I'm not aware of any formal appeal

1  process.

2         THE COURT:  So effectively if you decide it's not an

3  imminent danger, it's dead.  They don't have any rights to be

4  able to say at the inspector level or at the regional level,

5  you have made a mistake here and we need to be able to go

6  someplace to be able to have that looked at and reviewed?

7         MR. HAMPTON:  Wouldn't that be this process, Your

8  Honor, that if, in fact, after investigation has been completed

9  and --

10        THE COURT:  Well, imminent danger is different than a

11 full investigation.  Like, your investigation is going to

12 include whether they have not involved practices that are the

13 best practices.  Some of them might be really serious and some

14 might be relatively minor, but that is a different animal than

15 it's imminent danger, and that's my concern.

16        With an imminent danger, it seems to me that timing

17 then becomes exceptionally important, because if there is --

18 I'm not saying there is or isn't here -- but if there is an

19 imminent danger, and merely an inspector or their superior can

20 say, we don't think so, and that's the end of that, without the

21 person who believes, if they do in good faith, it's an imminent

22 danger, has no recourse beyond it?

23        MR. BUCHANAN:  The two I do not believe are mutually

24 exclusive.  That is, OSHA can open an inspection and determine

25 that there is an imminent danger based on what they learned

1  during the inspection.  They don't have to determine it the

2  moment they get a complaint letter.  They don't necessarily

3  have to determine it, but they might determine that it is upon

4  receipt or lack of receipt from an employer in response to the

5  allegations.

6          THE COURT:  I get that, but you are mixing apples and

7  oranges.  I understand what you're saying is if the

8  investigation remains open, maybe at some point in time during

9  the investigation they will decide it's an imminent danger.

10 That is not the question.

11         The question is, when someone makes an allegation of

12 an imminent danger, is there a time frame within which the

13 determination, at least preliminarily of whether it is or is

14 not an imminent danger, is done?  Because imminent to me is a

15 whole different word than just OSHA violation.  Imminent means

16 now, immediate, something that could harm somebody now.

17         It seems to me that if the determination is made, no,

18 it's not, that might be a completely legitimate determination,

19 but is the person that has made the complaint saying this is an

20 imminent danger, are they notified that OSHA is not going to

21 treat it as such so that they have an opportunity to try to be

22 able to say to somebody higher, you are really missing the ball

23 on this one and people are going to get hurt, or is it just

24 once whatever that official says is done, that's it, it's done?

25         MR. HAMPTON:  There are no internal appeal rights

1  within OSHA itself for an employee to ask, other than

2  contacting the area director directly with complaints, which,

3  in my experience, have occurred, but there is no formal way to

4  appeal a determination by OSHA to not issue a citation or, for

5  that matter, to not issue a citation with an imminent danger,

6  other than where we're at now with OSHA having exercised its

7  prosecutorial discretion.

8          What the Plaintiffs are asking for here is not

9  ministerial.  It is discretionary.  The Court gives agencies --

10          THE COURT:  Well, you want to take us someplace else,

11  and I don't want to go there yet.

12          MR. HAMPTON:  Fair enough, Your Honor.

13          THE COURT:  So what you are telling me is that

14  theoretically that this is the place that the Plaintiffs would

15  come that if they have made a legitimate request for an

16  imminent danger, and OSHA has not in fact agreed with that, and

17  they basically said, well, we'll either keep an investigation

18  or we will close it, it is not an imminent danger, or we'll

19  handle it in some other manner, you're saying that their

20  recourse -- there is no recourse within OSHA for them.  So the

21  only recourse, if they truly believe it's an imminent danger,

22  is to come to the Court and say it's an imminent danger?

23          MR. HAMPTON:  Well, our position is that condition

24  precedent in doing that is that the CSHO has to issue an

25  imminent danger that the Secretary --

1          THE COURT:  Right.  That's issue an imminent danger.

2   My point is that if you don't, so you can just kill it and

3   that's the end of it.  According to that theory, you can

4   basically say, you know what, it's not, and then that's over

5   with.

6          You're saying there is no recourse whatsoever for an

7   employee that believes in good faith there is an imminent

8   danger and disagrees with the agency's determination that there

9   is not, they are just stuck?

10         MR. BUCHANAN:  That is correct, Your Honor.

11         MR. HAMPTON:  Sir, if you are saying we're a hundred

12  percent right --

13         THE COURT:  No, I'm not saying any of that.  You keep

14  wanting to go someplace else.

15         I'm only talking about -- I'm just trying to find out

16  simply the procedure that is or is not available, that's all,

17  nothing else.  I'm not saying good, bad, or indifferent about

18  whatever you did.  I'm just trying to find out the mechanics of

19  what can or cannot happen under the circumstance, that's it.

20         It's not a question of the quality of your review at

21  this stage.  My concern is the mechanism that is either

22  available or not available, it's as simple as that.

23         MR. HAMPTON:  I'm not aware of any internal, other

24  than contacting the area director directly, which I know has

25  occurred, or, for that matter, having a representative contact

1    the regional solicitor's office, that in that situation, no.

2           I don't -- I think I understand what the Court says,

3    but I do take issue with some of the presumptions that are

4    embedded in the question, but the answer is, no, there isn't.

5           THE COURT:  Going for a moment to the Plaintiffs, you

6    argued a little while ago when we talked about and we used the

7    word infeasible, and you seemed to say you objected to OSHA or

8    the Government's or Labor's semantics concerning costs.

9           So my question to you is, are you saying that costs

10   don't matter?  In deciding whether something is feasible, is

11   that merely a determination of whether or not it can be done?

12          So, for example, if I can make the plant safe by

13   building a separate plant for every employee so they don't have

14   to interact with anybody, and it is going to cost me a million

15   dollars and I make a profit of $20 a year, does a cost factor

16   include -- is included reasonably in a feasibility

17   determination by OSHA?  Are you saying that it doesn't make any

18   difference what the costs are?

19          MR. SELIGMAN:  Your Honor, I think at some point

20   surely the costs would be high enough that that would

21   constitute that they become infeasible, but I think the

22   critical point is that the costs of spreading people on the

23   lines are absolutely not feasible, and we're prepared to submit

24   evidence on that issue.  Modestly --

25          THE COURT:  You are breaking up an awful lot.  I

1  don't know why exactly that is, but we get -- you know, we are

2  getting bits and pieces sometimes.  Like from before I think

3  you cited -- or somebody else cited 657 and we got 67 out of

4  it.  So I don't know whether it would be better to talk closer

5  or farther, but you are breaking up on us in terms of getting

6  this down.

7           MR. SELIGMAN:  Can you hear me a little better now?

8           THE COURT:  So far so good.

9           MR. SELIGMAN:  So long as you don't mind my face

10  right up against the camera.

11           THE COURT:  We don't mind your face right up against

12  the camera.

13           MR. SELIGMAN:  So in response to your question, Your

14  Honor, at some point costs would become infeasible.

15           I think the key point here is that none of the

16  required changes that need to be made at the Maid-Rite plant

17  present costs, in particular with respect to socially

18  distancing workers along the lines seems to be since before

19  this complaint was filed and after it was filed an acute

20  concern.

21           THE COURT:  You are breaking up again.

22           I understand your argument.  Like I said earlier, I

23  think that you more or less alleged or your fundamental drift

24  was that costs shouldn't be a consideration, and while we'll

25  all agree that safety is the primary concern of OSHA and what

1  they should be doing with respect to employees, that that if

2  feasible language I think has a number of components, and the

3  question is later on where that determination of feasibility

4  should be, with the agency or with the Court someplace, but

5  clearly, in my mind, costs are not irrelevant or unmeaning,

6  that it is part of the factors that have to be considered.

7           I want to go back to OSHA again, and this may bring

8  us to the point where we need to hear from a couple of

9  witnesses anyway.

10          The first thing is that something that concerned me

11 in the complaint was the statement -- and I think it was made

12 in a declaration by one of the Plaintiffs' counsel, Ms.

13 Al-Khatib, indicating that -- I think it's Ms. Giguere -- made

14 some statement that was indicative of the fact that OSHA does

15 not treat COVID cases as imminent dangers.

16          She put in her declaration that that's a statement

17 that was made by Ms. Giguere, and that's something I want to

18 hear from both witnesses as to what was actually said and what

19 was meant by that in terms of whether or not, in all honesty,

20 some either policy, some informal, you know, understanding in

21 OSHA in any way has made a determination that if it says

22 COVID-19, we don't have to look any further, it is not

23 something that could possibly be an imminent danger.  I want to

24 know what the answer to that is.

25          So without much more, I think that what I would like

1  to do is hear from a couple of witnesses, and the first ones

2  that I want to hear from are either we will do Ms. Al-Khatib

3  first since she is -- since you are the Plaintiffs bringing the

4  action, and I want to hear her explanation of that conversation

5  and discussion, and then we will hear from Ms. Giguere as to

6  her.

7       MR. HAMPTON:  Your Honor, if I could, I just want to

8  correct two things.  One is that there have been four citations

9  issued by OSHA in connection with COVID violations.  You

10 mentioned one.  There has actually been four.

11      THE COURT:  I was just mentioning what your assistant

12 director said, not what I said.

13      MR. HAMPTON:  I understand, but I just wanted to make

14 sure.  It may not seem important to the Court.

15      THE COURT:  So we have gone from 7,300 complaints to

16 four now instead of one.

17      MR. HAMPTON:  I understand your point, Your Honor.

18      The other thing is that I just want to make sure with

19 regard to the evidentiary fact about reconfigurations out at

20 the Maid-Rite plant, we have no evidence that any person from

21 the Plaintiffs or Plaintiffs' representative or Plaintiffs'

22 expert has visited Maid-Rite.

23      So any speculation about any costs or feasibility

24 costs associated with reconfiguring, adding to any of that out

25 at the plant that is the subject of this imminent danger

1  complaint, couldn't possibly be relevant.  Someone can testify

2  generally as to --

3         THE COURT:  I'm not going to be asking for evidence

4  about if feasible at this stage of our proceeding.  That is not

5  where I'm looking at.

6         I'm looking toward the statutory provisions that

7  relate to whether or not we have imminent danger and whether or

8  not it was, as I said, inappropriate under Section D and

9  whether as a result of the activities that it was arbitrary and

10 capricious for the decisions that were made and whether or not

11 we have jurisdiction over that particular issue.

12        So I'm not going to be deciding what's feasible or

13 not feasible and how much it cost or doesn't cost.  That is not

14 something I'm going to be involved with at all today.

15        MR. HAMPTON:  Thank you, Your Honor.

16        THE COURT:  Can we hear from Ms. Al-Khatib?

17        MR. SELIGMAN:  Yes, Your Honor.

18        THE COURT:  I do want to remind everybody that this

19 is a hearing and not a trial, and so the rules of evidence

20 don't apply.  So you can save your hearsay objections and

21 things of that nature for some other proceeding.

22        I do want to focus on the issues related to the

23 determination that the complaint related to, whether there was

24 imminent danger, and the conversations and discussions that

25 would indicate that whether OSHA acted arbitrarily and

1  capriciously with respect to that allegation and complaint or

2  not.

3          MR. HAMPTON:  Your Honor, we did the research on

4  this, but we found nothing that would indicate that the Federal

5  Rules of Evidence don't apply.

6          THE COURT:  Well, in a hearing in Federal Court, the

7  Federal Rules of Evidence don't apply.  So if you look at the

8  Federal Rules, you would find out they, themselves, indicate

9  that in a hearing, the Federal Rules of Evidence don't apply.

10          MR. HAMPTON:  I just want to bring to the Court's --

11  and I apologize.  I don't want to make this more difficult, but

12  one of the prime concerns we have is the hearsay nature of most

13  of the allegations, and we do believe that we would like the

14  rules of evidence to apply.  So I have raised my objection.

15          THE COURT:  Okay.  It is overruled.

16          MR. HAMPTON:  Thank you.

17          THE COURT:  Let's move.  Do we have Ms. Al-Khatib?

18          MS. KROON:  Your Honor, I believe that Mr. Seligman

19  will be calling in with his phone to try to address the audio

20  issues so he may need to be admitted.

21          THE COURT:  This is a rather unusual case where the

22  Court had directed that lead counsel be physically present.

23          I note for the Plaintiffs so far that lead counsel

24  have not actually done or said anything related to the case.

25  Perhaps my order wasn't quite as specific as it should have

1  been.  So let's move on.

2          We will have you placed under oath.

3  ALIA AL-KHATIB, CALLED AS A WITNESS, HAVING BEEN DULY SWORN OR

4  AFFIRMED ACCORDING TO LAW, TESTIFIED AS FOLLOWS:

5                  DIRECT EXAMINATION

6  BY MR. SELIGMAN:

7  Q.   Good afternoon, Ms. Al-Khatib.

8  A.   Good afternoon.

9  Q.   Where do you work?

10  A.   I work at Justice at Work.

11  Q.   And can you tell us generally what Justice at Work's

12  mission is?

13  A.   Yes.  Our mission is to provide legal aid services to

14  workers in Pennsylvania that work in low wage industries.

15      We have been around for over 40 years, and we started

16  working with farm workers primarily and then expanded to any

17  industry throughout Pennsylvania.

18      We help workers with employment issues, other legal aid

19  they might need, and workplace safety and protection.

20  Q.   Ms. Al-Khatib, what is your role at Justice at Work?

21  A.   I'm a staff attorney.

22  Q.   Turning to this case, when did you first hear about

23  concerns respecting the operation of the Maid-Rite facility in

24  Dunmore, Pennsylvania?

25  A.   We first spoke with workers in mid-May.  They were

1  concerned about imminent dangers at the facility, specifically

2  that there had been a recent outbreak, that there were issues

3  around social distancing that wasn't being enforced at the

4  facility, and they were not being provided masks and workers

5  had to provide their own masks.

6  Q.   In light of those concerns, what did Justice at Work

7  decide to do?

8  A.   After consulting with the clients and the Justice at Work

9  team, we decided to file an imminent danger complaint with

10 OSHA.

11 Q.   And when did Justice at Work file the imminent danger

12 complaint?

13 A.   On May 19th of this year.

14 Q.   What were the basic allegations of that complaint?

15 A.   We alleged that the current workers at the Maid-Rite

16 facility in Dunmore faced an imminent danger because of risk of

17 exposure to COVID-19.  We outlined some of the concerns that

18 the workers told us including that --

19           MR. HAMPTON:  We lost video.

20           THE COURT:  But you have audio, right?

21           MR. HAMPTON:  Yes.  Okay.

22           THE COURT:  So I don't think the video helps, because

23 they have masks on and it doesn't help to read anyone's

24 expression.

25           MR. HAMPTON:  You can go ahead, Your Honor.

1          THE COURT:  We will continue with you, Ms. Al-Khatib,

2  and hopefully we get the video back in a little bit, if that's

3  okay with counsel.  Go ahead.

4          THE WITNESS:  Yes.  I was just summarizing the

5  imminent danger complaint that we submitted that highlighted

6  concerns about social distancing at the facility, and that

7  workers were working very close to one another on production

8  lines, often bumping into one another on the lines.  They

9  weren't provided masks regularly by the facility.

10          I think when we submitted the complaint, they only

11  had been provided masks twice, and workers were bringing their

12  own masks to work.

13          There was a recent outbreak as well in the facility

14  and workers were concerned that the company was incentivizing

15  workers to come in sick by providing a bonus for workers who

16  didn't miss a day of work.  So those were the main concerns.

17  BY MR. SELIGMAN:

18  Q.    Ms. Al-Khatib, did you know what a formal OSHA complaint

19  is?

20  A.    Yes, I do.

21  Q.    What is a formal complaint?

22  A.    My understanding is that a formal complaint has several

23  requirements.  First that it be brought by a current worker or

24  worker representative, that it be in writing, and that it be

25  signed by the current worker or the worker representative.

1  Q.    Did you intend for your May 19th complaint to be a formal

2  complaint?

3  A.    Yes, we did.

4  Q.    And can you explain what you understood the consequences

5  of filing a formal complaint or an imminent danger complaint to

6  be?

7  A.    We understood that it would mean that an inspection would

8  happen immediately after filing the complaint, whether it be a

9  formal complaint or an imminent danger complaint, and we

10 understood that to mean that there would be an on-site

11 inspection as soon as possible.

12 Q.    As far as you're aware, did OSHA conduct an inspection as

13 soon as practicable, which I think is the language of the

14 statute?

15 A.    No, I don't think they did.

16 Q.    Did OSHA tell you at that time pursuant to the statute

17 that they had determined there was no imminent danger?

18 A.    At that time they didn't say there was no imminent danger.

19 On my call with the Assistant Area Director Susan Giguere on

20 June 1st, she explained that they were not treating COVID-19

21 complaints as imminent danger complaints, because then all

22 COVID related complaints would have to be treated as imminent

23 danger complaints.

24 Q.    Thank you.  I want focus on that phone call.

25        What was the impetus of that phone call?

1  A.    I had called the Assistant Area Direct Ms. Giguere after

2  we reviewed the letter we received from OSHA from the Area

3  Director Mark Stelmack, in which he said that OSHA had received

4  our imminent danger complaint and that they sent a letter to

5  the facility.

6      After our office received that letter, I contacted Ms.

7  Giguere on June 1st and asked her if there had been any

8  response received from the company, because we hadn't received

9  any response.  She told me that there was a response received

10  from the company, and that was when I also was able to talk to

11  her about the classification of our complaint as a non-formal

12  complaint.

13  Q.    When you said you were able to talk to her about that, did

14  she tell you that the complaint had been classified as a

15  non-formal complaint?

16  A.    I believe she told me on the earlier call, and the letter

17  we received from OSHA also stated it was classified as a

18  non-formal complaint.

19  Q.    Did you ask her why she had treated the complaint as a

20  non-formal complaint?

21  A.    Yes, I did.

22  Q.    What did she say?

23  A.    She explained that because the county at the time,

24  Lackawanna County, was under a red phase order, meaning they

25  had high rates of COVID in that county, that OSHA was treating

1  complaints that they received in those red phased regions as

2  non-formal complaints so that then they wouldn't have to

3  initiate the inspection process.

4  Q.    Returning to something we had just spoken about, did you

5  ask her why the complaint was not being treated as an imminent

6  danger complaint?

7  A.    Yes, and that was when she explained that they were not

8  treating COVID related complaints as imminent danger

9  complaints, because then all COVID related complaints would

10  have to be treated as imminent danger complaints.

11  Q.    Thank you.  I would like to talk briefly about your

12  subsequent conversations with Ms. Giguere.

13      Did you monitor OSHA's website to determine whether there

14  was an investigation proceeding involving the Maid-Rite plant

15  in Dunmore?

16  A.    Yes.  We checked OSHA's website.  They provide information

17  on what's called an inspection detail, and I believe I had

18  checked it around June 11th, and then contacted Ms. Giguere via

19  e-mail because we had seen on the web page that an opening and

20  closing conference had been held.  So I asked her if that meant

21  that an on-site inspection had been conducted.

22  Q.    What did she say in response?

23  A.    She e-mailed me in response the next day and told me that

24  at the start of an inspection, an opening and closing

25  conference is held, and earlier she said an inspection could

1  take up to six months and that we would receive more

2  information at the conclusion of the inspection.

3  Q.   So she didn't tell you one way or the other whether an

4  on-site inspection had been held?

5  A.   She didn't.  Her response was vague.

6  Q.   What was your next communication with Ms. Giguere?

7  A.   I called her the next day and left a voicemail, because it

8  was still unclear whether an on-site inspection had been held,

9  and I asked whether OSHA had conducted an on-site inspection

10 and I didn't hear back.

11 Q.   What about after that?

12 A.   After that I received an e-mail from Ms. Giguere, I think

13 on June 25th, because we, in all of our communications with

14 OSHA, had alerted them that our clients continued to report

15 that no changes were being made at Maid-Rite.  She followed up

16 in response to one of my e-mails indicating our clients'

17 concerns and asked the basis for our clients' concerns.

18 Q.   And did you provide a response?

19 A.   Yes.  On June 29th, we responded to OSHA to provide more

20 information to assist in the investigation.  We submitted to

21 OSHA three redacted declarations from the three Jane Does in

22 the case.

23 Q.   Have you had any further communications with OSHA?

24 A.   I haven't, no.

25         MR. SELIGMAN:  Your Honor, that's all that Plaintiffs

1   have for Ms. Al-Khatib.

2           THE COURT:  What was the date -- was June 1st the

3   date that you indicate that you had a conversation with Ms.

4   Giguere in which she said that in the red zone or read area

5   that OSHA was not treating COVID cases as an imminent danger

6   and that that would mean that they would have to do it with all

7   cases, is that all on June 1st?

8           THE WITNESS:  Yes, that was during the June 1st call

9   with her.

10          THE COURT:  And tell me what your understanding is of

11  a formal versus a non-formal complaint.

12          THE WITNESS:  My understanding is that a formal

13  complaint triggers a specific process from OSHA, and that

14  process involves an inspection.

15          A non-formal complaint -- again, my understanding is

16  that OSHA then can choose whether to investigate through a

17  series of letters with the company or may choose to do an

18  inspection, but a non-formal complain doesn't trigger the same

19  automatic inspection as a formal complaint does.

20          THE COURT:  Let me ask you, is it your understanding

21  that the complainant or the plaintiff or you are the ones that

22  get to make the determination of whether a complaint is

23  determined to be formal or non-formal, or is that ultimately

24  you make the complaint, then OSHA decides whether the complaint

25  is treated in a formal or a non-formal matter?

1        THE WITNESS:  I'm not sure who would necessarily make

2  that decision.

3        What I do know is that we met all the requirements

4  for a formal complaint under the regulations that we -- under

5  the OSHA regulations that we reviewed, and that included

6  submitting it in a written form, submitting it on behalf of

7  current workers as their representatives, and signing it as

8  their representatives as well.

9        So having met all those requirements, we believed

10  that OSHA then would treat it as a formal complaint.

11        THE COURT:  Questions by counsel.

12        MR. BUCHANAN:  Yes, Your Honor.

13                    CROSS EXAMINATION

14  BY MR. BUCHANAN:

15  Q.    Hello, Ms. Al-Khatib.  Can you hear me?

16  A.    Yes, I can.

17  Q.    My name is Richard Buchanan.  I'm an attorney with the

18  Regional Solicitor's Office and represent the Department of

19  Labor in this proceeding.

20        THE COURT:  You got to pull that closely, because

21  even I'm having a hard time hearing you.  I know that it

22  clearly is not in your nature by the way that you are speaking,

23  but you have to become a loudmouth for today's proceeding.

24        MR. BUCHANAN:  I will do my best.

25        THE COURT:  Thank you.

1  BY MR. BUCHANAN.

2  Q.    Ms. Al-Khatib, you spoke with Susan Giguere on May 28th,

3  correct, she called you?

4  A.    Yes, that's correct.

5  Q.    And you also spoke with her on June 1st, correct?

6  A.    Yes.

7  Q.    And you spoke with her on June 2nd, correct?

8  A.    Yes.

9  Q.    And you spoke with her on June 8th?

10  A.    Yes.

11  Q.    And she called you three of those four times that you had

12  conversations with her, correct?

13  A.    Yes, I believe so.

14  Q.    So you spoke with Ms. Giguere about this matter four times

15  in the space of 11 days?

16  A.    Yes, that sounds right.

17  Q.    Did you consider that to be nonresponsive to your

18  concerns?

19  A.    No, I didn't consider it to be nonresponsive, but I didn't

20  feel that she provided information about an on-site inspection

21  and when that would be conducted.

22  Q.    But you didn't think it was nonresponsive, correct?

23  A.    No.  She responded to my e-mails or voice mails.

24  Q.    Now, you used the word imminent danger complaint, correct?

25  A.    Yes.

1  Q.    Ms. Giguere did not use that term?

2  A.    She told us that she didn't classify our complaint as an

3  imminent danger complaint.

4  Q.    So she didn't use the term an imminent danger complaint?

5  A.    I don't believe she classified it that way.  So, no, I

6  don't believe she would say an imminent danger complaint then.

7  Q.    That was your term?

8  A.    Yes.  We submitted it to OSHA as an imminent danger

9  complaint.

10 Q.    And in your conversations with her that was your term, and

11 when I say your, I mean your singular?

12 A.    Yes.

13 Q.    So you spoke with her on May 28th, correct?

14 A.    Yes.

15 Q.    I'm looking at that declaration that you completed that

16 was attached to the complaint.  Do you have that in front of

17 you?

18 A.    I have it near me, if you would like me to get it.

19 Q.    I think it would assist the proceedings if you had it in

20 front of you.  Could you get that?

21         THE COURT:  Sure.  Go ahead and get that.

22         THE WITNESS:  I have it now.

23 BY MR. BUCHANAN:

24 Q.    Take a moment to review Paragraph 7 of your declaration,

25 please.  Tell me when you are done.

1  A.    I'm sorry.  7?

2  Q.    7, that's right.

3  A.    Yes, I have reviewed that.

4  Q.    The first sentence says, on May 28th, 2020, Assistant Area

5  Director Susan Giguere called me in response to Justice at

6  Work's May 27th, 2020 letter.

7        The second sentence, Ms. Giguere stated that OSHA sent our

8  office a letter in response to our complaint, and that such

9  complaints are handled the day they are received.

10       Did Ms. Giguere use the word such?

11 A.    I don't recall if she said such.

12 Q.    But that is what you wrote down here on your sworn

13 declaration?

14 A.    Yes, that's correct.

15 Q.    What did you mean by such?

16 A.    I was referring to our imminent danger complaint that we

17 submitted.

18 Q.    So when you say such complaints, you mean imminent danger

19 complaints plural?

20 A.    Yes, I was referring to our an imminent danger complaint.

21 I believe Ms. Giguere was referring to any complaints that OSHA

22 received.  She said that they handled them the day that they

23 are received.

24 Q.    So she wasn't referring to what you call imminent danger

25 complaints.  She was referring to all complaints?

1  A.   That's right.  She was referring to OSHA's practice.

2       THE COURT:  We're going to have to break for 10

3  minutes, and I apologize for this.  Believe it or not, I've got

4  another emergency matter that I scheduled for 2:00 before this

5  occurred.  I don't expect it to take more than 10 minutes of my

6  time.  So we will take a 10-minute break and then we will come

7  back.  I apologize.

8       (At this time, a 10-minute break was taken.)

9       THE COURT:  We're continuing then with the cross

10  examination by Mr. Buchanan of Ms. Al-Khatib.

11  BY MR. BUCHANAN:

12  Q.   Ms. Al-Khatib, we're back after a break.

13       It is your understanding that the complaint becomes a

14  formal complaint in OSHA's world when the complaint is signed

15  by an employee or representatives of an employee, is that

16  correct?

17  A.   Yes, that and other requirements.

18  Q.   And I believe you stated on direct that in response to a

19  formal complaint, OSHA is required to initiate an inspection,

20  is that right?

21  A.   Yes.

22  Q.   So that any employee who files a complaint with OSHA and

23  signs his or her name to the complaint can automatically,

24  according to your understanding, trigger an inspection of a

25  worksite by OSHA, correct?

1  A.    That was our understanding of a formal complaint.

2  Q.    I'm sorry.  Could you repeat your answer?

3  A.    Yes.  That was our understanding of a formal complaint.

4  Q.    Did you say that was your plural understanding?

5          THE COURT:  She said that was her understanding of a

6  formal complaint.

7  BY MR. BUCHANAN:

8  Q.    Is that still your understanding of a formal complaint?

9  Thank you, Your Honor.

10  A.    Yes.

11  Q.    I'm looking at your declaration again if you have that in

12  front of you?

13  A.    Yes, I do.

14  Q.    Paragraph 10, the second sentence you write, Ms. Giguere

15  stated that the next step would involve either an on-site

16  inspector or further inquiry with the company.

17       Did I read that correctly?

18  A.    Yes.

19  Q.    So Ms. Giguere told you that the next step would have been

20  -- one of the options was involving an on-site inspection, she

21  used the word on site?

22  A.    I can't recall if she said on site or called it an

23  inspection.

24  Q.    But you said on site in your declaration sworn under

25  penalty of perjury, correct?

1 A.    Yes.   That was my understanding of the word inspection

2 that it would involve on site.

3 Q.    You don't know the distinction between an inspection and

4 an on-site inspection, do you?

5 A.    I now know there is some sort of distinction, that an

6 inspection may not necessarily involve an on site, though we

7 certainly talked to her about an on-site inspection.

8 Q.    You keep using the word we.   When you say we, who are you

9 talking about?

10 A.    Oh, I spoke with her directly, and the letters, they're

11 signed by me and colleagues at Justice at Work.

12 Q.    So when you say we, you are referring to the

13 correspondence that is sometimes signed by others?

14 A.    Yes.

15 Q.    Thank you for that clarification.

16      Paragraph 11 of your declaration, if you could take a

17 moment to read that to yourself and tell me when you are done.

18 A.    Yes, I'm done.

19 Q.    In the first sentence you say, when I asked Ms. Giguere

20 why the complaint was treated as, quote, non-formal, end quote,

21 she explained it was because all complaints in counties under

22 red zone orders were being treated as non-formal so that OSHA

23 would not have to perform on-site inspections.

24      You're certain that Ms. Giguere told you that?

25 A.    Yes.

1  Q.    Did she ever tell you or suggest to you that OSHA was not

2  considering any complaint having to do with COVID as an

3  imminent danger?

4  A.    Yes, she did, during that call.

5  Q.    Paragraph 13, take a moment to read that to yourself,

6  please.  Again, we're on your declaration that's signed July

7  21st, 2020, for the record.

8  A.    Yes, I read it.

9  Q.    You say, Ms. Giguere called me in response to the June

10  2nd, 2020 letter to explain that we were not entitled to the

11  response because the inquiry had not been finalized.

12        She used the word entitled?

13  A.    I'm not sure if she exactly said entitled, but that would

14  be receiving the response because it had not been final.

15  Q.    Words are important, particularly for a lawyer, aren't

16  they?

17  A.    Yes.

18  Q.    Paragraph 15, if you could take a moment to read that to

19  yourself.

20  A.    Yes, I read it.

21  Q.    The second sentence said, Ms. Giguere stated that only

22  union representatives can be present during inspections.

23        She told you just that?

24  A.    Yes, that's right.

25  Q.    Ms. Giguere proposed to you that your clients be

1  interviewed by OSHA, did she not?

2  A.   Yes, she did.

3  Q.   And you insisted that to do that, your clients, which are

4  three employees of Maid-Rite, that their identities remain

5  anonymous, correct?

6  A.   Yes.  Our clients feared retaliation and did not want to

7  share their names.

8  Q.   And Ms. Giguere explained to you that OSHA would keep

9  their identities confidential, generally speaking?

10  A.   Generally speaking, yes.  However, their names might come

11  out in the process of a hearing when they would be called as

12  witnesses.

13  Q.   I'm looking at the last sentence of Paragraph 20 of your

14  declaration.  Do you have that in front of you?

15  A.   Yes.

16  Q.   It says, however, if the administrative process reached

17  the point of a hearing, the workers would be called to testify.

18  She used those words?

19  A.   Yes.  If there was a hearing, then they would be called to

20  testify.

21  Q.   She used the word would, is that correct?

22  A.   Yes.

23  Q.   You're certain?

24  A.   She explained that they need --

25  Q.   Are you certain that she used the word would?

1  A.    From what I recall, yes.

2  Q.    You mentioned there was an outbreak at the facility during

3  your direct examination?

4  A.    Yes, that's correct.

5  Q.    And is that mentioned in the May 19th complaint?

6  A.    Yes, I believe so.

7          MR. BUCHANAN:  I have nothing further at this time,

8  Your Honor.

9          THE COURT:  Any redirect?

10          MR. SELIGMAN:  Yes, Your Honor, very briefly.

11                      REDIRECT EXAMINATION

12  BY MR. SELIGMAN:

13  Q.    Ms. Al-Khatib, did it seems like Ms. Giguere during your

14  phone call on June 1st, did it seem like she understood what an

15  imminent danger complaint was?

16  A.    I can't say whether or not she understood it.  It was

17  clear that they would not be acting on it as if it we're an

18  imminent danger complaint.

19  Q.    Did she say whether there was anything specific about your

20  complaint that meant that OSHA wouldn't treat it as an imminent

21  danger complaint?

22  A.    No, there was nothing in the complaint that made OSHA not

23  treat it as an imminent danger complaint.  It was based on the

24  location of where the complaint was coming from.

25  Q.    Apologies.  I believe on direct you suggested that she had

1 said that the reason it wouldn't be treated as an imminent

2 danger complaint, is it then all COVID-19 earlier complaints

3 would be treated as imminent danger complaints?

4 A.   Yes, that's right.

5          MR. HAMPTON:  Objection.

6          MR. BUCHANAN:  Objection.

7          THE COURT:  Objection is overruled.

8          Who made the objection?

9          MR. BUCHANAN:  Both of us.

10          THE COURT:  No.  It's only one of you makes the

11 objection.  This is your witness, you're the one who makes the

12 objection.

13          Objection is overruled.  Go ahead.

14 MS. MR. SELIGMAN:

15 Q.   So again why did she tell you during the June 1st call it

16 would not be treated as an imminent danger complaint?

17 A.   She said that it would not be treated as imminent danger

18 because that if they were to treat us as an imminent danger

19 complaint, that all COVID related complaints would have to be

20 treated as imminent danger complaints.

21 Q.   Did she use the words imminent danger in that

22 conversation?

23 A.   Yes, in that conversation she did.

24 Q.   In describing why she wouldn't treat it as an imminent

25 danger complaint?

1  A.    Yes, that's right.

2  Q.    It seemed during your phone call on June 1st that Ms.

3  Giguere understood what a formal complaint was?

4  A.    Again, I can't say if she understood what a formal

5  complaint was.  She explained to me why it was being treated as

6  a non-formal, and that was because it came from Dunmore, which

7  is located in Lackawanna County, which at the time was

8  designated as being under a red phase order, and for that

9  reason they were treating it as a non-formal complaint instead

10  of a formal complaint.

11  Q.    Did she use the word non-formal?

12  A.    Yes, she did.

13           MR. SELIGMAN:  That's all, Your Honor.

14           THE COURT:  I want to hear from Ms. Giguere, so we're

15  going to hear from her next.

16           MR. SELIGMAN:  Your Honor, our co-counsel needs to be

17  let in, Matthew Morgan.

18  SUSAN GIGUERE, CALLED AS A WITNESS, HAVING BEEN DULY SWORN OR

19  AFFIRMED ACCORDING TO LAW, TESTIFIED AS FOLLOWS:

20           THE COURT:  Ms. Giguere, would you pull that

21  microphone right down close to you?  I'm asking everyone to

22  speak somewhat abnormally loud so we can make sure that carries

23  through our system.  So don't feel bad if you are kind of like

24  yelling, it's okay.

25           THE WITNESS:  Thank you.

1    THE COURT:  Okay.  MR. BUCHANAN:

2              DIRECT EXAMINATION

3  BY MR. BUCHANAN:

4  Q.   Ms. Giguere, my name is Richard Buchanan.  We have met

5  before, correct?

6  A.   Correct.

7  Q.   Tell me, where do you work?

8  A.   I work for the U.S. Department of Labor, OSHA, in the

9  Wilkes-Barre area office.

10  Q.   What is your position there?

11  A.   My position is assistant area director.

12  Q.   How long have you been the assistant area director?

13  A.   About nine and a half years now.

14  Q.   What do you do generally in your job duties as the

15  assistant area director?

16  A.   I run the occupational health side of the house, supervise

17  a staff of industrial hygienists to do enforcement.

18  Q.   Before becoming an assistant area director in

19  Wilkes-Barre, what did you do?

20  A.   I was a compliance safety and health officer for 23 years

21  in the same location.

22  Q.   At the Wilkes-Barre area office?

23  A.   Yes.

24  Q.   So you have a total of approximately 32 and a half years

25  of experience with OSHA?

1  A.    That's correct.

2  Q.    Approximately how many inspections would you estimate you

3  have conducted or you conducted as a compliance officer or an

4  industrial hygienist?

5  A.    Somewhere in the 600 inspection range.

6  Q.    And approximately how many have you supervised as an

7  assistant area director?

8  A.    Between 800 and 900 inspections.

9  Q.    Tell me about your formal education.

10  A.    I have a bachelor's of science degree in microbiology and

11  I have an associate engineering degree in biomedical

12  engineering.

13  Q.    Do you have any professional certifications beyond your

14  college degree?

15  A.    Yes.  I'm a certified safety professional.

16  Q.    You corresponded and spoke with Alia Al-Khatib from

17  Justice at Work in connection with complaints that Justice at

18  Work filed about conditions at Maid-Rite, am I right?

19  A.    That's correct.

20  Q.    I'm going to give you the declaration of Ms. Al-Khatib.

21        MR. BUCHANAN:  Your Honor, may I approach?

22        THE COURT:  Certainly.  You don't have to ask.

23  BY MR. BUCHANAN:

24  Q.    First of all, Ms. Giguere, I will ask you, did you ever

25  state or suggest to Ms. Al-Khatib that OSHA would never or

1  would not consider any COVID related complaint as an imminent

2  danger?

3  A.   No.

4  Q.   Turning to the declaration that you have in front of you,

5  Ms. Al-Khatib in Paragraphs 3 and 4 of the declaration refers

6  to an imminent danger complaint.  Do you see that there?

7  A.   Yes.

8  Q.   Did you ever use the term imminent danger complaint with

9  Ms. Al-Khatib?

10  A.   I did not.

11  Q.   What did you call correspondence that she sent on May

12  19th, 2020, in your conversations with her?

13  A.   I referred to it as a complaint.

14  Q.   I direct your attention to Paragraph 10 of the

15  declaration.  Do you see that there?

16  A.   Yes.

17  Q.   Did you ever use the word on-site inspection with Ms.

18  Al-Khatib?

19  A.   No.

20  Q.   What did you use?  What term did you use?

21  A.   I just referred to it as an inspection.  I don't use the

22  word on-site inspection.

23  Q.   How do you distinguish between those two things?

24  A.   I think in 32 years I referred to the inspection process

25  as an inspection.  They have always been considered inspections

1  and so I don't use the word on site.

2  Q.    If you could look at Paragraph 11, do you see that there?

3  A.    Yes.

4  Q.    The first sentence says, when I asked Ms. Giguere why the

5  complaint was treated as non-formal, she explained it was

6  because all complaints in counties under red zone orders were

7  being treated as non-formal so that OSHA would not have to

8  perform on-site inspections.

9        Did you make that statement to her?

10 A.    No.

11 Q.    Paragraph 13 of the declaration, do you see that there?

12 A.    Yes.

13 Q.    Did use the word entitled with Ms. Al-Khatib?

14 A.    I did not.

15 Q.    Paragraph 15, the second sentence there says, Ms. Giguere

16 stated that only union representatives can be present during

17 inspections.

18       Did you tell her that?

19 A.    I'm sorry.  What was the question?

20 Q.    We're in Paragraph 15 and the second sentence says, Ms.

21 Giguere stated -- and this is with respect to a June 2nd

22 telephone call you had with her -- Ms. Giguere stated that only

23 union representatives can be present during inspections.

24       Do you see that there?

25 A.    I do.

1  Q.    Did you make that statement to her?

2  A.    I did not.

3  Q.    What did you tell her about representatives during

4  inspections?

5  A.    Well, the first sentence was -- is incorrect in that she

6  asked me whether representatives from our office could be

7  present.

8        We had a conversation where she said, my understanding is

9  that an employee representative could accompany an inspector on

10 the inspection, and I said that was correct.  Typically it is a

11 union representative, but it can also be either through a

12 safety health committee member or someone else, but she never

13 directly asked me that she wanted to be a representative.

14       She asked me if a representative of employees could

15 accompany someone on the inspection.  If I had been asked if

16 she could be a representative, I would have taken that forward

17 to my leadership.

18             MR. BUCHANAN:  Your Honor, I want to be certain since

19 this is all by Zoom that the witnesses are sequestered or

20 should be sequestered, is that right?

21             THE COURT:  Well, nobody asked.

22             MR. BUCHANAN:  Ms. Al-Khatib -- and I'm not trying to

23 bring any allegations.

24             THE COURT:  The answer is nobody asked for

25 sequestration, and so now it is being asked for sequestration.

1  So if Ms. Al-Khatib is on, she should go off now.

2          Are you done with her or do you expect to recall her?

3          MR. BUCHANAN:  I do not expect to recall her.

4          THE COURT:  Do the Plaintiffs expect to recall her?

5          MR. SELIGMAN:  No, Your Honor.

6          THE COURT:  Then I don't see any reason at this stage

7  why she would need to be sequestered, and it is a late request

8  at any rate, so go ahead.

9  BY MR. BUCHANAN:

10  Q.   Ms. Giguere, tell me what your understanding of what the

11  difference is between a formal and a non-formal complaint is.

12       In explaining that, what are the procedures that are

13  associated with either of those two things, formal and

14  non-formal?

15  A.   A non-formal complaint can also be referred to as an

16  inquiry, and that is something that takes places through an

17  e-mail process where we can send the allegations to the

18  employer and have them respond back to us.

19       A formal complaint is typically something that is signed

20  by an employee or employee representative, and then that can

21  initiate an inspection of a facility.

22  Q.   You said a formal complaint can initiate an inspection, is

23  that right?

24  A.   Yes.

25  Q.   Is an inspection mandatory, required in response to a

1 formal complaint?

2 A.   No.

3          MR. BUCHANAN:  Your Honor, I want to be sure that no

4 other witnesses, Ms. Al-Khatib aside, are participating at this

5 point, that they are sequestered.  So I will renew my

6 request -- it's more timely now -- for witnesses other than Ms.

7 Al-Khatib to be sequestered.

8          THE COURT:  I'm not sure we will have any other

9 witnesses, but who else from the Plaintiffs was a prospective

10 witness that you intended to call?

11          MR. SELIGMAN:  Well, Your Honor, I'm not sure that we

12 will be calling others, but we were anticipating potentially

13 calling an expert and a former OSHA official.

14          THE COURT:  So I'm not seeing how I'm going to --

15 like said, it's not a trial.  It's a determination of a legal

16 matter.  It sounds to me that there is no other witnesses that

17 the Plaintiffs will be calling in the case.

18          What about from the Defense, are there any witnesses

19 that you intend to call that are either in the courtroom or

20 that are listening?

21          MR. BUCHANAN:  We have physically present Mark

22 Stelmack, who is the area director, and we also have --

23          THE COURT:  Are you going to be calling him?

24          MR. BUCHANAN:  We plan to call him.

25          THE COURT:  Well, then, if you're moving for

1 sequestration, it goes both ways.

2          MR. BUCHANAN:  Correct.

3          THE COURT:  Is he out?

4          MR. BUCHANAN:  He is physically outside, as is

5 Shannon Warner, the inspector, compliance officer, who is

6 physically here and outside.

7          THE COURT:  Okay.  So they are both factual witnesses

8 about exactly what occurred in this case, correct?

9          MR. BUCHANAN:  Yes, it relates solely to this case.

10          THE COURT:  From Plaintiffs' perspective, the two

11 witnesses you referred to, the one expert and the prior OSHA

12 official, are either one of them witnesses that relate to the

13 facts of this particular case from personal knowledge?

14          MR. SELIGMAN:  No, Your Honor, but I do just want to

15 clarify -- this was my mistake -- I think we may also call the

16 compliance officer, Ms. Warner.

17          THE COURT:  Well, I think that they have already

18 indicated that they are going to call Ms. Warner as a witness.

19 The Defense has indicated they're going to call Ms. Warner, and

20 she's not in the courtroom either.  She is sequestered from

21 this witness and from the testimony of Ms. Al-Khatib.

22          MR. BUCHANAN:  I don't have anything further.

23          THE COURT:  Let me ask a couple questions of Ms.

24 Giguere.  First I want to go back to this formal/non-formal and

25 complaint.

1          You indicated that a complaint is considered a formal
2   complaint if it is signed by somebody.  So tell me then, aside
3   from them signing it, what's the process or procedure that is
4   different in a formal complaint versus a non-formal complaint?
5          THE WITNESS:  A non-formal complaint does not
6   initiate an inspection.  It is the inquiry that we do between
7   the employer and us through e-mail where they have to respond
8   to us.
9          A formal complaint can initiate an inspection if it
10  meets the requirements of a formal complaint with a signature
11  from an employee or an employee representative and then that
12  can initiate an inspection.
13         THE COURT:  So tell me what the difference is between
14  an inquiry and an inspection, because it sounds to me like an
15  inspection, you could make a decision.  You just write to the
16  employer and say, tell us -- show us your information, which
17  sounds to me the same thing that you are telling us that you
18  would do in an inquiry.
19         So what is the difference between an inspection and
20  an inquiry?
21         THE WITNESS:  An inspection is -- an actual
22  inspection means that we would discuss with the employer and
23  good through the motions, have an opening conference and a
24  closing conference, and all of the things that are on the
25  inspection protocol, as opposed to just giving them the

1  allegations through e-mail and having them respond, which would

2  be an inquiry.

3        THE COURT:  Let me ask you about the terminology

4  used, imminent danger complaint that was used.  Forgetting it

5  being called an imminent danger complaint, is there something

6  in OSHA that relates to whether an allegation or a complaint

7  made is to be determined or not determined that it's an

8  imminent danger of death or serious physical injury?

9        THE WITNESS:  We do have an imminent danger.  An

10  imminent danger has a definition that's in our field operations

11  manual as to what an imminent danger is.  That is looked upon

12  as being the most serious of situations that would require

13  someone to do an inspection imminently.

14        THE COURT:  Now, again, when you say inspection, that

15  could mean the site or could not mean.  Are there any

16  requirements or procedures in OSHA if there is an imminent

17  danger complaint or an imminent danger that somebody is

18  alleging, is there a time frame within which if you get

19  something that is alleged to be an imminent danger that you

20  have to either decide whether it is or isn't an imminent

21  danger, and then decide whether it involves or needs a site

22  visit or whether it can be done by e-mail or letter

23  communication or some other method?

24        THE WITNESS:  Yes, an imminent danger does have a

25  time period.  They are responded to very quickly, typically

1  within one day that we would do an inspection.

2          Now we have COVID, we have virtual inspections, and

3  we also have regular inspections, but an imminent danger would

4  not be handled as a non-formal inquiry, that would be we want

5  to go and find out what's going on and see if it's an actual

6  imminent danger from the allegation, and either have it stopped

7  or, you know, deal with the facts of the case individually.

8          THE COURT:  Forgetting the terminology for a minute

9  that was used by the Plaintiffs in this case, they alleged that

10  they filed an imminent danger complaint.  It appears that

11  OSHA's position is there is no such animal as an imminent

12  danger complaint.  It is either a complaint or not.

13          Did you understand in your conversations or in

14  reviewing the documentation that was submitted by the

15  Plaintiffs that it was, for whatever reason, their opinion that

16  this was an imminent danger?

17          THE WITNESS:  That's how they titled the complaint.

18  The top of the complaint itself, it said imminent danger

19  complaint, but the protocol that we follow is that we make the

20  decision as to how we're going to respond to something, and I

21  get complaints all the time that say life-threatening complaint

22  at the top, and the complaint item will be somebody forgot to

23  put toilet paper in the middle stall of the bathroom.

24          So even though they call it a life-threatening

25  complaint, that does not make my decision as to what it is.  I

1   have to look at the complaint item and what the allegation is

2   and what I believe the hazard is and make my decisions from

3   there.

4           THE COURT:  So let me ask you about that, in terms of

5   the timeline for making those decisions and what happens when

6   you do make those decisions.

7           In this case, it appears that you were aware of the

8   fact that the Plaintiffs' position was this was an imminent

9   danger that was going on.  That was their take on it.  So

10  you're telling me at some point that you review that to make a

11  decision as to whether or not it is, in fact, an imminent

12  danger, and I assume if you say it is, it requires then one

13  kind of response, and if you decide that it's not, it requires

14  or would have normally a different kind of response in terms of

15  the time and severity of, you know, what is looked at and

16  what's done, is that right?

17          THE WITNESS:  What you said, I agree with, yes.

18          THE COURT:  Let me ask you then, if you made the

19  determination this is not an imminent danger, when that

20  determination is made, and ultimately you decided in this case

21  that an inspection was appropriate and that is apparently

22  ongoing, but as to making the determination that this is not an

23  imminent danger in this case, is that communicated to anybody

24  after?

25          So if I'm a complainant and I say, there is this

1  terrible imminent danger -- in this case COVID-19 -- and

2  they're not socially distancing me, I'm touching arm to arm

3  with people next to me, I'm 2 feet from those across from me,

4  blah, blah, blah, things that are in the complaint, and you

5  review it based on your experience and background and you

6  decide this is not an imminent danger complaint, are the

7  complainants, the Plaintiffs, their representatives, are they

8  notified that we are not treating this as an imminent danger

9  complaint -- or an imminent danger, or are they not notified of

10 that early decision, I guess?

11          THE WITNESS:  The protocol that we follow is that we

12 notify them as to how we are handling it.  It is not so much

13 that we're not handling it as an imminent danger, but we

14 communicate to them how we are handling it.

15          THE COURT:  So if you advise them that you are

16 handling their complaint as a non-formal complaint, is that the

17 equivalent of saying I'm not handling it as an imminent danger?

18          THE WITNESS:  It would be, if they looked at our

19 field operations manual or our website and saw what those

20 things meant, but it does explain in the letter that we are

21 handling it as an inquiry and that it explains what we did,

22 that we sent this letter to the employer and they have five

23 days to respond back to us, and it goes through an explanation

24 of what they have to do, provide documentation to us.  So, yes,

25 that letter does contain all of that.

1          THE COURT:  Let me ask you this:  Is there a

2  procedure or a mechanism in OSHA if a plaintiff makes a

3  complaint and says there's an imminent danger of death or

4  serious injury, and you decide, no, we're going to treat this

5  as a non-formal complaint or as an inquiry, is there a

6  mechanism for them to, for lack of a better term, appeal that?

7          Is there some procedure by which, if they believe

8  that you're incorrect in your analysis of whether this is an

9  imminent danger, is there some process that OSHA has that

10  allows them to basically go to the next step and say, I think

11  they made a mistake here and we need to have it corrected, or

12  is your determination final with respect to that?

13          THE WITNESS:  Yes.  I think that the way we do it,

14  and over the years I have seen that new evidence was brought to

15  us, new facts were brought to us besides what we got to make

16  our initial decision, and sometimes we have to adjust to those

17  new facts.

18          THE COURT:  I get that, but that's different.  So if

19  somebody comes in and during the course of your inspection or

20  your investigation, as it takes off later on, circumstances

21  change, then you can change how you consider it, but my

22  question really here is, because theoretically if something is

23  an imminent danger, it is important to take care of it

24  immediately.  Do you agree with that?

25          THE WITNESS:  Yes.

1        THE COURT:  And so if you make the decision it's not

2   an imminent danger, but the complainant or the representative

3   believes you're incorrect in that analysis and they're

4   concerned about it, is there a procedure for them to, as I

5   said, go up the chain or to appeal or something, to have

6   somebody else look at it because they think you're incorrect,

7   as opposed to just be stuck with the fact that if you were

8   wrong and they're in a dangerous situation that they have no

9   recourse from that?

10       THE WITNESS:  I believe the procedure that I have

11   seen take place within our area office would be to go above my

12   head to my area director.

13       So if they want to speak to my area director and get

14   a second opinion on that, if they want to make a complaint that

15   they don't believe that I evaluated it correctly, I think the

16   next step would be up to my area director and then also to the

17   regional office.

18       THE COURT:  You're sounding to me like you're saying

19   these are things they could do if they wanted to, but it

20   doesn't sound to me like there's a written procedure in OSHA

21   somewhere that says that if you are dissatisfied with this

22   determination, here is your next formal step you must take.

23       A lot of administrative procedures have very specific

24   steps, you know, within a certain amount of days, you got to do

25   this or you have to do that or else you've waived the right to

1   do that.

2         It sounds to me like you're telling me that there

3   isn't that, and the determination that you make of something

4   not being an imminent danger, that if they wanted to, they

5   could go to the next step and ask your supervisor to review it,

6   but that there is not some sort of a step plan that they could

7   read off of your procedures to know this is what I need to do

8   next because you have said this is not an imminent danger and I

9   believe you are wrong, it is an imminent danger.

10         THE WITNESS:  I think that the procedure that would

11   follow after the inquiry went out to the employer, and if they

12   did not agree with that, within five days when the employer's

13   response comes back to us, there is a procedure at that point

14   in time for them to follow up with disagreeing with a response.

15         If we said it was a satisfactory response, and they

16   disagree with that, then there is a procedure in the letter

17   that goes out to them telling them how to do that process that

18   you've just outlined.

19         THE COURT:  What are the alternatives for an

20   employee, meaning that if an employee thinks that my life is in

21   danger working here, I have made my complaint to OSHA, they are

22   going to investigate it, and I don't know how long that's going

23   to take, but in the meantime, I'm concerned for my own safety

24   and danger, what are the options available to an employee?

25         Can they not go to work and yet not be retaliated

1  against if there's an ultimate decision by OSHA, or is it just

2  quit and go find yourself another job?

3          THE WITNESS:  Well, the letters that go out to them

4  always do talk about their whistle-blower rights and what they

5  can do as far as being a whistle-blower goes and what they can

6  do as far as refusal of work.  That would all be covered by the

7  whistle-blower section as to whether or not they are protected

8  if they do refuse to do work, and that is outlined in the

9  letter also.

10          THE COURT:  Okay.  Cross examination by -- I'm not

11  sure who.

12          MR. MORGAN:  Thank you, Your Honor.  This is

13  Mr. Morgan from Minneapolis.  I'm going to ask Ms. Giguere some

14  questions, if that's okay?

15          THE COURT:  Sure.

16          MR. MORGAN:  Thank you.

17                      CROSS EXAMINATION

18  BY MR. MORGAN:

19  Q.   And before I begin, Ms. Giguere, just let me know if you

20  can't hear a question clearly.  Obviously, I'm asking through

21  Zoom.  So just let me know, and I will be happy to rephrase it

22  or restate or speak louder, okay?

23  A.   Yes.

24  Q.   Can you hear me okay?

25  A.   Yes, I can.

1  Q.   Great.  My co-counsel has a copy of the May 19th, 2020

2  complaint that we have been talking about.

3          MR. MORGAN:  Your Honor, can my co-counsel approach

4  and provide the Court and the witness a copy and opposing

5  counsel?

6          THE COURT:  Sure.

7  BY MR. MORGAN:

8  Q.   Just so the record is clear, the document you have in

9  front of you, Ms. Giguere, is the May 20th complaint that you

10 have been referring to in your testimony, correct?

11 A.   Yes.

12 Q.   And as you note on the first page, the subject line reads

13 imminent danger complaint, correct?

14 A.   Yes.

15 Q.   So at least from OSHA's perspective, it was understood

16 that Justice at Work was filing the complaint with the

17 intention that it be treated as a formal complaint, true?

18 A.   I'm sorry.  Can you repeat that?

19 Q.   Sure.  At least upon receipt of this complaint on May

20 20th, you at OSHA understood that Justice at Work's intention

21 was that OSHA treat this complaint as a formal complaint?

22 A.   I don't know that I can say what their intentions were

23 from reading the complaint.

24 Q.   Well, in order to meet the requirements of a formal

25 complaint, you need a complaint that's in writing and signed by

1  a current employee or a worker representative, correct?

2  A.   For a formal complaint, yes.

3  Q.   Along with an assertion that an imminent danger is

4  present, correct?

5  A.   Yes.

6  Q.   And nonetheless, despite the letter that you are looking

7  at that is dated May 19th, OSHA's determination was that it was

8  a non-formal complaint, correct?

9  A.   Yes.

10 Q.   And whose decision was that?

11 A.   That was my decision.

12 Q.   Did anybody else make that decision other than you?

13 A.   It was my decision in collaboration with my area director.

14 Q.   So you spoke with Mr. Stelmack about this as well?

15 A.   Yes.

16 Q.   And did he agree or disagree with you?

17 A.   He agreed.

18 Q.   And what was the basis for the decision to treat this May

19 19th, 2020 complaint as a non-formal complaint?

20 A.   You're asking how I made that decision?

21 Q.   I want to understand, yes, the reasons behind it.

22         MR. BUCHANAN:  Your Honor, I'm going to object to the

23 extent that it calls for deliberations between Ms. Giguere and

24 Mr. Stelmack.  The Government delivered a process to protect

25 these employees from talking about deliberations in open court

1  that is predecisional, and I believe that she should not be

2  answering that question under those grounds.

3          THE COURT:  Mr. Morgan.

4          MR. MORGAN:  Your Honor, I think in a situation like

5  this and in a setting like this, I think we get to understand

6  what the basis is for OSHA to determine that it is a non-formal

7  complaint, notwithstanding the evidence we've heard about this

8  letter and the elements that need to be met in order to have it

9  fall into the formal complaint category.

10         THE COURT:  Well, I'm not sure that's what your

11  question was.  Your question seemed to be what were the

12  deliberations that she's had with the assistant director.

13         If you're asking her why she determined that this was

14  a non-formal complaint, she can answer that question.

15         MR. MORGAN:  Thank you, Your Honor.  That is my

16  question.  I'm sorry if it was confusing.

17         THE COURT:  You can tell us why you found in this

18  case why this was a non-formal complaint.

19         THE WITNESS:  It was determined to be a non-formal

20  complaint because the guidance documents that we have from OSHA

21  outline how the complaints will be handled, and this one fell

22  under the category of non-formal complaint.

23  BY MR. MORGAN:

24  Q.  I guess I'm trying to understand, Ms. Giguere, what the

25  basis was for reaching that conclusion.

1            MR. BUCHANAN:  Again, Your Honor, I would object to

2    the extent --

3            THE COURT:  It's overruled.  Go ahead.

4            Tell me what -- you said that OSHA had some sort of

5    guidance.  What is OSHA's guidance that you used to make the

6    determination on?

7            THE WITNESS:  The guidance document that we have

8    states that a non-formal complaint should be completed at

9    facilities that would fall under our risk category of medium

10   risk.  It goes through levels of risk, with this being a medium

11   risk facility, and the direction is to do a non-formal

12   complaint, of course, if there aren't any outlying issues that

13   would make it an imminent danger.

14           THE COURT:  So that's the procedure that indicates

15   that health care workers and others are at the high level and

16   meatpacking and some others are at a medium level, is that what

17   you were referring to?

18           THE WITNESS:  Yes, the risk pyramid.

19           THE COURT:  Okay.  Go ahead.

20           MR. MORGAN:  Thank you, Your Honor.

21   BY MR. MORGAN:

22   Q.   So were there any other reasons, other than your reference

23   to the guidelines and the medium risk and the fact that

24   complaints concerned workers at a meatpacking plant?

25   A.   Well, we look at the hazards that are alleged in the

1  complaint and we make our decision from that based on the

2  guidance.

3  Q.    And so at Page 3 of 5 -- 3 and 4 of the letter complaint,

4  Justice at Work lays out the specific conditions that they

5  maintained posed an imminent danger, is that true?

6  A.    Yes.

7  Q.    So if I understand your testimony, you and the area

8  director reviewed this and nonetheless reached the conclusion

9  that the circumstances didn't warrant treating this complaint

10  as a formal complaint?

11  A.    A formal complaint or an imminent danger complaint, which

12  one are you looking at?

13       Because a formal complaint, even under our COVID guidance,

14  we are not looking at it as being a formal complaint.  Even

15  formal complaints were being handled as non-formal based on the

16  guidance.

17  Q.    Okay.  When you say the guidance, are you talking about

18  the guidance on workplaces for COVID-19 specifically?

19  A.    The guidance that was given to us on April 13th, I think

20  it's dated.

21  Q.    Okay.  So back to my question -- and I will rephrase it

22  just slightly -- there was a determination then that you made

23  after reviewing all of the conditions listed in the May 19th

24  letter on Pages 3 and 4 that those reports or complaints did

25  not give rise to an imminent danger?

1  A.   That the conditions listed on the complaint did not give

2  rise to an imminent danger?

3  Q.   Right.

4  A.   That's correct, yes.

5  Q.   And that would -- so in terms of just what you reviewed

6  and what you relied on, there were conversations with the area

7  director and your review of this complaint, and then you

8  consulted the guidelines, is that true?

9  A.   I'm sorry.  The last part was and we followed the

10  guidelines?

11  Q.   And you consulted the guidelines.

12  A.   Yes, that's correct.

13      I'm sorry.  If you are not facing me, I have a hard time

14  hearing you.

15  Q.   I apologize.

16  A.   Thank you.

17  Q.   Now, on May 20th, you understood that your office had

18  received a complaint six weeks earlier about the exact same

19  meatpacking plant, correct?

20  A.   Yes.

21  Q.   Did that in any way impact your decision on this

22  particular complaint?

23  A.   Well, one thing that I have learned through the COVID

24  through March and April and May is that conditions change very

25  quickly, and so what an employer is doing in the beginning of

1  April may not be what they are doing at the end of May.  So we

2  looked at this one and we made our decision based on the

3  guidance that we just discussed.

4  Q.    So the April 9th, 2020 complaint that was received had no

5  bearing on the decision in this particular instance, is that

6  true?

7  A.    My area director had been through the review with that.  I

8  was not involved with that complaint.  He did have knowledge of

9  that, but I did not.

10 Q.    So what would constitute an imminent danger?

11 A.    I'm sorry.  What would constitute an imminent danger in

12 general?

13 Q.    Let me rephrase it.  What particular conditions in the

14 workplace would constitute an imminent danger such that you

15 would receive a complaint and make the determination within a

16 day that it was an imminent danger?

17         MR. BUCHANAN:  Object to the form of the question.

18         THE COURT:  It is overruled, if you can answer it.

19         THE WITNESS:  In general, an imminent danger, in my

20 opinion, would be something that was going to happen imminently

21 and can be reasonably expected.

22         The example that I usually give to people is a trench

23 that, you know, has no shoring, there is no cave-in protection,

24 and the employee is working in it, and it's raining and you can

25 see that the sides are sloughing off and you would expect

1  that -- and we have history of these collapses happening.

2         So if somebody were to report something like that to

3  me, I probably would take that to my area director and say this

4  might be an imminent danger.

5  BY MR. MORGAN:

6  Q.    Is that the only example you can give?

7  A.    Oh, no.  I can give you more.  An employee going into a

8  tank that has low oxygen levels, and the employer says you have

9  to go into this tank and clean it out, and you would reasonably

10 expect with low oxygen levels that that employee is going to

11 die when they get in there, and that would constitute an

12 imminent danger to me.

13        Are you relating to COVID-19?  I'm just giving you general

14 answers.

15 Q.    I understand.  I am going to pivot here to talk about

16 COVID in particular.

17        Has your office conducted or deemed a complaint -- since

18 COVID, has your office received a complaint related to the

19 COVID concerns that is deemed an imminent danger?

20 A.    Not as far as I know.

21 Q.    Well, you would know, wouldn't you?

22 A.    My area director also does complaint review.

23 Q.    Sure.  But if your office, as the assistant area director,

24 instituted an imminent danger complaint regarding COVID in the

25 workplace, you would know about it, wouldn't you?

1          MR. BUCHANAN:  Objection, lack of foundation.

2          THE COURT:  Well, I think we are being somewhat

3    argumentative.  Her answer was that she wasn't aware of one,

4    and so let's try not to be argumentative, but move on and ask

5    your next question.  You can certainly ask questions related to

6    that.

7          MR. MORGAN:  Fair enough, Your Honor.

8    BY MR. MORGAN:

9    Q.    So at least since COVID, to your knowledge, your office

10   hasn't seen a complaint that would give rise to imminent

11   danger?

12   A.    I have not seen one, no.

13   Q.    Are you familiar with meat and poultry processing workers

14   and employers -- meat and poultry processors CDC OSHA guidance?

15   A.    Yes.

16   Q.    And that was issued in April -- late April of 2020, is

17   that right?

18   A.    I believe so, yes.

19         MR. MORGAN:  Your Honor, we have a copy of that.  I just

20   want to have the witness take a look at it.  Can I have my

21   co-counsel approach the bench and the witness and provide

22   copies?

23         THE COURT:  Certainly.

24         MR. MORGAN:  Thank you, Your Honor.

25   BY MR. MORGAN:

1  Q.    Ms. Giguere, are you familiar with these guidelines?

2  A.    Yes.

3              MR. BUCHANAN:  Your Honor, if I may interrupt?

4              I think the reference was to April guidelines.  What

5  has been provided to us is updated as of July 9th.  Ms. Giguere

6  referred to the guidelines issued in April.

7              THE COURT:  So your argument is that Mr. Morgan has

8  indicated the guidelines are from April and these are

9  guidelines from July?

10             MR. BUCHANAN:  Yes.  He wants to ask her about the

11 guidelines.  She mentioned the April guidelines.  He said I

12 will provide you with those.  If he wants to ask her about the

13 July guidelines in the context that the guidelines are July,

14 that's fine, but if he's talking about what she was considering

15 between April and July 9th, that would be a different document.

16             THE COURT:  That objection is overruled.  That goes

17 to weight.  I don't know if there is changes in there, if there

18 are any changes in there, and you could certainly, if there are

19 changes, you can bring that up on redirect.  Go ahead.

20             MR. MORGAN:  Thank you, Your Honor.

21 BY MR. MORGAN:

22 Q.    And you're familiar with these guidelines, Ms. Giguere?

23 A.    Yes.

24 Q.    If you look at the very bottom of Page 1, it says in the

25 second sentence, however, their work environment, referring to

1  workers at meat and poultry processing plants, processing lines

2  and other areas in busy plants where they have close contact

3  with co-workers and supervisors may contribute substantially to

4  their potential exposure.  Do you see that?

5  A.    Yes.

6  Q.    Did you understand that was the case or that was the

7  guidance from OSHA and the CDC on May 20th, 2020?

8  A.    I believe it was, yes.

9  Q.    If you turn to the second page, please, Ms. Giguere, at

10  the very top, the last sentence before the bullet points refers

11  to distinctive factors that affect workers' risk of exposure to

12  SARS-COV-2 in meat and poultry processing workplaces, do you

13  see that?

14  A.    Yes.

15  Q.    And in the very first bullet point is distance between

16  workers, right?

17  A.    Yes.

18  Q.    As well as duration of contact and type of contact,

19  correct?

20  A.    Yes.

21  Q.    And you obviously knew about these factors as well on May

22  20th of 2020?

23  A.    Yes.

24  Q.    And then toward the bottom of the page under engineering

25  controls -- we're talking about how to prevent the spread --

1  the first line reads, configure communal work environments so

2  that workers are spaced at least 6 feet apart if possible, is

3  that right?

4  A.    That's what it says, yes.

5  Q.    That was something you knew in May 20th of 2020?

6  A.    Yes.

7  Q.    Then if you finally just turn to -- well, maybe not

8  finally -- the third page, there are some diagrams that

9  basically show the bad and the good ways of aligning

10 manufacturing work stations, right?

11 A.    Yes.

12 Q.    And then finally if you could turn to Page 4, there are

13 some suggestions or guidance about -- in the first paragraph

14 under the diagram, there is guidance along the lines of

15 examples on how to, if feasible, align work stations so that

16 workers are 6 feet apart in all directions.  Do you see that?

17 A.    Yes.

18 Q.    And I'm done with the questions regarding the guidance for

19 now, Ms. Giguere.

20       You understood that one of the principal parts of the

21 complaint, conditions that were being reported on May 19th,

22 2020, had to do with Maid-Rite's failure to have its employees

23 socially distance while working the lines?

24 A.    That was one of the items.

25              MR. BUCHANAN:  I object to the form.

1           THE COURT:  It's overruled.

2   BY MR. MORGAN:

3   Q.   And you also understood on May 20th these guidelines that

4   talk about, if feasible, workers work at least 6 feet apart in

5   all directions, correct?

6   A.   Yes.

7   Q.   So at least according to the complaint on social

8   distancing alone, would you agree there is at least a

9   suggestion that the company wasn't complying with the

10  guidelines regarding social distancing?

11  A.   There was an allegation that they were not using social

12  distancing.

13  Q.   And was that allegation concerning to you?

14  A.   I'm sorry.  I didn't hear you.

15  Q.   Was that allegation concerning to you, Ms. Giguere?

16  A.   Concerning to me?

17  Q.   Yes.

18  A.   It was an allegation, but within that complaint there were

19  other things listed that also told me more about that

20  workplace, other than just the employees not being 6 feet

21  apart.  So you're focusing on one thing and my concern is over

22  the overall complaint.

23  Q.   I understand that, and that's why we went over Pages 1 and

24  2 of the guidance that was issued at the end of April, talking

25  about what may substantially contribute to potential exposure

1 in meat and poultry processing plants.

2 A.    Yes, and it was a contributing factor according to the

3 allegations, yes.

4 Q.    Did you consult these guidelines, the meat processing

5 guidelines, when you made the determination to treat the

6 complaint as a non-formal complaint?

7 A.    Yes.

8 Q.    And did you reach any conclusions about whether the

9 allegations, if true, were violations of the guidance?

10 A.    Reach a conclusion?

11         MR. BUCHANAN:  I'll object to the form.

12         THE COURT:  It's overruled.  Go ahead.  You can

13 answer the question.

14         THE WITNESS:  So you want to know if I reached a

15 conclusion based on the allegations that were given to me by

16 Justice at Work?

17 BY MR. MORGAN:

18 Q.    Right.  That if true, they were violations of the guidance

19 that we just discussed.

20 A.    Well, again, the other things within that complaint shows

21 some protections that were being done.  So you have to consider

22 the protections that were being done at the facility, which you

23 outlined in the complaint, to look at it and have an overall

24 picture of how serious the allegations were.

25         They were serious allegations regarding COVID, regarding

1 social distancing, but there were protections in place.

2 Q.    And what protections are you referring to?

3 A.    I'm referring to your complaint where you outline some of

4 the complaint items.  You gave us a picture of what was

5 happening in the facility, and that picture included the use of

6 face shields and masks.  So these employees were not

7 unprotected and not 6 feet away.  They did have protections.

8 Q.    On the question of masks, if you turn -- if you're at Page

9 3 of 5 of the complaint, under lack of safe personal protective

10 equipment, there is a reference to masks, do you see that?

11 A.    In the second paragraph?

12 Q.    It's the first full paragraph under the heading, lack of

13 safe personal protective equipment.  Do you see that, Ms.

14 Giguere?

15 A.    I see it.  I'm just reading it at this point in time.

16 Q.    Okay.  Take a second.

17 A.    Okay.  I read the first paragraph.

18 Q.    You had mentioned in the context of the social distancing

19 questions just a minute or two ago that based on what was in

20 the complaint, there were things that the company was doing,

21 and that you were kind of looking at the whole picture and you

22 referenced masks.

23      The complaint tells you that the company provided each

24 employee with a single thin mask on one day in March and one

25 other occasion, but otherwise failed to provide masks, correct?

1   A.    That's what it says, yes.

2   Q.    And the company requires the workers to supply their own

3   masks, correct?

4   A.    That was the allegation.

5   Q.    Is that allegation consistent with the meat processing

6   worker guidance?

7   A.    I'm sorry.  Is it consistent with the guidelines as to

8   what's required?

9   Q.    Right, that companies should require workers to provide

10  their own masks for at work.

11  A.    No, that would not be consistent.

12  Q.    On the topic of shields, you mentioned shields, face

13  shields.  That's the next paragraph below it.

14        Do you want to take a look at it and read that paragraph?

15  A.    Yes, please.  Okay.

16  Q.    So there is a discussion about masks -- excuse me -- the

17  plastic face shields.  About a third of the way down, there is

18  a sentence that begins, near the complaining workers report.

19  Do you see that?

20  A.    Yes.

21  Q.    Then it goes on to say that shields provided by Maid-Rite

22  do not cover the nose or mouth, so they have to be worn in

23  addition to the masks, right?

24  A.    That's what it says, yes.

25  Q.    And then to clear the shields, the workers have to use

1  their arms and hands, causing them to touch their face.  Do you

2  see that?

3  A.    I do.

4  Q.    Is that practice as alleged consistent or inconsistent

5  with the guidance?

6  A.    Well, the guidance gives you a lot of possibilities.  It

7  doesn't say everything is required or needed.  I think it's

8  more of -- the way I looked at it was they were wearing masks.

9  The allegation was that they were not adequate and they were

10  wearing face shields, although they were having a problem with

11  fogging, it seems to be the allegation there, but they did have

12  protections.

13  Q.    So to answer my question, is the practice, as alleged in

14  the complaint, consistent or inconsistent with the guidance in

15  your judgments?

16  A.    I'm not sure the practice that you're referring to.

17  You're talking about wearing masks?  The guidance does

18  recommend that masks be worn.  Is that what you're asking me?

19  Q.    I'm sorry.  We have talked about the masks.  I was on to

20  the face shields.

21  A.    So you're asking me if the guidance requires the use of

22  face shields?

23  Q.    No.  If workers are going to wear face shields that

24  they're used in such a way where workers' hands and arms aren't

25  used to touch their faces and wipe off the masks or the

1  shields.

2        MR. BUCHANAN:  I will object.  This is vague, very

3  vague questioning.

4        THE COURT:  It's overruled.  If you can answer.

5        THE WITNESS:  If you know how a meat processing plant

6  works, you know that the employees aren't using contaminated

7  skin to touch their faces or their face shields because they

8  have gloves on and they have jackets on and it's not

9  contaminated.  Because they're working with meat, they can't

10 have contamination in there.

11       So I think that in my looking at that, I read it

12 differently than you do.  So I'm not sure I can answer your

13 question.

14 BY MR. MORGAN:

15 Q.   Fair enough.  How long did it take you in total to

16 conclude after receiving the complaint that this would be

17 deemed a non-formal complaint?

18 A.   We received the complaint on the 20th, and we handled it

19 as an inquiry on the 21st.

20 Q.   But I'm talking in terms of your workday.  Like, is it

21 something that you process in 20 or 30 minutes, or is it

22 something that requires several meetings throughout the day and

23 some analysis that would take you half a day or a full day to

24 reach the conclusion?

25 A.   I'm not sure that I can answer that.  I don't know the

1  time it took.

2  Q.   So you don't know how long it took?

3  A.   I can't answer that, no.  I would be guessing.

4  Q.   At some point -- and on May 21st, as I understand it, OSHA

5  sent a letter to Maid-rite asking for some information and

6  putting them on notice that the complaint had been received,

7  correct?

8  A.   On May 21st -- I'm sorry.  I didn't get your -- say that

9  one more time, please.

10 Q.   Sure.  I'm sorry, Ms. Giguere.

11       On May 21st, OSHA sent a correspondence to Maid-Rite

12 indicating that it had received a complaint and requesting

13 certain information, is that right?

14 A.   We sent that to Maid-Rite, yes, the allegations.

15 Q.   And in that correspondence to Maid-Rite, OSHA told

16 Maid-Rite that it did not intend to conduct an on-site

17 inspection, correct?

18 A.   In that letter?

19            MR. BUCHANAN:  Objection.  It misstates what's in the

20 letter.

21            THE COURT:  You can answer the question.  Go head and

22 answer the question.

23            THE WITNESS:  In the letter to Maid-Rite, you're

24 asking me if it said that we were not going to conduct an

25 inspection?

1  BY MR. MORGAN:

2  Q.   Right, at the time.

3  A.   At that time, correct.

4  Q.   That position of OSHA changed at some time shortly after

5  that letter went out, correct?

6  A.   Yes.

7  Q.   And was that in response to information that OSHA received

8  from the company?

9  A.   Yes.

10  Q.   What information was that?

11  A.   We received the response back from them to the letter that

12  we sent as the inquiry.

13  Q.   Has that response been provided to Justice at Work?

14  A.   No, it has not.

15  Q.   Why not?

16  A.   Because our protocol that we follow in our field

17  operations manual is that when you get a response back, if it

18  is a separate -- what we're considering an adequate or

19  satisfactory response, then we send it to the source so that

20  the source can look at it and accept or deny it.  They have the

21  opportunity to say, no, we don't agree with that.

22       When the response is received back, as this one was, and

23  we decide that we are going to do an inspection on it, that

24  complaint becomes part of the inspection case file, because the

25  case file has initiating action in it, which is the complaint,

1  the original complaint from the inquiry, and the response back.

2  So all of those become part of the case file.

3  Q.    Did you make the determination to start an inspection on

4  or about June 2nd?

5  A.    Yes.

6  Q.    What did you see in the company's response that you

7  weren't satisfied?

8  A.    I did not believe that they addressed the social

9  distancing issue adequately.

10  Q.    At that point then, Ms. Giguere, is the complaint that was

11  filed on May 20th converted from a non-formal complaint to a

12  formal complaint, or is there not any administrative change?

13  A.    There is not an administrative change.

14        Basically what happens is that the complaint is marked

15  that it wasn't a satisfactory response, and it is assigned for

16  inspection.

17  Q.    Notwithstanding the inadequacy of the response of the

18  company from your perspective, you didn't at that time deem the

19  allegations with regard to social distancing an imminent

20  danger, did you?

21  A.    I did not.

22  Q.    Can you help us with you not being satisfied as part of

23  the response and the decision nonetheless not to deem it as an

24  imminent danger?

25              MR. BUCHANAN:  Objection, Your Honor.  That is not a

1  clear question.

2        THE COURT:  If you can, answer it.

3        THE WITNESS:  In discussions with my supervisor, the

4  area director, we decided that it was not an imminent danger

5  because there were protections in place for the employees.

6        Some of the allegations that were made in this

7  complaint were responded to adequately in the response that we

8  got from the employer, and we looked at everything the employer

9  said that they were doing, and we made a determination at that

10 point in time to do an inspection to see if social distancing

11 was, in fact, not being appropriately done, because we had the

12 response that we needed more information.

13 BY MR. MORGAN:

14 Q.   Do you recall the specific date that you received the

15 response from the company?

16 A.   I believe it was the 29th, May 29th.

17 Q.   And the on-site inspection didn't occur until July 9th, is

18 that right?

19 A.   On-site inspection, that's correct.

20 Q.   Do you know why it took nearly six weeks for the on-site

21 inspection to occur?

22        MR. BUCHANAN:  Your Honor, I object.  This is delving

23 straight into the inspection process which is improper.

24        THE COURT:  It's overruled.  He's asking, if you

25 know, why it was.  I don't know.  Were there other things going

1  on?  So it's overruled.  Go ahead.

2          THE WITNESS:  We opened the inspection itself on June

3  2nd, which was -- I believe the 29th was a Friday and the 2nd

4  was a Tuesday.  So by the time the response was reviewed from

5  the employer that we received on the 29th, it was being

6  reviewed, I believe, through June 1st, and at the end of the

7  day, I decided we would do an inspection, and we opened the

8  inspection the following day.

9          So that inspection did entail an opening conference

10 and a document request and all the things that we would

11 normally do on an inspection.

12         The on site part of it did not occur until July 9th,

13 because we went on site for specific reasons, to look at

14 certain things, but we had gathered information for the first

15 weeks that we were doing the inspection, and we gathered that

16 information and did employee interviews, we talked to the

17 employees within the plant, and all of that is valuable, and

18 then saying, okay, we're going to go out and look at X, Y, and

19 Z.

20 BY MR. MORGAN:

21 Q.   If I understand your testimony correctly, in your

22 judgment, sometime between May 28th and June 2nd, you thought

23 the company's response to all of the allegations in the May

24 20th complaint, with the exception of the allegations

25 concerning social distancing, were adequate or satisfactory?

1          MR. BUCHANAN:  Objection.

2          THE COURT:  I will sustain that.  That is not what

3   she said.  There is no need for you to characterize her

4   statements.  You can ask her questions.  Her statements are on

5   the record.

6          MR. MORGAN:  Fair enough, Your Honor.  I wasn't --

7   fair enough.

8   BY MR. MORGAN:

9   Q.   Let's just ask then, what, other than the social

10  distancing aspect of the complaint, did you find inadequate in

11  the company's response?

12  A.   They gave us a baseline documentation that showed us

13  various things going on within the facility, and based on the

14  photos and the things that we have and the way they had

15  responded, we felt that the things that they were doing were

16  okay, as far as sanitation and providing masks and face shields

17  and those things, but we did not feel they had enough

18  information about social distancing.

19  Q.   And the investigation is still ongoing, is that true?

20  A.   Yes.

21  Q.   I want to ask you a little bit about your conversations

22  that you had with Ms. Al-Khatib that you were asked about on

23  direct examination.

24       Do you still have her declaration in front of you?

25  A.   Yes.

1  Q.    And counsel was asking you about Paragraph 11 of the

2  declaration, and this was in reference to a conversation of

3  June 1st of 2020, correct?

4  A.    Yes.

5  Q.    Now, you recall having that conversation, it sounds like?

6  A.    I do recall the conversation.

7  Q.    And did you take notes during the calls with Ms.

8  Al-Khatib?

9  A.    I did take notes.

10  Q.    Do you recall whether you took notes on June 1st?

11  A.    I do not.

12  Q.    Did you review those notes to prepare yourself to testify

13  today?

14  A.    I did not.

15  Q.    Counsel asked you about the top part of the paragraph in

16  connection with the question by Ms. Al-Khatib about why the

17  complaint was treated as non-formal, do you see that?

18  A.    Yes.

19  Q.    And I understand that you denied making that statement.

20       My question is, did you at all discuss with Ms. Al-Khatib

21  on June 1st about complaints coming from counties under red

22  zone orders?

23  A.    What's not in that paragraph that I recall from that

24  conversation is that we talked about the guidance document.  I

25  referred her to OSHA.gov where the guidance document was.  I

1 told her that's what we were following, and at that time, in

2 addition to that guidance of the risks, we talked about the

3 medium risk and the risk pyramid, and in addition to that, we

4 were also considering community spread when making our

5 decisions, and I did say that Lackawanna County, which is where

6 Maid-Rite is located, is still having community spread because

7 they were still a red county.

8 Q.    I don't think counsel specifically asked you about Ms.

9 Al-Khatib's statement in the last sentence of Paragraph 11, so

10 I just want to ask you about the last sentence.

11     Could you read that to yourself, please?

12 A.    Okay.

13 Q.    Did you tell Ms. Al-Khatib that the May 19th, 2020

14 complaint could not be treated as an imminent danger complaint

15 because then OSHA would have to treat all COVID related

16 complaints as imminent danger complaints?

17 A.    I remember talking to her about medium risk complaints and

18 stating to her that medium risk complaints -- and, again,

19 foregoing extenuating circumstances -- would not be treated as

20 imminent danger.

21 Q.    Do you have a specific recollection one way or another

22 whether you would have told Ms. Al-Khatib that the May 19th,

23 2020 complaint could not be treated as an imminent danger

24 complaint because then OSHA would have to treat all COVID

25 related complaints as an imminent danger?

1  A.    I know when I was speaking, I was speaking about medium

2  risk cases.  That's the conversation we were having.

3      I'm not sure about the verbiage that is there, but we were

4  talking about medium risk complaints, and I did say those would

5  not be treated as imminent danger unless there were extenuating

6  circumstances.

7  Q.    And did you have any particular -- were you thinking about

8  anything particular with regard to extenuating circumstances?

9  A.    I'm sorry.  I didn't hear the first part.

10  Q.    I'm sorry, Ms. Giguere.

11      I said, were you thinking about anything in particular

12  when you told Ms. Al-Khatib about, you know, absent any

13  extenuating circumstances, what those circumstances might look

14  like?

15  A.    I was not.  I have learned not to generalize everything.

16  I don't use words such as every, all, never, because that's --

17  I find that that changes and those words are not good to use.

18  So in my characterizations, I try not to use those.

19      I did say that -- because at the moment I say that a

20  medium risk facility would not be treated as an imminent

21  danger, then we would have one in that would have the right

22  recipe for an imminent danger.  So that's why I'm correcting

23  the way that I would have said it.

24      I had no reason to say that we would not treat a COVID

25  complaint as an imminent danger.  Imminent dangers have been

1  around long before there were COVID complaints, and so imminent

2  dangers are always taken on a case-by-case basis.  That's the

3  way we do them.  That's the way I have done them for 32 years,

4  and I'm not sure what else I can tell you about that.

5  Q.    Fair enough.

6        And you were using the phrase medium risk.  Why?

7  A.    From the risk pyramid, we had talked about the risk

8  pyramid from the guidance document.

9  Q.    Oh, in connection with meat processing plant complaints?

10  A.    That they would fall under medium risk, yes.

11  Q.    I'm just going through my notes, if you would just mind

12  bearing with me.

13        Ms. Giguere, did you or anyone from your office

14  communicate to Justice at Work that OSHA was opening up an

15  inspection with regard to Maid-Rite and the complaints made on

16  May 19th, 2020?

17  A.    I believe you have it in your affidavit that I told her on

18  June 2nd, and I would agree with that since the inspection was

19  opened on June 2nd.

20  Q.    Forgive me.  You are correct.

21        Is that typical?  Is that the standard process?

22              MR. BUCHANAN:  Objection to the form of the question.

23              THE COURT:  Yeah, it's overruled.  I'm not sure it

24  makes any difference you were told.  So I think that whatever

25  the standard process is, is of no particular consequence.

164

1          MR. MORGAN:  I will withdraw the question.

2          THE COURT:  You don't have to.  It was sustained.

3          MR. MORGAN:  Oh, I thought you said overruled.  I'm

4 sorry.

5          THE COURT:  You're right.  So I withdraw my overruled

6 and I will sustain it.

7 BY MR. MORGAN:

8 Q.   Are you able to tell us, Ms. Giguere, the intentions of

9 OSHA with regard to the inspection of the Maid-Rite facility in

10 Dunmore, Pennsylvania going forward?

11         MR. BUCHANAN:  Your Honor, I didn't hear the

12 question.

13         THE COURT:  What was the question?

14         MR. MORGAN:  I asked whether Ms. Giguere was able to

15 tell us the intentions of OSHA with respect to continuing the

16 inspection of the Maid-Rite plant in Dunmore, Pennsylvania.

17         MR. BUCHANAN:  I object, Your Honor.

18         THE COURT:  You mean, aside from what we've already

19 been told that they are continuing the investigation?

20         MR. MORGAN:  Right.  If she could provide a

21 description of what still remains.

22         MR. BUCHANAN:  I object.

23         THE COURT:  That's sustained.

24         Let's stay with our question as to where we've been,

25 and whether or not, based upon what's happened in the past,

1   there's some reason for recourse under 662(d).

2           Anything else, Mr. Morgan?

3           MR. MORGAN:  I don't have anything else, Your Honor.

4   Thank you.  Thank you, Ms. Giguere, for answering my questions.

5           THE WITNESS:  Thank you.

6           THE COURT:  Do you have any redirect?

7           MR. BUCHANAN:  Just a couple questions, Your Honor.

8           THE COURT:  Go ahead.

9                       REDIRECT EXAMINATION

10  BY MR. BUCHANAN:

11  Q.   You were asked by counsel about violations of the CDC

12  OSHA -- I'm sorry.  Can you hear my question?

13  A.   So far I'm good, yes.

14  Q.   You were asked by counsel about violations of the CDC OSHA

15  joint guidance.  Do you remember that?

16  A.   Yes.

17  Q.   To your knowledge, are any of the provisions of the CDC

18  OSHA guidance that you have before you which is dated July 9th

19  mandatory?

20       Do you understand my question?

21  A.   Yes.  You said any.  You are not talking about any

22  specific one.  You're saying all of them?

23  Q.   I will rephrase my question.

24       Are the CDC OSHA joint, either of the guidance, do they

25  impose requirements on meatpacking facilities?

1  A.    No.

2        MR. BUCHANAN:  That's all the questions I have.

3        THE COURT:  You may step down.

4        Tell me what additional -- I don't want to, in all

5  honesty, regurgitate the same things over and over again.  So

6  what additional testimony is it that we're going to be calling

7  here?

8        MR. BUCHANAN:  Yes.  Mr. Stelmack, the area director,

9  will testify about the number of COVID inspections that have

10 come into the Wilkes-Barre office, and also the Compliance

11 Officer Shannon Warner.

12       THE COURT:  Okay.  Let's call whoever is next.

13 MARK STELMACK, CALLED AS A WITNESS, HAVING BEEN DULY SWORN OR

14 AFFIRMED ACCORDING TO LAW, TESTIFIED AS FOLLOWS:

15                      DIRECT EXAMINATION

16 BY MR. BUCHANAN:

17 Q.    Mr. Stelmack, where do you work?

18 A.    The Wilkes-Barre area office for OSHA.

19 Q.    What is your position there?

20 A.    Area director.

21 Q.    How long have you been the area director?

22 A.    About 12 years.

23 Q.    And what did you do before that?

24 A.    Prior to that I was the assistant area director in the

25 Allentown office, and before that I was a compliance officer

1 out of the Allentown, Pennsylvania area office.

2 Q.   And how long were you the assistant area director in

3 Allentown?

4 A.   About 10 years.

5 Q.   So how many years of experience do you have with OSHA

6 total?

7 A.   32.

8 Q.   How many safety and health professionals who are

9 authorized to conduct inspections are there in the Wilkes-Barre

10 area office?

11 A.   That are authorized to conduct inspections?

12 Q.   That are authorized to conduct inspections.

13 A.   Six.   There are three safety professionals and three

14 industrial hygienists.

15        THE COURT:   Three safety professionals and three?

16        THE WITNESS:   Industrial hygienists.

17        THE COURT:   I would ask you to speak close to the

18 mic, if you can, and just speak loud so we can make sure over

19 Zoom we're getting everybody to hear clearly.

20        THE WITNESS:   If I can make a correction on that.

21 Currently I have two industrial hygienists since one was just

22 recently promoted.

23 BY MR. BUCHANAN:

24 Q.   But currently you still have six total professionals who

25 are authorized to conduct inspections?

1  A.    Currently there would be five, since one was just promoted

2  to the assistant area director.

3  Q.    How many counties in Pennsylvania is the Wilkes-Barre

4  office responsible for enforcing the Occupational Safety and

5  Health Act?

6  A.    20.

7  Q.    Can you give me a rough estimate of the number of

8  inspections you have conducted as a compliance officer?

9  A.    Personally?

10  Q.    Yes.

11  A.    1100, something around there.  It was over a thousand.

12  Q.    How many complaints from employees or their

13  representatives has your office received concerning practices

14  related to COVID-19 at workplaces?

15  A.    To date, I believe we have close to 300, just under 300

16  complaints.

17  Q.    Are you familiar with the inspection of the Wilkes-Barre

18  office of the Maid-Rite Specialty Foods facility in Dunmore?

19  A.    Yes.

20  Q.    Have you been provided information from the compliance

21  officer or Ms. Giguere about that?

22  A.    I don't know that I have been provided documents, but we

23  have discussed the state of the inspection, yes.

24  Q.    And based on your knowledge of the inspection so far, do

25  you believe there's an imminent danger with respect to the

1  spread of COVID-19 among the employees at that facility?

2  A.    No.

3  Q.    And what information that you're aware of that has been

4  provided to OSHA did you consider in arriving at that

5  conclusion?

6  A.    What we are considering are the factors, the mitigation

7  factors that have already taken place within the company:

8  Sanitation, staggering work breaks, providing for social

9  distancing in break rooms, installation of additional hand

10  sanitizing stations in the facility, the purchase and

11  distribution of face masks and face shields for employees to

12  wear.  We looked at the fact that COVID cases haven't been

13  reported since mid-May, I believe it was, over a month.

14  Q.    Are you aware of whether or not the company does

15  temperature checks of employees?

16  A.    Yes.  Yes.

17  Q.    Did you take that into consideration in determining

18  whether or not there exists an imminent danger at the facility?

19  A.    Yes, that, and the fact that they tell employees if they

20  feel ill not to come into work.

21  Q.    Is the inspection ongoing?

22  A.    Yes, it is.

23          MR. BUCHANAN:  I don't have anything further, Your

24  Honor.

25          THE COURT:  Who is going to be asking questions here?

1    MR. MORGAN:  I am, Your Honor, but I wanted to know

2 whether the Court wanted to ask before I asked questions?

3    THE COURT:  No, but thank you, Mr. Morgan.  Go ahead.

4    MR. MORGAN:  Thank you, Your Honor, and I'm mindful

5 of the comments of not wanting to repeat much.  So I might do a

6 little bit of that, but just let me know if you think I have

7 gone too far afield, and I won't be as long as the last

8 witness.

9                        CROSS EXAMINATION

10 BY MR. MORGAN:

11 Q.    Good afternoon, Mr. Stelmack.  Can you hear me okay?

12 A.    Yes, sir.

13 Q.    It sounds like Ms. Giguere, was she, at least from a

14 management level, the person responsible for the May 19th, 2020

15 complaint, or your office's handling of the May 19th, 2020

16 complaint?

17 A.    She handled it in conjunction with myself, yes.

18 Q.    So counsel just asked you your opinion on whether the

19 plant poses an imminent danger, do you recall that?

20 A.    Yes.

21 Q.    And when you answered that question for us, are you

22 talking about today?

23 A.    Yes.

24 Q.    And when did you first form this opinion?

25 A.    Following the on-site portion of our inspection.

1  Q.   And on site meaning the on-site inspection that Ms. Warner

2  did in early July of this year?

3  A.   Yes.

4  Q.   And so prior to July, early July of 2020, you had not

5  formed an opinion one way or another whether the conditions at

6  the Dunmore plant had presented an imminent danger, is that

7  true?

8  A.   No, that's not true.  I think the question I was asked

9  was, as a result of the inspection did I have that opinion.

10 Q.   Okay.  Well, that wasn't the intention of the question.

11      I'm trying to understand when you first formed the

12 opinion.

13          MR. BUCHANAN:  That's been asked and answered, Your

14 Honor.

15          THE COURT:  No, it was asked, and he said after the

16 inspection, which now he's saying it's not the question he

17 understood.  So it has not been asked and answered and that

18 objection is overruled.

19          You may answer the question if you can.

20          THE WITNESS:  Can you repeat the question, please?

21 BY MR. MORGAN:

22 Q.   Sure.  I am trying to understand when you first formed the

23 opinion that the conditions that were complained about in the

24 May 19th, 2020 letter at the Maid-Rite facility in Dunmore did

25 not impose an imminent danger.

1  A.    In regards to -- you're asking about the complaint.  When

2  I looked at the complaint and saw the complaint items, I made

3  the determination that the complaint items as stated in the

4  letter that was sent to our office did not constitute an

5  imminent danger.

6  Q.    And you looked at the complaint and the allegations in the

7  complaint, is that what you said?

8  A.    That's correct.

9  Q.    Did you consider anything else other than the complaints

10  or the allegations in the complaint?

11  A.    I considered the previous complaint that we received in

12  our office and the response that was given to that complaint.

13        MR. BUCHANAN:  Your Honor, I will object.  This is

14  going well beyond the scope of his direct testimony, which

15  was --

16        THE COURT:  I know what his direct testimony was.

17  Thank you.  It's overruled.  Go ahead.

18  BY MR. MORGAN:

19  Q.    Are you referring to the April 9th, 2020 complaint?

20  A.    I don't recall exactly which date.  I think it was the

21  15th, but I'm not positive on that.

22  Q.    In May 20th or so of 2020, you were familiar with the CDC

23  OSHA guidance for meatpacking plants, correct?

24  A.    Yes.

25  Q.    Do you have a copy of the May 19th, 2020 letter in front

1  of you?

2  A.   I do not.

3         MR. MORGAN:   Could we provide the witness with a copy

4  of that, please?

5  BY MR. MORGAN:

6  Q.   Mr. Stelmack, do you have a copy in front of you?

7  A.   I do, yes.

8  Q.   Okay.  Great.

9       You understood that the allegations that are on Pages 3

10  and 4 of the complaint -- I'll let you get there.

11  A.   I'm there.

12  Q.   -- concern lack of personal protective equipment.

13  Specifically there are allegations about masks and face

14  shields, correct?

15  A.   Yes.

16  Q.   Failure to slow production lines down, correct?

17  A.   Yes.

18  Q.   And maintain social distancing, among other things,

19  correct?

20  A.   Correct.

21  Q.   Now, at that point in time, you didn't have any

22  information from the company in terms of this response being

23  validated, did you?

24  A.   We had the previous complaint, yes.

25  Q.   So you were using the response that the company had

1  provided in connection with the last complaint for this one?

2  A.   I don't understand what you're asking there.

3  Q.   Were you relying on information that Maid-Rite provided to

4  OSHA in response to the April 9th complaint to form the basis

5  that there was no imminent danger alleged with regard to the

6  May 19th complaint?

7  A.   No.

8  Q.   So other than the allegations in this complaint and your

9  experience, what else did you consult or consider to reach the

10  opinions here?

11  A.   Sir, when I was looking at the complaint, I made a

12  determination that this complaint was not alleging an imminent

13  danger at the facility.  There is nothing in the complaint that

14  I read that led me to believe that there was an imminent danger

15  situation at Maid-Rite.

16  Q.   And I just want to explore imminent danger a little bit

17  with you.

18       Could the failure to socially distance on production lines

19  be enough in this COVID world to justify OSHA finding that the

20  allegations -- let me rephrase it.

21       Could the allegation that there isn't social distancing on

22  a production line in this COVID pandemic world, could that be

23  enough to satisfy the imminent danger definition in your

24  judgment?

25  A.   No.

1  Q.   How about the issue of masks, if there were allegations

2  that the masks -- that there weren't masks either being given

3  or employees weren't wearing them enough, alone, standing on

4  its own, would that be sufficient to justify an imminent danger

5  finding in your opinion?

6  A.   No.

7  Q.   With regard to both the social distancing issue and the

8  mask issue, what more would you have needed to see on May 20th

9  in order to make a determination that such allegations amounted

10  to an imminent danger?

11          MR. BUCHANAN:  Objection.  It calls for speculation.

12          THE COURT:  That's sustained.

13  BY MR. MORGAN:

14  Q.   At some point OSHA decided to perform an on-site

15  inspection at the Maid-Rite facility, correct?

16  A.   Yes.

17  Q.   Were you involved in that in any way, Mr. Stelmack?

18  A.   Yes.

19  Q.   And can you tell us the reasons why the decision was made

20  to do an on-site inspection?

21          MR. BUCHANAN:  Again, I will object to the extent

22  that it calls for testimony about deliberations.

23          THE COURT:  It's overruled.  We have already heard

24  the testimony from a previous witness.  You can answer.

25          THE WITNESS:  Can you repeat that again, please, sir?

1  BY MR. MORGAN:

2  Q.   I'm trying to understand the basis that justifies the

3  decision from OSHA to do an on-site inspection.

4  A.   When we received the response from the company in regards

5  to the social distancing question on the complaint, we

6  discussed it within the office, and they were claiming pretty

7  much the same infeasibility claim as they had in the previous

8  complaint.

9       When we looked at a photograph of the facility, we

10 questioned whether or not there could be a feasible method to

11 maintain social distancing since it didn't look like there was

12 that many people in the area.

13      The second thing that I was looking at is that time had

14 passed.  It has was over a month since the previous complaint

15 that we looked at, and when we're talking about a feasibility

16 issue, the company should be looking at what's feasible

17 continuously, not just, you know, a one-time infeasibility

18 argument, and then never try to do anything again.

19      So we decided to go into the facility to evaluate the

20 feasibility issue on the production lines.

21 Q.   How would you define feasibility in this context?

22 A.   I guess what we would be looking at is whether or not --

23 and it would have to be done in conjunction with the company --

24 to determine whether or not they could actually continue to do

25 the operation that they're intended to do while spacing out the

1  individuals along the production lines.

2       We would also have to look at whether or not what our

3  recommendations might be would interfere with any USDA type

4  regulations that would also govern activities over these

5  conveyor lines.

6  Q.   Anything else?

7  A.   That's what we would be looking at initially.

8  Q.   And then anything else?

9       At other points in time are you looking at other things?

10 A.   I think we would look at whatever the company raised as

11 their reason for saying that it's infeasible.

12 Q.   Has Maid-Rite said that?

13          MR. BUCHANAN:  Objection, Your Honor.

14          THE COURT:  Sustained.

15          We're not going to get into the ongoing

16 investigation.  We are only going to get into whether or not

17 you're entitled to a mandamus.  So let's stick to the things we

18 need to talk about, please.

19          MR. MORGAN:  Fair enough, Your Honor.

20 BY MR. MORGAN:

21 Q.   Have you personally had any conversations with anyone from

22 Justice at Work?

23 A.   No.

24 Q.   You weren't privy to any of the discussions between anyone

25 from your office and anyone at Justice at Work, correct?

1          MR. BUCHANAN:  Objection to the form.  What does

2   privy mean?

3          THE COURT:  If he understands it, he can answer it.

4   It's overruled.

5          THE WITNESS:  I knew there was conversations, yes.

6   BY MR. MORGAN:

7   Q.   Right.  But you weren't involved in any of those

8   conversations, is that true?

9   A.   That's true.

10  Q.   And how about Maid-Rite, have you had any direct

11  communications with anyone at Maid-Rite?

12  A.   Not that I recall, in particular toward this inspection or

13  this complaint.

14  Q.   How many COVID related complaints has your office

15  received?

16  A.   I don't know the exact number, but it is just under 300, I

17  believe.

18  Q.   And is it true that none of those COVID related complaints

19  have been designated by your office as posing an imminent

20  danger?

21  A.   That's true.

22  Q.   Just bear with me one moment, please, Mr. Stelmack.

23       Mr. Stelmack, does the Wilkes-Barre office have a policy

24  to treat all complaints in counties under red zone orders as

25  non-formal?

1          MR. BUCHANAN:  Objection, Your Honor.  This is well

2    beyond the scope of his direct.

3          THE COURT:  Repeat the question, please.

4          MR. MORGAN:  Sure, Your Honor.

5          I asked whether the OSHA office in Wilkes-Barre, his

6    office that he's the area director for, has a policy that all

7    complaints in counties under red zone orders be treated as

8    non-formal.

9          THE COURT:  Objection is overruled.  You can answer

10   the question if you can.

11         THE WITNESS:  OSHA Wilkes-Barre office does not have

12   that policy.

13         THE COURT:  Are you done, Mr. Morgan?

14         MR. MORGAN:  I'm just going over my notes, Your

15   Honor.  I'm sorry.  Just give me 10 seconds, please.

16         That's all for now, Your Honor.  Thank you,

17   Mr. Stelmack.

18         THE COURT:  Mr. Stelmack, let me ask you, is there

19   any policy, formal or informal, in OSHA or the Department of

20   Labor that you are aware of that requires you to not designate

21   anything that's COVID-19 as an imminent danger?

22         THE WITNESS:  No, Your Honor.

23         THE COURT:  Any redirect?

24         MR. BUCHANAN:  Nothing further, Your Honor.

25         THE COURT:  You may step down.  Thank you.

1          We have one more witness?

2          MR. BUCHANAN:  Can I have just a few minutes to

3     confer with counsel, please?

4          THE COURT:  Yes.

5          MR. MORGAN:  Your Honor, this is Mr. Morgan.  Would

6     the Court mind taking a 10-minute break?

7          THE COURT:  Okay.  We will take a 10-minute break and

8     wrap up hopefully.

9        (At this time, a 10-minute break was taken.)

10          THE COURT:  Mr. Morgan, are you back and ready?

11          MR. MORGAN:  I am.

12          THE COURT:  Counsel, you can call your next witness.

13          MR. BUCHANAN:  We won't not be calling any more

14     witnesses, Your Honor.

15          THE COURT:  You're not calling Ms. Warner?

16          MR. BUCHANAN:  No, we're not.

17          THE COURT:  Does Plaintiffs want to call her?  Since

18     I had indicated earlier that she was going to be available, so

19     we're going to make sure that she is, in fact, available.

20          MR. MORGAN:  We would like to call her briefly, Your

21     Honor.

22     SHANNON WARNER, CALLED AS A WITNESS, HAVING BEEN DULY SWORN OR

23     AFFIRMED ACCORDING TO LAW, TESTIFIED AS FOLLOWS:

24          THE COURT:  Ms. Warner, if you would, since we're

25     doing a lot of this by Zoom, lean into the microphone and speak

181

1  loud.

2          THE WITNESS:  Okay.

3          THE COURT:  Mr. Morgan.

4          MR. MORGAN:  Thank you, Your Honor.

5                    DIRECT EXAMINATION

6  BY MR. MORGAN:

7  Q.   Good afternoon, Ms. Warner.

8  A.   Good afternoon.

9  Q.   Thanks for being here today.  I know it's been a long

10 afternoon, so I just have a few questions for you.

11      How long -- you began working for the Department of Labor

12 in February of 2019, is that right?

13 A.   That's correct.

14 Q.   And the position you held before arriving to the

15 Department of Labor was with Amazon?

16 A.   Correct.

17 Q.   You were assigned the investigation into the Maid-Rite

18 facility in Dunmore, Pennsylvania, on or about June 1st of

19 2020, is that right?

20 A.   Yes.

21 Q.   So when you received the assignment, you had been with the

22 DOL for just about 16 months?

23 A.   Correct.

24 Q.   What did you understand as the basis for your getting

25 assigned the inspection of the Maid-Rite plant in Dunmore,

1  Pennsylvania in early June of 2020?

2  A.    It was a complaint inspection regarding COVID-19.

3  Q.    At that time, how many complaint inspections regarding

4  COVID-19 had you dealt with?

5  A.    Regarding COVID-19 as a whole?

6  Q.    In the context of meatpacking plants.

7  A.    I'm sorry.  Can you repeat the question?

8  Q.    Sure.  How many other complaint inspections had you done

9  in connection with COVID-19 in meatpacking plants?

10 A.    None.

11 Q.    Were you familiar on June 1st, 2020, with the CDC and OSHA

12 guidance with regard to COVID-19 in meatpacking plants?

13 A.    Yes.

14 Q.    What did you do upon assignment to do a complaint

15 inspection of the Maid-Rite facility?  What did you first do?

16 A.    As per any inspection that I do, I perform a history of

17 the company, and then I read the scope of the inspection.  So I

18 read the complaint items and then prep material for the opening

19 conference.

20 Q.    Had you reviewed any documents that Maid-Rite had provided

21 to OSHA?

22 A.    Yes.  I was given the file from the non-formal complaint

23 and the documents they provided.

24 Q.    And did you conduct an opening conference then on June

25 2nd?

1  A.    Yes.

2  Q.    And what does the opening conference entail?

3  A.    Typically we gather background information about the

4  company, go over the scope of the inspection, which this one

5  was a complaint inspection, so we went over the complaint

6  items, and then I asked for a document request of applicable

7  things for the inspection.

8  Q.    And who from Maid-Rite did you meet with?

9  A.    David Hollander, their director of HR.

10 Q.    Anyone else?

11 A.    No.

12 Q.    Was that over the phone or in person?

13 A.    Over the phone.

14 Q.    Were you in your office in Wilkes-Barre?

15 A.    Yes.

16 Q.    And did you conduct an on-site inspection that day?

17 A.    No.

18 Q.    Are you familiar with OSHA's field operations manual?

19 A.    I am.

20 Q.    Did it call for on-site inspections on the days of opening

21 conferences?

22         MR. BUCHANAN:  Object to the form of the question.

23         THE COURT:  What's wrong with the form of the

24 question?

25         MR. BUCHANAN:  Call for.

1          THE COURT:  What's that?

2          MR. BUCHANAN:  Does it require, does it suggest,

3   does --

4          THE COURT:  It's overruled.  If you can answer the

5   question, answer the question.

6          THE WITNESS:  So due to the nature of COVID-19, the

7   guidance given was to initiate a virtual inspection, and then

8   if and when it was determined that I would need to go on site,

9   that would be -- that decision would be made at that time.

10  BY MR. MORGAN:

11  Q.   Did you conduct a virtual inspection on June 2nd, 2020?

12  A.   Yes.

13  Q.   And what did that visual inspection entail -- or virtual

14  inspection entail?

15  A.   It was the opening conference, and then we went over

16  documents they had provided in the non-formal.  I requested

17  additional documents, and we went over the complaint items.

18  Q.   At that point in time through this virtual inspection, did

19  you see the plant, any parts of the plant?

20  A.   One of the things I requested was a map of the plant since

21  I had never been there.  I received that from them.  So I was

22  able to see what the flow of the establishment was like.

23  Q.   But in terms of June 2nd, other than conducting the

24  opening conference with the Maid-Rite official that you

25  explained everything that went into it, did you do anything

1  else as part of the virtual inspection?

2  A.   No.

3  Q.   Did you conduct a virtual inspection or did you conduct an

4  opening conference?

5          THE COURT:  Mr. Morgan, I'm not sure that, you know,

6  we have talked before about what an inspection is, and there

7  seems to be different uses of that verbiage, and I know no one

8  is trying to trick anybody, but, you know, let's make sure that

9  we're not playing games with semantics.

10          MR. MORGAN:  I appreciate that.  Let me restate the

11  question.

12  BY MR. MORGAN:

13  Q.   Other than what you have told us so far in terms of just

14  the meeting or the opening conference that you had with the

15  Maid-Rite official, did you do anything else on June 2nd?

16  A.   No.

17  Q.   So you weren't taken to any parts of the plant or you

18  didn't see any of the production lines virtually?

19          MR. BUCHANAN:  Objection, asked and answer.

20          THE COURT:  Overruled.

21          THE WITNESS:  I was provided documents from the

22  employer in the non-formal which included pictures.  So I was

23  able to see certain areas of the plant in the pictures they

24  provided.

25  BY MR. MORGAN:

1  Q.   I understand that your office received some photos of the

2  facility, as well as some diagrams following the opening

3  conference, is that right?

4  A.   Yes.

5  Q.   And then you also conducted approximately 15 interviews of

6  employees -- or 15 to 20 employees since June 2nd, is that

7  correct?

8  A.   Correct.

9  Q.   Have you conducted any interviews of the employees since

10  you were out at the plant for the on-site inspection of July

11  9th, 2020?

12  A.   Yes.

13  Q.   How many have you conducted?

14  A.   I requested to do three, but I only ended up doing two,

15  because one of the areas I requested to speak to someone, I had

16  already previously spoke with them in an earlier interview.

17  Q.   July 9th, 2020, was the day you were at the facility doing

18  the on-site inspection, correct?

19  A.   Correct.

20  Q.   Was there anyone from the OSHA office with you?

21  A.   My supervisor was there.  She did not enter the

22  establishment with me, though.

23  Q.   Is that Ms. Giguere?

24  A.   Yes.

25  Q.   And of the 15 or 20 approximate interviews that -- let me

1   rephrase it.

2      Of the approximately 15 to 20 interviews that you

3   conducted of Maid-Rite employees as part of your inspection,

4   how many were workers on the production line?

5   A.   I believe all employees that I spoke with worked in the

6   production areas except for one.

7   Q.   You have that declaration that you signed on July 28th,

8   2020, in front of you -- or July 27th, 2020.

9      Do you have that in front of you, Ms. Warner?

10  A.   Yes.

11  Q.   Do you need a moment to familiarize yourself with it?

12  A.   Please.  Thank you.

13  Q.   And I want to turn your attention to Page 2, Paragraph 7.

14  The paragraph reads, from the employee interviews, I learned

15  that workers typically wear gloves, masks, hair nets, and face

16  shields.  Did I read that correctly?

17  A.   Yes.

18  Q.   What did you mean by typically?

19  A.   As their normal personal protective equipment when

20  working.

21  Q.   Did you also learn during the interviews that there were

22  certain times in which workers on the production lines were not

23  wearing masks?

24  A.   It's my understanding that everyone is required to wear

25  masks.  However, there was some exceptions to the face shields,

1  if the employee provided a doctor's note to the employer that

2  it would create a greater hazard.  Say they had asthma or

3  something of that nature, they would get a doctor's note to not

4  wear the face shield, but there was no exception otherwise.

5  Q.   Did you learn from the interviews whether the employees

6  provided or used their own masks or were provided by the

7  company?

8  A.   I learned from the interviews that the employer was

9  providing masks, but that employees were also allowed to

10  provide their own if they were more comfortable in their own

11  mask.

12  Q.   Did you ask on how many occasions the employer would

13  provide a fresh mask to production workers, for example?

14  A.   I learned that the employer is approximately giving masks

15  out every two weeks.

16  Q.   When did you learn that?

17  A.   I asked the employer how often they were providing masks

18  during the opening conference, but then I also consulted with

19  employees to confirm that that was happening.

20  Q.   Did the employees in fact confirm that it was happening

21  every two weeks?

22  A.   Yes.  They said approximately.

23  Q.   Did you talk at all during any of these interviews about

24  social distancing or distancing while workers were on the line?

25  A.   Yes.

189

1  Q.    You don't mention anything in your declaration about

2  social distancing while working on the line, that's why I

3  asked, but that was an area that you discussed during your

4  interviews?

5  A.    Yes.

6  Q.    Were you able -- when you went on site to inspect on July

7  9th, were you able to observe the production lines?

8  A.    Yes.

9  Q.    Now, before arriving, did you place the company on notice

10 that you were going to do an on-site inspection on July 9th?

11 A.    Yes.

12 Q.    And how much time before you arrived on July 9th did you

13 tell Maid-Rite?

14 A.    I don't know the exact time frame, but I called late in

15 the day the day before to state that I was coming on site.

16 Q.    And when you arrived on -- did you speak with somebody

17 directly?

18 A.    Yes.

19 Q.    Who did you speak with?

20        MR. BUCHANAN:  Your Honor, I will object.  This is

21 going very deeply into the inspection.

22        THE COURT:  It's not that deeply at all.  It's

23 overruled.  Go ahead.  You can answer the question.

24        THE WITNESS:  David Hollander.

25 BY MR. MORGAN:

1 Q.   And when you arrived on site at the inspection, who did

2 you first meet?

3 A.   David Hollander.

4 Q.   Did you meet any other management level officials?

5 A.   During the walk around, the --

6 Q.   All right.

7 A.   I'm sorry.  What?

8 Q.   Go ahead.  I'm sorry.

9        THE COURT:  Well, where are we going now?

10       In other words, Mr. Hollander, we see his name in the

11 documents that are there.  We're aware of that.  Let's move on

12 to the issues that relate to here, not to who else you spoke

13 with from the Plaintiffs.  They talked to a person who has

14 reasonable authority to speak, the HR director, you're aware of

15 that.  Let's move on.

16 BY MR. MORGAN:

17 Q.   Can you tell us about the actual on-site inspection of the

18 plant?  What did you do?

19 A.   I asked for a tour of the facility.  We went in the main

20 door, went through the raw production area, went to the cooking

21 production area, went to the administrative area, and then back

22 out through the other door, the exit.

23 Q.   How long did that take?

24 A.   Approximately an hour.

25 Q.   With regard to the raw section area, was the lines -- were

1  there people working on the lines?

2  A.   Yes.

3  Q.   And could you observe whether they were working elbow to

4  elbow or within several feet or 6 feet or more?  Could you

5  tell?

6  A.   Yes.

7  Q.   What did you observe?

8  A.   There are some work stations in the facility that are

9  naturally set up so that employees can social distance within 6

10 feet of the production area, but there are some areas in the

11 facility where employees are approximately 2 to 3 feet apart

12 from one another.

13 Q.   Is that both on the raw production line, as well as the

14 cooked production line?

15 A.   Yeah.  There's a couple lines within the facility, but not

16 all of them are set up the same.

17 Q.   And while you were observing those particular lines where

18 employees were close to one another working less than 6 feet,

19 did you comment or talk with Mr. Hollander about that

20 observation?

21 A.   Not while I was on site.

22 Q.   Were you able to observe while you were on site the

23 frequency with which the workers on the production lines were

24 taking breaks?

25 A.   No.  I was able to see the break schedule posted, but I

1 was not observing breaks or times people went to breaks.

2 Q.   During the on-site inspection, were you able to ascertain

3 where the employees had to travel or walk through in order to

4 wash their hands?

5 A.   Yes.

6 Q.   Did you observe employees washing their hands during your

7 on-site inspection?

8 A.   Yes.

9 Q.   During your interviews with the employees, did you ask

10 about whether they were allowed to take more regular or

11 frequent breaks to wash their hands?

12          MR. BUCHANAN:  Objection.

13          THE COURT:  I'm going to sustain the objection.

14 We're now getting into where I don't see is particularly

15 relevant to where we need to go in this case right now.  Move

16 on.

17          MR. MORGAN:  I will.

18 BY MR. MORGAN:

19 Q.   Did you conduct any interviews of employees while you were

20 on site?

21 A.   No.

22 Q.   During either the -- strike that.

23          Did you observe during the on-site inspection -- while you

24 were in the cook production area or the raw production area,

25 did you observe any notations on the floor that marked where

1  employees should stand for purposes of COVID?

2  A.   No.

3  Q.   Have you reached any conclusions based on the inspection

4  you conducted so far about whether the conditions at the

5  Maid-Rite facility pose an imminent danger?

6  A.   Yes.  I made a conclusion about whether or not it's an

7  imminent danger.

8  Q.   And what is your conclusion?

9  A.   That it is not an imminent danger.

10 Q.   What is the basis to reach that conclusion?

11 A.   Based on the facts that I have gathered about this

12 facility and the measures that they have taken based on

13 COVID-19 and what an imminent danger is, they do not align.

14 Q.   What do you understand an imminent danger to mean?

15 A.   I'm sorry.  Can you repeat that?

16 Q.   Sure.  What do you understand an imminent danger to mean?

17 A.   An imminent danger is a hazard that exists that could

18 cause death or serious physical harm in an imminent or quick

19 fashion.

20 Q.   At the on-site inspection, you observed production line

21 workers not separated by 6 feet, is that true?

22        MR. BUCHANAN:  Objection, Your Honor.  It's been

23 asked and answered.

24        THE COURT:  Yes, that was asked and answered.

25        Your arguments -- Mr. Morgan, you can make your

1  arguments to me.  For her it's about getting the facts.  You

2  are not going to have to argue with her as to what you think or

3  she thinks or whatever.

4          MR. MORGAN:  Fair enough.

5  BY MR. MORGAN:

6  Q.   Are you familiar with the phrase feasibility in the

7  context of modifying work stations for purposes of achieving

8  social distancing in meatpacking plants?

9  A.   Yes.

10 Q.   What do you understand that term to mean?

11 A.   Where it can be implemented, you can put other measures in

12 place if it's feasible to set up the employees in their work

13 stations.

14 Q.   And since your on-site inspection, have you had any

15 conversations with Maid-Rite about whether it's feasible to

16 modify the work stations to allow the production workers who

17 are not socially distanced to achieve that?

18         MR. BUCHANAN:  I will object, Your Honor.

19         THE COURT:  That's sustained.  We're wrapping it up

20 now, Mr. Morgan, right?

21         MR. MORGAN:  I understand.  Yes, Your Honor.  I'm

22 just going through my notes.

23         THE COURT:  I know you're in Minneapolis, but you

24 have to remember we're an hour or two behind you here.

25         MR. MORGAN:  I understand, Your Honor.  I'm sorry.

1 BY MR. MORGAN:

2 Q.    Ms. Warner, how were the interviewees chosen?

3            MR. BUCHANAN:  I will object, Your Honor.

4            THE COURT:  No.  I was going to ask that question.

5 It's overruled.

6            How were the interviewees chosen?

7            THE WITNESS:  So during the opening conference, I

8 asked the breakdown of the production area.  We had talked

9 about how many people work in each area.

10            So, as a measure of COVID-19, they separated the

11 areas completely so there's administrative staff, raw staff,

12 and cooking staff.  So I requested someone from the

13 administrative side, and then I took employees from both

14 cooking and raw on both shifts and interviewed those employees,

15 and then I requested more employees after my on-site visit from

16 cooking and raw.

17            THE COURT:  Who selects them, do you, or does

18 Maid-Rite tell you that these are people that you can talk to?

19            THE WITNESS:  So there is a language barrier at

20 Maid-Rite.  So we had three different days of interviews.  One

21 day was English-speaking employees, the second day was

22 Spanish-speaking employees with an interpreter, and then the

23 third day was specific areas that I saw when I was on site that

24 I wanted to interview more people at.

25            The first few were selected by Maid-Rite since I was

1  unable to be there physically.

2         THE COURT:  And then were others selected by you?

3         THE WITNESS:  Yes.

4         THE COURT:  Was it a private area when you were

5  interviewing them, outside of the hearing of anybody from

6  Maid-Rite?

7         THE WITNESS:  Yes.  So I arranged it with David that

8  he would set up a conference room, would get on the call,

9  introduce the person, and then he would leave.

10        Then I would confirm with the person that I was

11  speaking with that they felt comfortable speaking with me and

12  that no one was listening in on the conversations.

13        THE COURT:  Okay.  Go ahead, Mr. Morgan.

14  BY MR. MORGAN:

15  Q.   Just a couple more questions regarding the on-site

16  inspection.

17        When you were in the cooking and the raw area of the

18  production areas of the plant, and specifically looking at the

19  lines, were there physical barriers that separated the workers

20  on the lines?

21  A.   No.

22  Q.   Did you go into the break rooms at all?

23  A.   Yes.

24  Q.   Were there -- was there any physical separation, physical

25  barriers of any sort separating where employees could sit or

1  interact?

2  A.   Yes, there was physical barriers in the break rooms.

3            MR. BUCHANAN:  Your Honor, could I ask the witness to

4  make sure to speak up a little bit, get into the microphone?

5            THE WITNESS:  Yes, there were physical barriers in

6  the break rooms for employees to social distance on their

7  breaks.

8            MR. MORGAN:  I know I'm bouncing around a little bit

9  because I'm trying to wrap up, Your Honor, but just a couple

10 more questions.

11 BY MR. MORGAN:

12 Q.   You testified that you had given advance notice -- well,

13 notice at least the afternoon before to Maid-Rite that you were

14 going to come out and do an on-site inspection the next day,

15 right?

16 A.   Yes.

17 Q.   Is that your typical practice, to give the company that

18 you're doing an on-site inspection on a notice or a heads up a

19 day or two before that you are going to come on site?

20            MR. BUCHANAN:  Objection, relevance.

21            THE COURT:  It's overruled, but it wasn't a day or

22 two before.  She said it was the night before in terms of the

23 facts that are in there, but go ahead.

24            THE WITNESS:  No, it was not a typical practice.

25 BY MR. MORGAN:

1 Q.    Then why did you do it here?

2 A.    Due to the nature of COVID-19, this wasn't a typical

3 inspection for us, and I listened to the guidance that I was

4 given from my supervisors in the office to set this up.

5 Q.    What guidance was that?

6           MR. BUCHANAN:  I'm going to object on relevance.

7           THE COURT:  Overruled.  Go ahead.

8           THE WITNESS:  That was the direction I was given.

9           THE COURT:  To call the night before?

10           THE WITNESS:  So it was a COVID-19 inspection, so we

11 had to conduct -- OSHA has a right to protect their employees

12 also.

13           So I was going into a worksite with potential

14 COVID-19 exposure, and so there was a job hazard analysis done

15 before I went on site on what I was allowed to do or not do to

16 make sure that I was safe from COVID-19.  So there was a little

17 backer behind that.

18           Once that job hazard analysis was approved, that's

19 when I got the green light to go on site, and then I needed

20 someone to walk me around to the areas and show me the

21 production line, so that's why we communicated about this

22 inspection.

23 BY MR. MORGAN:

24 Q.    Just following up on the Court's question then, other than

25 being directed to give advance notice of your on-site

1  inspection, was there any other guidance given to you with

2  regard to this inspection?

3  A.    Guidance in reference to what?

4  Q.    In reference to your supervisors talking to you about what

5  you, you know, could and couldn't see or do with regard to this

6  inspection because it was a COVID inspection.

7           MR. BUCHANAN:  Same objection, Your Honor.

8           THE COURT:  Overruled.

9           THE WITNESS:  We just wanted to make sure that we

10  were adequately prepared and safe to do a COVID-19 inspection.

11           I do my inspections as I would normally do an

12  inspection.  I walk around with the employer, and that's what

13  we did.

14           It's just we had to -- I had to wear appropriate

15  personal protective equipment to do this inspection, so we just

16  had to set that up in addition to the normal on-site inspection

17  work.

18           MR. MORGAN:  Your Honor, I don't have any more

19  questions on this topic or with the witness.

20           Thank you, Ms. Warner.

21           THE WITNESS:  Thank you.

22           THE COURT:  Do you have any cross?

23           MR. BUCHANAN:  I have redirect.

24           THE COURT:  Well, this is actually cross because it

25  wasn't your witness.

1     MR. BUCHANAN:  I have just one question, Your Honor.

2                      CROSS EXAMINATION

3  BY MR. BUCHANAN:

4  Q.   When you conducted the on-site, did someone from the

5  company take your temperature before you entered the building?

6  A.   Yes.

7          MR. BUCHANAN:  That's all I have.

8          THE COURT:  All right.  You may step down.

9          Tell me what -- counsel, have you guys got together

10 and discussed a time frame for additional briefing based on the

11 results of today's hearing?

12         MR. SELIGMAN:  Your Honor, this is David Seligman.  I

13 don't believe we've completed conversations.  We would be happy

14 to resume them, particularly in light of -- frankly, I think we

15 will probably want the briefing to be based in part on when we

16 receive the transcript.  I know it has been a very long day for

17 the court reporter.

18         THE COURT:  You're breaking up again, Mr. Seligman.

19 You need a better iPad there or something.  I don't know.

20         MR. SELIGMAN:  I think that we can resume those

21 conversations with the Government regarding a timeline for

22 post-hearing briefing.

23         THE COURT:  Well, can we decide on it now?  Let's

24 figure out how much time do we need to do our briefing.

25         MR. SELIGMAN:  I think from our perspective, Your

 1 | Honor, we would need a week after the transcript comes in.

 2 | THE COURT:  Okay.  Suzanne, how long is it going to

 3 | be for the transcript?

 4 | MS. HALKO:  They said they wanted it on an expedited

 5 | basis.  I can have it to them by next Thursday or Friday.

 6 | THE COURT:  So that would be the 13th for briefing by

 7 | the Plaintiffs, is that right?

 8 | MR. SELIGMAN:  That's fine for us, Your Honor.

 9 | THE COURT:  The transcript will be available by next

10 | Friday, the 6th, and then you said you needed a week, is that

11 | correct?

12 | MR. SELIGMAN:  Yes, Your Honor.

13 | THE COURT:  And then the Government will take a week

14 | after that?

15 | MR. HAMPTON:  Yes, Your Honor.

16 | THE COURT:  That's the 20th.

17 | Then any reply briefs should be filed by the

18 | following Wednesday, which would be the 25th.

19 | MS. SEMPA:  The 26th.

20 | THE COURT:  I thought the 13th and 20th are Fridays.

21 | MS. SEMPA:  No, they're Thursdays.

22 | THE COURT:  Okay.  Thank you.  We will do the 14th

23 | and 21st and 26th for any reply briefs.

24 | Now, page limits.  Like I said, I don't want -- I'm

25 | not interested in a lot of fluff.  I'm interested in getting to

1  the meat of the matter.

2          The things I'm most concerned about are obviously

3  whether I have jurisdiction under Subsection 662(d) and how

4  that reads with respect to the rest of 662.

5          After that I am most interested in, if I do have

6  jurisdiction under that section then, were the activities of

7  OSHA arbitrary and capricious under Section D?  They are the

8  issues that I am most concerned with in this case.  They are

9  the things that I'm interested in.

10          How many pages do you need, gentlemen?

11          MR. SELIGMAN:  Your Honor, I'm having a hard time

12  translating into pages now.

13          THE COURT:  Briefs, no more than 25 pages.  If

14  there's a reply brief that's being filed by anybody, it's no

15  more than seven pages.

16          The parties can do away with, as I said, any fluff,

17  any, you know, reading, telling me all of this stuff that you

18  would normally put in briefs to make them look like they extend

19  in pages and you can bill your clients at a higher rate.

20          All I care about is getting to the points, getting to

21  the matters and the law succinctly and particularly.

22          Where do I care most?  In all honesty, the Supreme

23  Court of the United States and the Third Circuit Court of

24  Appeals.  They are the only two courts that I'm bound by, so

25  they're the ones that are most important to me in terms of my

1  review of case law.

2         After that, additional circuits or districts or

3  whatever, we'll certainly read anything that you have in there,

4  but the ones that I will be most focused on will be opinions

5  from the United States Supreme Court and United States Court of

6  Appeals for the Third Circuit.

7         MR. HAMPTON:  I have one more matter, Your Honor.

8         I hardly just want to bring this out, but I have been

9  instructed to do so.  We still have the motion to dismiss

10  pending before you and we would like a ruling on that.

11         THE COURT:  Prior to briefing?

12         MR. HAMPTON:  That's --

13         THE COURT:  Okay.  The answer is you won't until

14  after we get the briefing on the case, and then I will make a

15  decision once I have received all the briefing as to that

16  issue.

17         MR. HAMPTON:  Yes, Your Honor.

18         THE COURT:  Thank you all very much for being patient

19  and have a nice night.

20     (At this time, the proceedings in the above-captioned

21  matter adjourned.)

22

23

24

25

# C E R T I F I C A T E

I, SUZANNE A. HALKO, Official Court Reporter for the United States District Court for the Middle District of Pennsylvania, appointed pursuant to the provisions of Title 28, United States Code, Section 753, do hereby certify that the foregoing is a true and correct transcript of the within-mentioned proceedings had in the above-mentioned and numbered cause on the date or dates hereinbefore set forth; and I do further certify that the foregoing transcript has been prepared by me or under my supervision.

_____
SUZANNE A. HALKO, RMR,CRR
Official Court Reporter

REPORTED BY:

    SUZANNE A. HALKO, RMR,CRR
    Official Court Reporter
    United States District Court
    Middle District of Pennsylvania
    Scranton, Pennsylvania  18501

        (The foregoing certificate of this transcript
does not apply to any reproduction of the same by any means
unless under the direct control and/or supervision of the
certifying reporter.)